Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 19, 2023

2023 CO 63

**No. 23SA300, *Anderson v. Griswold* — Election Law — Fourteenth Amendment — First Amendment — Political Questions — Hearsay.**

In this appeal from a district court proceeding under the Colorado Election Code, the supreme court considers whether former President Donald J. Trump may appear on the Colorado Republican presidential primary ballot in 2024. A majority of the court holds that President Trump is disqualified from holding the office of President under Section Three of the Fourteenth Amendment to the United States Constitution. Because he is disqualified, it would be a wrongful act under the Election Code for the Colorado Secretary of State to list him as a candidate on the presidential primary ballot. The court stays its ruling until January 4, 2024, subject to any further appellate proceedings.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2023 CO 63**

**Supreme Court Case No. 23SA300**
*Appeal Pursuant to § 1-1-113(3), C.R.S. (2023)*
District Court, City and County of Denver, Case No. 23CV32577
Honorable Sarah B. Wallace, Judge

**Petitioners-Appellants/Cross-Appellees:**

Norma Anderson, Michelle Priola, Claudine Cmarada, Krista Kafer, Kathi Wright, and Christopher Castilian,

v.

**Respondent-Appellee:**

Jena Griswold, in her official capacity as Colorado Secretary of State,

**and**

**Intervenor-Appellee:**

Colorado Republican State Central Committee, an unincorporated association,

**Intervenor-Appellee/Cross-Appellant:**

Donald J. Trump.

**Order Affirmed in Part and Reversed in Part**
*en banc*
December 19, 2023

**Attorneys for Petitioners-Appellants/Cross-Appellees:**
KBN Law, LLC
Mario Nicolais
*Lakewood, Colorado*

Tierney Lawrence Stiles LLC
Martha M. Tierney
*Denver, Colorado*

Olson Grimsley Kawanabe Hinchcliff & Murray LLC
Eric Olson
Sean Grimsley
Jason Murray
*Denver, Colorado*

Donald Sherman
Nikhel Sus
Jonathan Maier
*Washington, District of Columbia*

**Attorneys for Respondent-Appellee:**
Philip J. Weiser, Attorney General
Michael Kotlarczyk, Senior Assistant Attorney General
Jennifer L. Sullivan, Deputy Attorney General
*Denver, Colorado*

**Attorneys for Intervenor-Appellee Colorado Republican State Central Committee:**
Melito Law LLC
Michael Melito
*Denver, Colorado*

Podoll & Podoll, P.C.
Robert A. Kitsmiller
*Greenwood Village, Colorado*

**Attorneys for Intervenor-Appellee/Cross-Appellant Donald J. Trump:**
Gessler Blue LLC
Scott E. Gessler
Geoffrey N. Blue
*Greenwood Village, Colorado*

**Attorneys for Amici Curiae Floyd Abrams, Bruce Ackerman, Maryam Ahranjani, Lee C. Bollinger, Erwin Chemerinsky, Alan Chen, Kent Greenfield, Martha Minow, and Geoffrey R. Stone:**
Keker Van Nest & Peters LLP
Steven A. Hirsch
    *San Francisco, California*

Rathod Mohamedbhai LLC
Edward C. Hopkins Jr.
    *Denver, Colorado*

**Attorneys for Amici Curiae Professors Carol Anderson and Ian Farrell:**
Ballard Spahr LLP
Matthew A. Morr
    *Denver, Colorado*

Ballard Spahr LLP
Burt M. Rublin
    *Philadelphia, Pennsylvania*

**Attorneys for Amici Curiae Colorado Common Cause and Mary Estill Buchanan:**
Rosenblatt, Gosch & Reinken, PLLC
William R. Reinken
    *Greenwood Village, Colorado*

**Attorneys for Amicus Curiae Constitutional Accountability Center:**
Ernst Legal Group, LLC
Dan Ernst
    *Denver, Colorado*

**Amicus Curiae Treniss Jewell Evans III, pro se**
    *Forney, Texas*

**Attorneys for Amicus Curiae Free Speech for People:**
Martinez Law Colorado, LLC
Anna N. Martinez
    *Denver, Colorado*

Martinez Law, LLC
Esteban A. Martinez
　　*Longmont, Colorado*

**Attorneys for Amicus Curiae Professor Mark A. Graber:**
The Paul Wilkinson Law Firm LLC
Nelson Boyle
　　*Denver, Colorado*

**Attorneys for Amici Curiae Kansas Republican Party, Delaware Republican Party, Michigan Republican Party, North Dakota Republican Party, Oklahoma Republican Party, West Virginia Republican Party, Wisconsin Republican Party, Wyoming Republican Party, Delaware Republican Party, Georgia Republican Party, Nebraska Republican Party, Maine Republican Party, Idaho Republican Party, and Rhode Island Republican Party:**
McGowne Law Offices, P.A.
Christopher J. McGowne
　　*Hays, Kansas*

**Attorneys for Amicus Curiae Professor Kurt T. Lash:**
Illingworth Law, LLC
David W. Illingworth II
　　*Woodland Park, Colorado*

**Attorneys for Amicus Curiae Professor Derek T. Muller:**
Covenant Law PLLC
Ian Speir
　　*Colorado Springs, Colorado*

**Attorneys for Amici Curiae Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee:**
Brownstein Hyatt Farber Schreck, LLP
Christopher O. Murray
Julian R. Ellis, Jr.
　　*Denver, Colorado*

**Attorneys for Amici Curiae States of Indiana, West Virginia, Alabama, Alaska, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North**

**Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming:**
Office of the Attorney General
James A. Barta, Solicitor General
*Indianapolis, Indiana*

Office of the Attorney General
Michael R. Williams, Principal Deputy Solicitor General
*Charleston, West Virginia*

Nussbaum Gleason
Andrew Nussbaum
*Colorado Springs, Colorado*

**Attorneys for Amicus Curiae Professor Seth Barrett Tillman:**
The Reisch Law Firm, LLC
R. Scott Reisch
Jessica L. Hays
*Denver, Colorado*

Josh Blackman LLC
Josh Blackman
*Houston, Texas*

**Attorneys for Amici Curiae Wyoming Secretary of State Chuck Gray, Missouri Secretary of State Jay Ashcroft, and Ohio Secretary of State Frank LaRose:**
West Group Law & Policy
Suzanne M. Taheri
*Denver, Colorado*

**PER CURIAM.**
**CHIEF JUSTICE BOATRIGHT** dissented.
**JUSTICE SAMOUR** dissented.
**JUSTICE BERKENKOTTER** dissented.

PER CURIAM.[1]

¶1     More than three months ago, a group of Colorado electors eligible to vote in the Republican presidential primary—both registered Republican and unaffiliated voters ("the Electors")—filed a lengthy petition in the District Court for the City and County of Denver ("Denver District Court" or "the district court"), asking the court to rule that former President Donald J. Trump ("President Trump") may not appear on the Colorado Republican presidential primary ballot.

¶2     Invoking provisions of Colorado's Uniform Election Code of 1992, §§ 1-1-101 to 1-13-804, C.R.S. (2023) (the "Election Code"), the Electors requested that the district court prohibit Jena Griswold, in her official capacity as Colorado's Secretary of State ("the Secretary"), from placing President Trump's name on the presidential primary ballot. They claimed that Section Three of the Fourteenth Amendment to the U.S. Constitution ("Section Three") disqualified President Trump from seeking the presidency. More specifically, they asserted that he was ineligible under Section Three because he engaged in insurrection on January 6, 2021, after swearing an oath as President to support the U.S. Constitution.

---

[1] Consistent with past practice in election-related cases with accelerated timelines, we issue this opinion per curiam. *E.g.*, *Kuhn v. Williams*, 2018 CO 30M, 418 P.3d 478; *In re Colo. Gen. Assemb.*, 332 P.3d 108 (Colo. 2011); *In re Reapportionment of Colo. Gen. Assemb.*, 647 P.2d 191 (Colo. 1982).

¶3 After permitting President Trump and the Colorado Republican State Central Committee ("CRSCC"; collectively, "Intervenors") to intervene in the action below, the district court conducted a five-day trial. The court found by clear and convincing evidence that President Trump engaged in insurrection as those terms are used in Section Three. *Anderson v. Griswold*, No. 23CV32577, ¶¶ 241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023). But, the district court concluded, Section Three does not apply to the President. *Id.* at ¶ 313. Therefore, the court denied the petition to keep President Trump off the presidential primary ballot. *Id.* at Part VI. Conclusion.

¶4 The Electors and President Trump sought this court's review of various rulings by the district court. We affirm in part and reverse in part. We hold as follows:

- The Election Code allows the Electors to challenge President Trump's status as a qualified candidate based on Section Three. Indeed, the Election Code provides the Electors their only viable means of litigating whether President Trump is disqualified from holding office under Section Three.

- Congress does not need to pass implementing legislation for Section Three's disqualification provision to attach, and Section Three is, in that sense, self-executing.

- Judicial review of President Trump's eligibility for office under Section Three is not precluded by the political question doctrine.

7

- Section Three encompasses the office of the Presidency and someone who has taken an oath as President. On this point, the district court committed reversible error.

- The district court did not abuse its discretion in admitting portions of Congress's January 6 Report into evidence at trial.

- The district court did not err in concluding that the events at the U.S. Capitol on January 6, 2021, constituted an "insurrection."

- The district court did not err in concluding that President Trump "engaged in" that insurrection through his personal actions.

- President Trump's speech inciting the crowd that breached the U.S. Capitol on January 6, 2021, was not protected by the First Amendment.

¶5 The sum of these parts is this: President Trump is disqualified from holding the office of President under Section Three; because he is disqualified, it would be a wrongful act under the Election Code for the Secretary to list him as a candidate on the presidential primary ballot.

¶6 We do not reach these conclusions lightly. We are mindful of the magnitude and weight of the questions now before us. We are likewise mindful of our solemn duty to apply the law, without fear or favor, and without being swayed by public reaction to the decisions that the law mandates we reach.

¶7 We are also cognizant that we travel in uncharted territory, and that this case presents several issues of first impression. But for our resolution of the Electors' challenge under the Election Code, the Secretary would be required to include President Trump's name on the 2024 presidential primary ballot.

8

Therefore, to maintain the status quo pending any review by the U.S. Supreme Court, we stay our ruling until January 4, 2024 (the day before the Secretary's deadline to certify the content of the presidential primary ballot). If review is sought in the Supreme Court before the stay expires on January 4, 2024, then the stay shall remain in place, and the Secretary will continue to be required to include President Trump's name on the 2024 presidential primary ballot, until the receipt of any order or mandate from the Supreme Court.

## I. Background

¶8 On November 8, 2016, President Trump was elected as the forty-fifth President of the United States. He served in that role for four years.

¶9 On November 7, 2020, Joseph R. Biden, Jr., was elected as the forty-sixth President of the United States. President Trump refused to accept the results, but President Biden now occupies the office of the President.

¶10 On December 14, 2020, the Electoral College officially confirmed the results: 306 electoral votes for President Biden; 232 for President Trump. President Trump continued to challenge the outcome, both in the courts and in the media.

¶11 On January 6, 2021, pursuant to the Twelfth Amendment, U.S. Const. amend. XII, and the Electoral Count Act, 3 U.S.C. § 15, Congress convened a joint session to certify the Electoral College votes. President Trump held a rally that morning at the Ellipse in Washington, D.C. at which he, along with several others,

9

spoke to the attendees. In his speech, which began around noon, President Trump persisted in rejecting the election results, telling his supporters that "[w]e won in a landslide" and "we will never concede." He urged his supporters to "confront this egregious assault on our democracy"; "walk down to the Capitol . . . [and] show strength"; and that if they did not "fight like hell, [they would] not . . . have a country anymore." Before his speech ended, portions of the crowd began moving toward the Capitol. Below, we discuss additional facts regarding the events of January 6, as relevant to the legal issues before us.

¶12    Just before 4 a.m. the next morning, January 7, 2021, Vice President Michael R. Pence certified the electoral votes, officially confirming President Biden as President-elect of the United States.

¶13    President Trump now seeks the Colorado Republican Party's 2024 presidential nomination.

## II.  Procedural History

¶14    On September 6, 2023, the Electors initiated these proceedings against the Secretary in Denver District Court under sections 1-4-1204(4), 1-1-113(1), 13-51-105, C.R.S. (2023), and C.R.C.P. 57(a). In their Verified Petition, the Electors challenged the Secretary's authority to list President Trump "as a candidate on the 2024 Republican presidential primary election ballot and any future election ballot, based on his disqualification from public office under Section [Three]."

10

¶15     President Trump intervened and almost immediately filed a Notice of Removal to federal court, asserting federal question jurisdiction. *See* 28 U.S.C. §§ 1331, 1441(a), 1446. In light of the removal, the Denver District Court closed the case on September 8. On September 12, the federal district court remanded the case back to state court, concluding that it lacked jurisdiction because the Electors had no Article III standing and the Secretary had neither joined nor consented to the removal.

¶16     Once the Electors filed proof with the Denver District Court that all parties had been served, the court reopened the case on September 14. At a status conference four days later, on September 18, the Secretary emphasized that she must certify the candidates for the 2024 presidential primary ballot by January 5. *See* § 1-4-1204(1). The court set the matter for a five-day trial, beginning on October 30. On September 22, with the parties' input, the court issued expedited case management deadlines for a host of matters, including the disclosure of expert reports, witness lists and exhibits, as well as for briefing and argument on several motions. The court also granted CRSCC's motion to intervene on October 5.

¶17     On October 11, the Secretary's office received (1) President Trump's signed and notarized statement of intent to run as a candidate for a major political party in the presidential primary; (2) the approval form for him to do so, signed by the chair of the Colorado Republican Party, asserting that President Trump was "bona

11

fide and affiliated with the [Republican] party"; and (3) the requisite filing fee. *See* § 1-4-1204(1)(c).

¶18 On October 20, the district court issued an Omnibus Order addressing many outstanding motions. Regarding President Trump's motions, the court reached three conclusions that are relevant now: (1) the Electors' petition involved constitutional questions, but remained "a challenge against an election official based on her alleged duties under the Election Code," and "such a claim [was] proper under [section] 1-1-113 as a matter of procedure"; (2) "[section] 1-4-1204 expressly incorporates [section] 1-1-113, and [section] 1-1-113 does not limit challenges to acts that have already occurred, but rather provides for relief when the Secretary is 'about to' take an improper or wrongful act"—thus, because the Electors had alleged such an act, the matter was ripe for decision; and (3) it could not conclude, as a matter of law, that the Fourteenth Amendment excludes a candidate from the presidential primary ballot or that the Secretary has the authority to determine candidate qualifications, so those issues would be determined at the trial.

¶19 Regarding CRSCC's motions, the court, in relevant part, concluded that the state does not violate a political party's First Amendment associational rights by excluding constitutionally ineligible candidates from the presidential primary ballot, but also rejected CRSCC's argument to the extent it purported to raise an

12

independent constitutional claim beyond the proper scope of a section 1-1-113 proceeding.

¶20 On October 23, President Trump filed a petition for review in this court, asking us to exercise original jurisdiction to halt the scheduled trial. Four days later, we denied the petition without passing judgment on the merits of any of President Trump's contentions.

¶21 On October 25, the district court denied President Trump's Fourteenth-Amendment-based motion to dismiss. As relevant now, the court concluded that (1) it would not dismiss the case under the political question doctrine, but it reserved the right to revisit the doctrine "to the extent that there is any evidence or argument at trial that provides the Court with additional guidance on whether the issue of presidential eligibility has been delegated to the United States Congress"; (2) whether Section Three is self-executing is irrelevant because section 1-4-1204 allows the Secretary to exclude constitutionally disqualified candidates, and states "can, and have, applied Section [Three] pursuant to state statutes without federal enforcement legislation"; and (3) it would reserve for trial the issues of whether Section Three applies to a President and whether President Trump had engaged in insurrection.

¶22 The trial began, as scheduled, on October 30. The evidentiary portion lasted five days, with closing arguments almost two weeks later, on November 15.

During those two weeks, the Electors, the Secretary, President Trump, and CRSCC submitted proposed findings of fact and conclusions of law. The court issued its written final order on November 17, finding, by clear and convincing evidence, that the events of January 6 constituted an insurrection and President Trump engaged in that insurrection. The court further concluded, however, that Section Three does not apply to a President because, as the terms are used in Section Three, the Presidency is not an "office . . . under the United States" nor is the President "an officer of the United States" who had "previously taken an oath . . . to support the Constitution of the United States." U.S. Const. amend. XIV, § 3; *see Anderson*, ¶¶ 299–315. Accordingly, the Secretary could not exclude President Trump's name from the presidential primary ballot. *Anderson*, Part VI. Conclusion.

¶23 On November 20, both the Electors and President Trump sought this court's review of the district court's rulings under section 1-1-113(3). We accepted jurisdiction of the parties' cross-petitions. Following extensive briefing from the parties and over a dozen amici, we held oral argument on December 6 and now issue this ruling.

### III. Analysis

¶24 We begin with an overview of Section Three. We then address threshold questions regarding (1) whether the Election Code provides a basis for review of the Electors' claim, (2) whether Section Three requires implementing legislation

14

before its disqualification provision attaches, and (3) whether Section Three poses a nonjusticiable political question. After concluding that these threshold issues do not prevent us from reaching the merits, we consider whether Section Three applies to a President. Concluding that it does, we address the admissibility of Congress's January 6 Report (the "Report") before reviewing, and ultimately upholding, the district court's findings of fact and conclusions of law in support of its determination that President Trump engaged in insurrection. Lastly, we consider and reject President Trump's argument that his speech on January 6 was protected by the First Amendment.[2]

### A. Section Three of the Fourteenth Amendment and Principles of Constitutional Interpretation

¶25    The end of the Civil War brought what one author has termed a "second founding" of the United States of America. *See* Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (2019). Reconstruction ushered in the Fourteenth Amendment, which includes Section Three, a provision

---

[2] President Trump also listed a challenge to the traditional evidentiary standard of proof for issues arising under the Election Code as a potential question on appeal, claiming that "[w]hen particularly important individual interests such as a constitutional right [is] at issue, the proper standard of proof requires more than a preponderance of the evidence." As noted above, the district court held that the Electors proved their challenge by clear and convincing evidence. And because President Trump chose not to brief this issue, he has abandoned it. *See People v. Eckley*, 775 P.2d 566, 570 (Colo. 1989).

addressing what to do with those individuals who held positions of political power before the war, fought on the side of the Confederacy, and then sought to return to those positions. *See* National Archives, *14th Amendment to the U.S. Constitution: Civil Rights (1868)*, https://www.archives.gov/milestone-documents/14th-amendment#:~:text=Passed%20by%20Congress%20June%2013,Rights%20to%20formerly%20enslaved%20people [https://perma.cc/5EZU-ABV3] (explaining that the Fourteenth Amendment was passed by Congress on June 13, 1866, and officially ratified on July 9, 1868); *see also* Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 91–92 (2021).

¶26 Section Three provides:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3.

¶27 In interpreting a constitutional provision, our goal is to prevent the evasion of the provision's legitimate operation and to effectuate the drafters' intent. *People v. Smith*, 2023 CO 40, ¶ 20, 531 P.3d 1051, 1055. To do so, we begin with

Section Three's plain language, giving its terms their ordinary and popular meanings. *Id.* "To discern such meanings, we may consult dictionary definitions." *Id.*

¶28 If the language is clear and unambiguous, then we enforce it as written, and we need not turn to other tools of construction. *Id.* at ¶ 21, 531 P.3d at 1055. However, if the provision's language is reasonably susceptible of multiple interpretations, then it is ambiguous, and we may consider "the textual, structural, and historical evidence put forward by the parties," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012), and we will construe the provision "in light of the objective sought to be achieved and the mischief to be avoided," *Smith*, ¶ 20, 531 P.3d at 1055 (quoting *Colo. Ethics Watch v. Senate Majority Fund, LLC*, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1254).

¶29 These principles of constitutional interpretation apply to all sections of this opinion in which we address the meaning of any constitutional provision.

## B. The State Court Has the Authority to Adjudicate a Challenge to Presidential Candidate Qualifications Under the Election Code

¶30 The Electors' claim is grounded in sections 1-4-1204 and 1-1-113 of the Election Code. They argue that it would be a breach of duty or other wrongful act under the Election Code for the Secretary to place President Trump on the presidential primary ballot because he is not a "qualified candidate" based on

17

Section Three's disqualification. § 1-4-1203(2)(a), C.R.S. (2023). The Electors therefore seek an order pursuant to section 1-1-113 directing the Secretary not to list President Trump on the presidential primary ballot for the election to be held on March 5, 2024 (or any future ballot).

¶31 President Trump and CRSCC contend that Colorado courts lack jurisdiction over the Electors' claim and that the Electors cannot state a proper section 1-1-113 claim, in part because the Electors' claim is a "constitutional claim" that cannot be raised in a section 1-1-113 action under this court's decisions in *Frazier v. Williams*, 2017 CO 85, 401 P.3d 541, and *Kuhn v. Williams*, 2018 CO 30M, 418 P.3d 478 (per curiam). CRSCC also argues that the Secretary lacks authority to interfere with a political party's decision-making process or to interfere with the party's First Amendment right of association to select its own candidates. Lastly, President Trump argues that the expedited procedures under section 1-1-113 are insufficient to evaluate the Electors' claim.

¶32 Before considering each of these arguments in turn, we first explain the standard of review for statutory interpretation and then provide an overview of the Election Code provisions at issue. Turning to Intervenors' contentions, we first conclude that the district court had jurisdiction to adjudicate the Electors' claim under section 1-1-113. But, recognizing that the ability to exercise *jurisdiction* here does not mean the Electors can state a *proper claim* under section 1-1-113, we

18

explore whether states have the constitutional power to assess presidential qualifications. We conclude that they do, provided their legislatures have established such authority by statute. Analyzing the relevant provisions of the Election Code, we then conclude that the General Assembly has given Colorado courts the authority to assess presidential qualifications and, therefore, that the Electors have stated a proper claim under sections 1-4-1204 and 1-1-113. We next address Intervenors' related arguments and conclude that limiting the presidential primary ballot to constitutionally qualified candidates does not interfere with CRSCC's associational rights under the First Amendment. Finally, we conclude that section 1-1-113 provides sufficient due process for evaluating whether a candidate satisfies the constitutional qualifications for the office he or she seeks.

### 1. Standard of Review

¶33 We review the district court's interpretation of the relevant statutes de novo. *Griswold v. Ferrigno Warren*, 2020 CO 34, ¶ 16, 462 P.3d 1081, 1084. In doing so, "[o]ur primary objective is to effectuate the intent of the General Assembly by looking to the plain meaning of the language used, considered within the context of the statute as a whole." *Mook v. Bd. of Cnty. Comm'rs*, 2020 CO 12, ¶ 24, 457 P.3d 568, 574 (alteration in original) (quoting *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010)). When a term is undefined, "we construe a statutory term in accordance with its ordinary or natural meaning." *Id.* (quoting *Cowen v. People*, 2018 CO 96, ¶ 14,

19

431 P.3d 215, 218).  If the language is clear, we apply it as written.  *Ferrigno Warren*, ¶ 16, 462 P.3d at 1084.

¶34    If, however, the language is reasonably susceptible of multiple interpretations, we may turn to other tools of construction to guide our interpretation.  *Cowen*, ¶ 12, 431 P.3d at 218.  These may include consideration of the purpose of the statute, the circumstances under which the statute was enacted, the legislative history, and the consequences of a particular construction. § 2-4-203(1), C.R.S. (2023).  We also avoid constructions that would yield illogical or absurd results.  *Educhildren LLC v. Cnty. of Douglas Bd. of Equalization*, 2023 CO 29, ¶ 27, 531 P.3d 986, 993.

## 2.  Presidential Primaries Under the Election Code

¶35    Before addressing the merits, we provide a brief overview of the Election Code's provisions relating to presidential primary elections.  Article VII, Section 11 of the Colorado Constitution commands the General Assembly to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Pursuant to this constitutional mandate, the Secretary's duties under the Election Code include supervising the conduct of primary and general elections in the state and enforcing the provisions of the Election Code.  § 1-1-107(1)(a)–(b), (5), C.R.S. (2023).

¶36　Part 12 of article 4 of the Election Code governs presidential primary elections. *See generally* §§ 1-4-1201 to -1207, C.R.S. (2023).[3] Section 1-4-1201, C.R.S. (2023), explains that "it is the intent of the People of the State of Colorado that the provisions of this part 12 conform to the requirements of federal law and national political party rules governing presidential primary elections." This reference indicates that the legislature envisioned part 12 as operating in harmony with

---

[3] Before 1990, Colorado's political parties used caucuses to nominate their presidential candidates. That year, Colorado voters adopted a referred measure establishing presidential primary elections. *See generally* Ch. 42, sec. 1–2, §§ 1-4-1101 to -1104, 1990 Colo. Sess. Laws 311, 311–13. The legislature later amended these statutes as part of a 1992 repeal and reenactment of the Election Code. *See* Ch. 118, sec. 7, §§ 1-4-1201 to -1207, 1992 Colo. Sess. Laws 624, 696–99. These amendments added the precursor to current section 1-4-1204(4): they permitted "challenges concerning the right of any candidate's name to appear on the ballot of the presidential primary election" but directed the Secretary (not a court) to hear and assess the validity of such challenges. Ch. 118, sec. 7, § 1-4-1203(4), 1992 Colo. Sess. Laws at 697–98.

Colorado eliminated presidential primary elections in 2003. Ch. 24, sec. 6, 2003 Colo. Sess. Laws 495, 496. In 2016, however, voters restored such elections through Proposition 107, a citizen-initiated measure. Proposition 107, Ballot Initiative No. 140, https://www.coloradosos.gov/pubs/elections/Initiatives/titleBoard/filings/2015-2016/140Final.pdf [https://perma.cc/7TX8-J59L]. Proposition 107 largely preserved the pre-2003 version of section 1-4-1204(4) that vested the Secretary with the power to hear challenges to the listing of presidential primary candidates. *Id.* at 61. In a 2017 clean-up bill, the General Assembly adopted several amendments to the citizen-initiated measure "to facilitate the effective implementation of the state's election laws." S.B. 17-305, 71st Gen. Assemb., Reg. Sess. (Colo. 2017). Relevant here, the legislature directed challenges under section 1-4-1204(4) away from the Secretary and instead to the district court through section 1-1-113 proceedings. *Id.* at 4–5. Section 1-4-1204(4) has remained otherwise unchanged since its reenactment.

federal law, including requirements governing presidential primary elections. As such, it is instructive when interpreting other provisions of part 12.

¶37 The Election Code limits participation in the presidential primary to "qualified" candidates. § 1-4-1203(2)(a) ("[E]ach political party that has a *qualified* candidate . . . is entitled to participate in the Colorado presidential primary election."[4] (emphasis added)); *see also* §§ 1-4-1101(1), -1205, C.R.S. (2023) (allowing a write-in candidate to participate in the presidential primary election if he or she submits an affidavit stating he or she is "qualified to assume" the duties of the office if elected). As a practical matter, the mechanism through which a presidential primary hopeful attests that he or she is a "qualified candidate" is the "statement of intent" (or "affidavit of intent") filed with the Secretary.[5] *See* § 1-4-1204(1)(c) (requiring candidates to submit to the Secretary a notarized "statement of intent"); § 1-4-1205 (requiring a write-in candidate to file a notarized

---

[4] In full, the quoted language reads: "[E]ach political party that has a qualified candidate entitled to participate in the presidential primary election pursuant to this section is entitled to participate in the Colorado presidential primary election." § 1-4-1203(2)(a). The phrase "pursuant to this section" sheds no light on the meaning of "qualified candidate." Section 1-4-1203 simply establishes the mechanics of presidential primaries, such as the date of the primary, elector party affiliation rules, and the content of primary ballots. § 1-4-1203(1), (2)(a), (4). Thus, "pursuant to this section" modifies the "presidential primary election" in which qualified candidates are entitled to participate: an election conducted in accordance with section 1-4-1203.

[5] In this context, the legislature appears to have used "statement" and "affidavit" interchangeably.

22

"statement of intent" in order for votes to be counted for that candidate and stating that "such affidavit" must be accompanied by the requisite filing fee).

¶38 The Secretary's statement-of-intent form for a major party presidential primary candidate requires the candidate to affirm via checkboxes that he or she meets the qualifications set forth in Article II of the U.S. Constitution for the office of President; specifically, that the candidate is at least thirty-five years old, has been a resident of the United States for at least fourteen years, and is a natural-born U.S. citizen. Colo. Sec'y of State, *Major Party Candidate Statement of Intent for Presidential Primary*, https://www.sos.state.co.us/pubs/elections/Candidates/files/MajorPartyCandidateStatementOfIntentForPresidentialPrimary.pdf [https://perma.cc/YA3X-3K9T] ("Intent Form"); *see also* U.S. Const. art. II, § 1, cl. 5. The form further requires the candidate to sign an affirmation that states, "I intend to run for the office stated above and *solemnly affirm that I meet all qualifications for the office prescribed by law*."[6] Intent Form, *supra* (emphasis added). No party has challenged the Secretary's authority to require candidates to provide this information on the statement-of-intent form.

---

[6] The Affidavit of Intent for write-in candidates for the presidential primary has the same requirements. *Affidavit of Intent for Presidential Primary Write-In Designation*, Colo. Sec'y of State (last updated June 20, 2023), https://www.sos.state.co.us/pubs/elections/Candidates/files/PresidentialPrimaryWrite-In.pdf [https://perma.cc/V83P-HLAD].

¶39 Section 1-4-1204(1) requires the Secretary to "certify the names and party affiliations of the candidates to be placed on any presidential primary election ballots" not later than sixty days before the presidential primary election. For the 2024 election cycle, that deadline is January 5, 2024.

¶40 Section 1-4-1204(1) further states:

The only candidates whose names shall be placed on ballots for the election shall be those candidates who:

. . . .

(b) Are seeking the nomination for president of a political party as a bona fide candidate for president of the United States pursuant to political party rules and are affiliated with a major political party that received at least twenty percent of the votes cast by eligible electors in Colorado at the last presidential election; and

(c) Have submitted to the secretary not later than eighty-five days before the date of the presidential primary election, a notarized candidate's statement of intent together with either a nonrefundable filing fee of five hundred dollars or a petition signed by at least five thousand eligible electors . . . .

For the 2024 election cycle, the deadline to submit these items was December 11, 2023.

¶41 Section 1-4-1204(4) allows for "challenge[s] to the listing of any candidate on the presidential primary election ballot." Any such challenge must be brought "no later than five days after the filing deadline for candidates" and "must provide notice . . . of the alleged impropriety that gives rise to the complaint." *Id.* The district court must hold a hearing no later than five days after the challenge is filed

24

to "assess the validity of all alleged improprieties." *Id.* The statute does not limit the length or content of the hearing; it does, however, require the district court to issue findings of fact and conclusions of law no later than forty-eight hours after the hearing concludes. *Id.* "The party filing the challenge has the burden to sustain the challenge by a preponderance of the evidence." *Id.*

¶42 Challenges under section 1-4-1204(4) must be brought through the special statutory procedure found in section 1-1-113 for adjudicating controversies that arise under the Election Code. § 1-4-1204(4) (providing that any challenge to the listing of a candidate on the presidential primary ballot "must be made in writing and filed with the district court in accordance with section 1-1-113(1)" and "any order entered by the district court may be reviewed [by the supreme court] in accordance with section 1-1-113(3)").

¶43 Section 1-1-113 has deep roots in Colorado election law. It originated in an 1894 amendment to Colorado's Australian Ballot Law, first adopted by the Eighth General Assembly in 1891. Ch. 7, sec. 5, § 26, 1894 Colo. Sess. Laws 59, 65. Much like its present-day counterpart, the original provision established procedures for adjudicating controversies between election officials and any candidate, political party officers or representatives, or persons making nominations.[7] *Id.*

_____

[7] Over time, the legislature amended the law to strengthen the courts' power to resolve election disputes. For example, in 1910, the General Assembly passed

¶44     The current version of section 1-1-113 establishes (with exceptions not relevant here) "the *exclusive method* for the adjudication of controversies arising from a breach or neglect of duty or other wrongful act that occurs prior to the day of an election."  § 1-1-113(4) (emphasis added).  It provides:

> When any controversy arises between any official charged with any duty or function under this code and any candidate, or any officers or representatives of a political party, or any persons who have made nominations or when any eligible elector files a verified petition in a district court of competent jurisdiction alleging that a person charged with a duty under this code *has committed or is about to commit a breach or neglect of duty or other wrongful act*, after notice to the official which includes an opportunity to be heard, upon a finding of good cause, the district court shall issue an order requiring substantial compliance with the provisions of this code.  The order shall require the person charged to forthwith *perform the duty or to desist from the wrongful act*

---

primary election legislation (not then applicable to presidential elections) authorizing district courts to accept verified petitions alleging, among other things, "that the name of any person has been or is about to be wrongfully placed upon" primary ballots and to order the Secretary (among other election officials) to correct such errors.  Ch. 4, § 25, 1910 Colo. Sess. Laws. 15, 33.  The 1910 law also gave this court the power to review the district court's decision.  *Id.* at 34; *see also People v. Republican State Cent. Comm.*, 226 P. 656, 657 (Colo. 1924) (confirming that if a proper entity "has violated a duty with which it is charged under the act, the court has power to direct it to correct the wrong").

In 1963, the General Assembly repealed and reenacted Colorado's Election Code.  *See generally* Ch. 118, 1963 Colo. Sess. Laws 360.  The 1963 code allowed for "any elector" to show "by verified petition . . . that any neglect of duty or wrongful act by any person charged with a duty under this act has occurred or is about to occur," mirroring the language in today's section 1-1-113.  Ch. 118, § 203, 1963 Colo. Sess. Laws at 457.  The legislature's next reenactment of the code in 1992 codified this procedure at section 1-1-113.  Ch. 118, sec. 1, § 1-1-113, 1992 Colo. Sess. Laws 624, 635.

> or to forthwith show cause why the order should not be obeyed. The burden of proof is on the petitioner.

§ 1-1-113(1) (emphases added).

¶45 Section 1-1-113 proceedings also provide for expedited, albeit discretionary, appellate review in this court. § 1-1-113(3). Either party may seek review from this court within three days after the district court proceedings conclude. *Id.* If this court declines jurisdiction of the case, the district court's decision is final and is not subject to further appellate review. *Id.*

¶46 Although Colorado's expedited statutory procedure for litigating election disputes may be unfamiliar nationally, our courts, particularly the Denver District Court (the proper venue when the Secretary is the named respondent), are accustomed to section 1-1-113 litigation. Such cases arise during virtually every election cycle, and this court has exercised jurisdiction many times to review these disputes. *E.g.*, *Kuhn*, ¶ 1, 418 P.3d at 480; *Frazier*, ¶ 1, 401 P.3d at 542; *Carson v. Reiner*, 2016 CO 38, ¶ 1, 370 P.3d 1137, 1138; *Hanlen v. Gessler*, 2014 CO 24, ¶ 3, 333 P.3d 41, 42. Moreover, it is not uncommon for section 1-1-113 cases to require courts to take evidence and grapple with complex legal issues. *E.g.*, *Ferrigno Warren*, ¶¶ 9–13, 462 P.3d at 1083–84 (describing a district court hearing, held one month after the petitioner filed her verified petition and after the parties filed briefing, to determine whether "substantial compliance" was the appropriate standard for a minimum signature requirement, how to apply that standard, and

27

whether, based on a four-factor test, a prospective U.S. Senate candidate satisfied that standard); *Kuhn*, ¶¶ 4, 15–18, 418 P.3d at 480–82 (describing a district court hearing to assess evidence and testimony concerning the residency of seven circulators of a petition to reelect a congressional representative); *Meyer v. Lamm*, 846 P.2d 862, 867 (Colo. 1993) (requiring an evidentiary hearing in district court that involved, among other things, the content of ballots cast for a write-in candidate). Even early cases recognized that the original 1894 provision "contemplate[d] the taking of evidence where the issues require[d] it." *Leighton v. Bates*, 50 P. 856, 858 (Colo. 1897).

### 3. The District Court Had Jurisdiction to Adjudicate the Electors' Claim Under the Election Code

¶47 President Trump argues that the district court lacked jurisdiction over the Electors' section 1-1-113 action because the Secretary has no duty under the Election Code to investigate a candidate's qualifications. A district court has jurisdiction pursuant to section 1-1-113(1) when: (1) an eligible elector; (2) files a verified petition in a district court of competent jurisdiction; (3) alleging that a person charged with a duty under the Election Code; (4) has committed, or is about to commit, a breach of duty or other wrongful act.

¶48 The district court plainly had jurisdiction under section 1-1-113 to hear the Electors' claim. First, the Electors are "eligible elector[s]" within the meaning of the Election Code because, as Republican and unaffiliated voters, they are

28

"person[s] who meet[] the specific requirements for voting at a specific election"; namely, the Republican presidential primary election. § 1-1-104(16), C.R.S. (2023); *see also* § 1-4-1203(2)(b) (providing that unaffiliated voters may vote in presidential primary elections); § 1-7-201(1), C.R.S. (2023) (identifying eligible electors for the purpose of primary elections). Second, the Electors timely filed their verified petition under sections 1-1-113 and 1-4-1204(4) in the proper district court. Third, their petition was filed against the Secretary, an election official charged with duties under the Election Code. *See* § 1-1-107 (prescribing the powers and duties of the Secretary); § 1-4-1204(1) ("[T]he secretary of state shall certify the names and party affiliations of the candidates to be placed on any presidential primary election ballots."). And fourth, the petition alleged that the Secretary was about to commit a breach of duty or other wrongful act under the Election Code by placing President Trump on the presidential primary ballot because he is not constitutionally qualified to hold office.

¶49    Though it does not affect the district court's *jurisdiction*, President Trump's assertion that the Secretary does not have a duty under the Election Code to determine a candidate's constitutional qualification raises the question of whether the Electors presented a *proper claim*. To answer that question, we must first determine whether, generally, states have the authority to determine presidential qualifications.

29

## 4. States Have the Authority to Assess Presidential Candidates' Qualifications

¶50 "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . ." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Constitution delegates to states the authority to prescribe the "Times, Places and Manner" of holding congressional elections, U.S. Const. art. I, § 4, cl. 1, and states retain the power to regulate their own elections, *Burdick*, 504 U.S. at 433. States exercise these powers through "comprehensive and sometimes complex election codes," regulating the registration and qualifications of voters, the selection and eligibility of candidates, and the voting process itself. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("*Celebrezze*"); *see also, e.g.*, § 1-4-501(1), C.R.S. (2023) (setting qualifications for state office candidates). These powers are uncontroversial and well-explored in U.S. Supreme Court case law.

¶51 But does the U.S. Constitution authorize states to assess the constitutional qualifications of presidential candidates? We conclude that it does.

¶52 Under Article II, Section 1, each state is authorized to appoint presidential electors "in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. So long as a state's exercise of its appointment power does not run afoul of another constitutional constraint, that power is plenary. *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020); *McPherson v. Blacker*, 146 U.S. 1, 25 (1892).

30

¶53 But voters no longer choose between slates of electors on Election Day. *Chiafalo*, 140 S. Ct. at 2321. Instead, they vote for presidential candidates who serve as proxies for their pledged electors. *Id.* Accordingly, states exercise their plenary appointment power not only to regulate the electors themselves, but also to regulate candidate access to presidential ballots. Absent a separate constitutional constraint, then, states may exercise their plenary appointment power to limit presidential ballot access to those candidates who are constitutionally qualified to hold the office of President. And nothing in the U.S. Constitution expressly *precludes* states from limiting access to the presidential ballot to such candidates. *See Lindsay v. Bowen*, 750 F.3d 1061, 1065 (9th Cir. 2014).

¶54 No party in this case has challenged the Secretary's authority to require a presidential primary candidate to confirm on the required statement-of-intent form that he or she meets the Article II requirements of age, residency, and citizenship, and to further attest that he or she "meet[s] all qualifications for the office prescribed by law." Moreover, several courts have expressly upheld states' ability to exclude constitutionally ineligible candidates from their presidential ballots. *See id.* (upholding California's refusal to place a twenty-seven-year-old candidate on the presidential ballot); *Hassan v. Colorado*, 495 F. App'x 947, 948–49 (10th Cir. 2012) (affirming the Secretary's decision to exclude a naturalized citizen from the presidential ballot); *Socialist Workers Party of Ill. v. Ogilvie*, 357 F. Supp.

109, 113 (N.D. Ill. 1972) (per curiam) (affirming Illinois's exclusion of a thirty-one-year-old candidate from the presidential ballot).

¶55 As then-Judge Gorsuch recognized in *Hassan*, it is "a state's legitimate interest in protecting the integrity and practical functioning of the political process" that "permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office." 495 F. App'x at 948.

¶56 The question then becomes whether Colorado has exercised this power through the Election Code. We conclude that it has. Section 1-4-1204(4) is Colorado's vehicle for advancing these state interests. When eligible electors challenge the Secretary's listing on the presidential primary ballot of a candidate who is not constitutionally qualified to assume office, section 1-4-1204(4), as exercised through a proceeding under section 1-1-113, offers an exclusive remedy under the Election Code. *See* § 1-1-113(4).

### 5. The Electors Have Stated a Proper Claim That Is Not Precluded by *Frazier* and *Kuhn*

¶57 President Trump argues that the Electors' claim cannot be properly litigated in a section 1-1-113 action because the Secretary has no duty under the Election Code to investigate a candidate's qualifications and because this court's precedent bars the litigation of constitutional claims in a section 1-1-113 action. Although we agree that the Secretary has no duty to independently investigate the qualifications of a presidential primary candidate, we conclude that the Electors may

32

nevertheless challenge a candidate's qualifications under section 1-4-1204(4), and that the Electors' claim here is not a "constitutional claim" precluded by our decisions in *Frazier* and *Kuhn*.

¶58 In presidential primary elections, the Secretary's duty is to "certify the names and party affiliations of the candidates to be placed on any presidential primary election ballots." § 1-4-1204(1). The conditions that must be satisfied before she can exercise this duty are limited to timely receiving (1) confirmation that the prospective candidate is a "bona fide candidate" under the party's rules, (2) a notarized statement of intent from the candidate, and (3) the requisite filing fee or a petition signed by at least 5,000 eligible electors affiliated with the candidate's political party who reside in Colorado. § 1-4-1204(1)(b)–(c).

¶59 Where a candidate does not submit (or cannot comply with) the required attestations on the statement of intent form, the Secretary cannot list the candidate on the ballot. *See Hassan v. Colorado*, 870 F. Supp. 2d 1192, 1195 (D. Colo. 2012), *aff'd* 495 F. App'x at 948. But if the contents of a signed and notarized statement of intent appear facially complete (i.e., the candidate has filled out the Secretary's form confirming that he or she meets the Article II requirements of age, residency, and citizenship, and further attesting that he or she "meet[s] all qualifications for the office prescribed by law"), the Secretary has no duty to further investigate the

33

accuracy or validity of the information the prospective candidate has supplied.[8] To that extent, we agree with President Trump that the Secretary has no duty to determine, beyond what is apparent on the face of the required documents, whether a presidential candidate is qualified.

¶60 The fact that the Secretary has complied with her section 1-4-1204(1) duties does not, however, foreclose a challenge under section 1-4-1204(4). As discussed above, section 1-4-1204(4) permits "[a]ny challenge to the listing of any candidate on the presidential primary election ballot," using section 1-1-113(1) as a procedural vehicle. Section 1-1-113(1), in turn, creates a cause of action for electors alleging a breach of duty *or other wrongful act* under the code. *See Frazier*, ¶ 3, 401 P.3d at 542 (construing "wrongful act" in section 1-1-113 as limited to a wrongful act under the Election Code). Section 1-1-113 then requires the district court—not the election official—to adjudicate an eligible elector's challenge to a candidate's eligibility. *Carson*, ¶ 8, 370 P.3d at 1139 (observing that the Election Code reflects an intent for challenges to the qualifications of a candidate to be

---

[8] In contrast, with respect to elections for state office, section 1-4-501(1), C.R.S. (2023), provides that "[t]he designated election official shall not certify the name of any designee or candidate . . . *who the designated election official determines is not qualified* to hold the office that he or she seeks based on residency requirements." (Emphasis added.) This provision for state office expressly charges the Secretary with a duty to investigate whether a candidate "meets any requirements of the office relating to registration, residence, or property ownership," among others. *Id.*

resolved by the courts); *Hanlen*, ¶ 40, 333 P.3d at 50 ("[T]he election code requires a court, not an election official, to determine the issue of [candidate] eligibility.").

¶61 As we have explained, the Secretary has complied with her limited duty to accept President Trump's properly completed paperwork. But the Electors have alleged an impending "wrongful act," which is "more expansive than a 'breach' or 'neglect of duty.'" *Frazier*, ¶ 16, 401 P.3d at 545 (quoting § 1-1-113(1)). Indeed, section 1-1-113 "clearly comprehends challenges to a broad range of wrongful acts committed by officials charged with duties under the code," *Carson*, ¶ 17, 370 P.3d at 1141, including any act that is "inconsistent with the Election Code," *Frazier*, ¶ 16, 401 P.3d at 545.

¶62 We conclude that certifying an unqualified candidate to the presidential primary ballot constitutes a "wrongful act" that runs afoul of section 1-4-1203(2)(a) and undermines the purposes of the Election Code. Nothing in section 1-4-1204(4) limits challenges under that provision to those based on a breach of the Secretary's duties under section 1-4-1204. And section 1-4-1203(2)(a) clearly limits participation in the presidential primary to political parties fielding "qualified" candidates. Although section 1-4-1203(2)(a) does not define "qualified," nearby provisions regarding write-in candidates indicate that "qualified" refers to a candidate's qualifications for office. As with bona fide major party candidates under section 1-4-1204(1), write-in candidates for the presidential primary must

file a "notarized candidate statement of intent." § 1-4-1205. Under the Election Code, such statements for all write-in candidates (regardless of the type of election) must indicate that the candidate "desires the office and is *qualified* to assume its duties if elected." § 1-4-1101(1) (emphasis added). The Election Code's explicit requirement that a write-in candidate be "qualified" to assume the duties of their intended office logically implies that major party candidates under 1-4-1204(1)(b) must be "qualified" in the same manner.[9]

¶63    Reading the Election Code as a whole, then, we conclude that "qualified" in section 1-4-1203(2)(a) must mean, at minimum, that a candidate is qualified under the U.S. Constitution to assume the duties of the office of President. It has to, as section 1-4-1203(2)(a) supplies the only textual basis in the Election Code for the Secretary's authority to require a presidential primary candidate to attest to his or her qualifications for office in the candidate statement (or affidavit) of intent. Moreover, to read "qualified" *not* to encompass federal constitutional qualifications would undermine the purpose of the Election Code—"to secure the

---

[9] This interpretation is further supported by the Election Code's treatment of uncontested primaries. The Election Code allows the Secretary to cancel a primary when every political party has no more than one affiliated candidate, whether that candidate is certified to the presidential primary ballot pursuant to section 1-4-1204(1) or is a write-in candidate entering under section 1-4-1205. § 1-4-1203(5). Because the General Assembly plainly treats such candidates as equivalent for purposes of 1-4-1203(5), we conclude that the legislature also viewed the "qualified" requirement in both provisions as equivalent.

36

purity of elections"—while compromising the Secretary's ability to advance that purpose. Colo. Const. art. VII, § 11; § 1-1-107(1), (5).

¶64 We therefore reject such an interpretation as contrary to the purpose of the Election Code. Instead, we conclude that, under the Election Code, "qualified" candidates for the presidential primary are those who, at a minimum, are qualified to hold office under the provisions of the U.S. Constitution.

¶65 We recognize that the Supreme Court has twice declined to address whether Section Three—which *disqualifies* an oath-breaking insurrectionist from *holding* office—amounts to a qualification for office. *Powell v. McCormack*, 395 U.S. 486, 520 n.41 (1969) (describing Section Three and similar disqualification provisions in the federal constitution but declining to address whether such provisions constitute "qualification[s]" for office because "both sides agree[d] that [the candidate] was not ineligible under" Section Three or any other, similar provision); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 787 n.2 (1995) (seeing "no need to resolve" the same question regarding Section Three in a case concerning the propriety of *additional* qualifications for office). But lower courts, when presented squarely with the question, have all but concluded that Section Three is the functional equivalent of a qualification for office. *See, e.g.*, *Greene v. Raffensperger*, 599 F. Supp. 3d 1283, 1316 (N.D. Ga. 2022) ("Section [Three] is an existing constitutional disqualification adopted in 1868—similar to but distinct

from the Article I, Section 2 requirements that congressional candidates be at least 25 years of age, have been citizens of the United States for 7 years, and reside in the states in which they seek to be elected."); *State v. Griffin*, No. D-101-CV-2022-00473, 2022 WL 4295619, at *24 (N.M. Dist. Ct. Sept. 6, 2022) ("Section Three imposes a qualification for public office, much like an age or residency requirement . . . .").

¶66 We perceive no logical distinction between a *disqualification* from office and a *qualification* to assume office, at least for the purposes of the section 1-1-113 claim here. Either way, it would be a wrongful act for the Secretary to list a candidate on the presidential primary ballot who is not "qualified" to assume the duties of the office. Moreover, because Section Three is a "part of the text of the Constitution," assessing a candidate's compliance with it for purposes of determining their eligibility for office does not improperly "add qualifications to those that appear in the Constitution." *U.S. Term Limits*, 514 U.S. at 787 n.2. Doing so merely renders the list of constitutional qualifications more complete.

¶67 Nor are we persuaded by President Trump's assertion that Section Three does not bar him from *running for* or *being elected to* office because Section Three bars individuals only from *holding* office. *Hassan* specifically rejected any such distinction. 495 Fed. App'x at 948. There, the candidate argued that even if Article II "properly holds him ineligible to *assume the office* of president," Colorado could

38

not "deny him *a place on the ballot*." *Id.* The *Hassan* panel concluded otherwise. *Id.* In any event, the provisions in the Election Code governing presidential primary elections do not recognize such a distinction. Rather, as discussed above, those provisions require all presidential primary candidates to be constitutionally "qualified" *before* their names are added to the presidential primary ballot pursuant to section 1-4-1204(1).

¶68  Were we to adopt President Trump's view, Colorado could not exclude from the ballot even candidates who plainly do not satisfy the age, residency, and citizenship requirements of the Presidential Qualifications Clause of Article II. *See* U.S. Const. art. II, § 1, cl. 5 (setting forth the qualifications to be "*eligible to the Office of President*" (emphasis added)). It would mean that the state would be powerless to exclude a twenty-eight-year-old, a non-resident of the United States, or even a foreign national from the presidential primary ballot in Colorado. Yet, as noted, several courts have upheld states' exclusion from ballots of presidential candidates who fail to meet the qualifications for office under Article II. *See Lindsay*, 750 F.3d at 1065; *Hassan*, 495 F. App'x at 948; *Ogilvie*, 357 F. Supp. at 113.

¶69  Lastly, we reject President Trump and CRSCC's argument that state courts may not hear the Electors' claim because this court's precedent bars the litigation of constitutional claims in a section 1-1-113 action. *See Frazier*, ¶ 3, 401 P.3d at 542;

39

*Kuhn*, ¶ 55, 418 P.3d at 489. The Electors have not asserted a constitutional claim, so *Frazier* and *Kuhn* do not control here.

¶70 Both *Frazier* and *Kuhn* addressed whether a petitioner could shoehorn a claim challenging the constitutionality of the Election Code into a section 1-1-113 proceeding. *Frazier*, ¶ 6, 401 P.3d at 543; *Kuhn*, ¶ 55, 418 P.3d at 489. In *Frazier*, we concluded that section 1-1-113 is not a proper vehicle to resolve claims under 42 U.S.C. § 1983 because they do not arise under the Election Code and because the sole remedy available under section 1-1-113 is a court order directing compliance with the Election Code. *Frazier*, ¶¶ 17–18, 401 P.3d at 545. Similarly, in *Kuhn*, we held that to the extent the candidate sought to challenge the constitutionality of the petition circulator residency requirement under the Election Code, the court lacked jurisdiction to address such arguments in a section 1-1-113 proceeding. ¶ 55, 418 P.3d at 489.

¶71 Here, however, the Electors do not challenge the constitutionality of the Election Code. Nor do they allege a violation of the Constitution. Instead, they allege a "wrongful act" under section 1-1-113. That the Electors' claim has constitutional implications or requires interpretation of a constitutional provision does not make it a separate "constitutional claim" of the sort prohibited by *Frazier* and *Kuhn*. And neither President Trump nor CRSCC suggests that a section 1-1-113 claim cannot have constitutional implications. Indeed, as the Secretary

40

notes in her brief, there is nothing "particularly unusual about a section 1-1-113 proceeding raising constitutional issues."

¶72 As discussed above, the Electors' claim is that the Secretary will commit a wrongful act under the Election Code if she lists a candidate on the presidential primary ballot who is not qualified for office. While this claim requires resolving constitutional questions, it remains a challenge brought by eligible electors against an election official regarding an alleged wrongful act under the Election Code. Section 1-1-113 is the "exclusive" vehicle for litigating such challenges prior to an election; the Electors have no other viable option. § 1-1-113(4).

### 6. Limiting Presidential Primary Ballot Access to Constitutionally Qualified Candidates Does Not Interfere with CRSCC's First Amendment Rights

¶73 CRSCC argues that section 1-4-1204(1)(b) vests it with the sole authority to determine who the Republican nominees will be on a ballot—a reflection, CRSCC contends, of its constitutional right to freely associate and exercise its political decisions. *See* U.S. Const. amend. I; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) ("The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas."). Taken to its logical end, CRSCC's position is that it has a First Amendment right to deem any person to be a "bona fide candidate" pursuant to their party rules, § 1-4-1204(1)(b), and subsequently mandate that individual's

placement on the presidential ballot, without regard to that candidate's age, residency, citizenship, *see* U.S. Const. art. II, § 1, cl. 5, or even whether the candidate has already served two terms as President, *see id.* at amend. XXII ("No person shall be elected to the office of the President more than twice . . . ."). We disagree with this position.

¶74 As a threshold matter, we acknowledge that the district court dismissed CRSCC's argument on this issue, ruling that it raised a separate constitutional claim improperly litigated in a section 1-1-113 action. *Anderson*, ¶ 12. We agree that a claim challenging the constitutionality of the Election Code cannot be reviewed under section 1-1-113. *See Kuhn*, ¶ 55, 418 P.3d at 489; *Frazier*, ¶ 3, 401 P.3d at 542. But to the extent that CRSCC argues in its Answer Brief that the Secretary lacks authority to interfere with CRSCC's associational rights, we respond briefly to those concerns.

¶75 We distinguish between (1) CRSCC's right to decide the candidates with whom it affiliates and recognizes as bona fide, and (2) CRSCC's ability to place candidates on the presidential primary ballot. CRSCC's "claim that it has a right to select its own candidate is uncontroversial, so far as it goes." *Timmons*, 520 U.S. at 359. Partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986), and "[a]s a result, political parties' government, structure,

and activities enjoy constitutional protection," *Timmons*, 520 U.S. at 358. In other words, CRSCC is well within its rights to choose with whom it affiliates and to decide which candidates it recognizes as bona fide. "It does not follow, though, that a party is absolutely entitled to have its nominee appear on the ballot as that party's candidate." *Id.* at 359 (noting that a "particular candidate might be ineligible for office," for example).

¶76 As a practical matter, any state election law governing the selection and eligibility of candidates affects, to some degree, the fundamental right to associate with others for political ends. *Celebrezze*, 460 U.S. at 788. Even so, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

¶77 Accordingly, to determine if a state election law impermissibly burdens a party's associational rights, courts must weigh the "'character and magnitude'" of the burden imposed by the rule "against the interests the State contends justify that burden," and then consider whether the state's interests make the burden necessary. *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). Limiting ballot access "to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable." *Burdick*, 504 U.S. at 440 n.10.

43

¶78 Here, the Election Code limits presidential primary ballot access to only qualified candidates. Such a restriction is an "eminently reasonable" regulation that does not severely burden CRSCC's associational rights. To hold otherwise would permit political parties to disregard the requirements of the law and the Constitution whenever they decide, as a matter of "political expression" or "political choice," that those requirements do not apply. That cannot be. The Constitution—not any political party rule—is the supreme law of the land. U.S. Const. art. VI, cl. 2.

### 7. Section 1-1-113 Proceedings Provide Adequate Due Process for Litigants

¶79 Lastly, President Trump asserts that section 1-1-113 is not a valid way to litigate complex constitutional legal and factual issues. He complains of unfairness inherent in the expedited procedures that section 1-1-113 demands. But President Trump's argument disregards how the Electors' claim proceeded here.

¶80 Initially, we note that to the extent President Trump purports to challenge the constitutionality of section 1-1-113 under the Fourteenth Amendment's Due Process clause as a defense to the Electors' claim, he raises precisely the type of independent constitutional claim he recognizes is barred by *Kuhn*. *See Kuhn*, ¶ 55, 418 P.3d at 489. As discussed above, constitutional challenges to provisions of the Election Code fall outside the scope of a proper section 1-1-113 challenge because these expedited statutory proceedings entertain only one type of claim—election

44

officials' violations of the Election Code—and one type of injunctive relief—an order compelling substantial compliance with the Election Code. *See Kuhn*, ¶ 55, 418 P.3d at 489; § 1-1-113(1); *accord Frazier*, ¶¶ 17–18, 401 P.3d at 545.

¶81 Furthermore, because section 1-1-113 proceedings are designed to address election-related disputes, they move quickly out of necessity. *Frazier*, ¶ 11, 401 P.3d at 544 ("Given the tight deadlines for conducting elections, section 1-1-113 is a summary proceeding designed to quickly resolve challenges brought by electors, candidates, and other designated plaintiffs against state election officials prior to election day."). Lawyers who practice in this area are well-aware of this. Looming elections trigger a cascade of deadlines under both state and federal law that cannot accommodate protracted litigation schedules, particularly when the dispute concerns a candidate's access to the ballot. And a state's interest in "protecting the integrity of the election process and avoiding voter confusion," *Lindsay*, 750 F.3d at 1063 (citing *Timmons*, 520 U.S. at 364–65), allows a state to expedite the process by which a candidate's qualifications, once challenged, are subsequently determined. That the form of section 1-1-113 proceedings reflects their function—to expeditiously resolve pre-election disputes over an election official's wrongful act—does not mean these proceedings lack due process.

¶82 Nor does the need for expedited proceedings in election disputes preclude a district court from using traditional means of case management in a section

45

1-1-113 proceeding to construct a schedule that accommodates legally or factually complex issues. *See Ferrigno Warren*, ¶¶ 8–13, 462 P.3d at 1083 (explaining that the district court ordered briefing and held a hearing one month after the candidate filed a section 1-1-113 petition). President Trump contends that the expedited nature of section 1-1-113 proceedings do not provide time for the kinds of procedures he believes the complexities of this case require—for example, filing C.R.C.P. 12 motions testing the legal sufficiency of the Electors' claims before the litigation proceeds, allowing for extended discovery and disclosure procedures, and providing the opportunity to depose expert witnesses. But he has never specifically articulated how the district court's approach lacked due process. He certainly does not contend that he was prejudiced because the district court moved too *slowly* or failed to resolve the case in a week. He made no specific offer of proof regarding other discovery he would have conducted or other evidence he would have tendered. Moreover, his arguments throughout this case have focused predominantly on questions of law and not on disputed issues of material fact.

¶83 In addition, the district court took many steps to address the complexities of the case. For example, the first hearing in this case was a status conference on September 18—four days after the case was reopened after being remanded from federal court. In recognition of the complexity of the case, the district court—with the parties' input—adopted a civil-case-management approach to the litigation

that afforded the parties the opportunity to be heard on a wide range of substantive issues.

¶84 The district court's case-management approach worked. After permitting multiple intervenors to participate, the district court allowed sufficient time for extensive prehearing motions in which all parties vigorously engaged. It then issued three substantive rulings on these motions, including an omnibus ruling addressing four of Intervenors' motions, all in advance of the trial. The trial took place over five days and included opening and closing statements, the direct- and cross-examination of fifteen witnesses, and the presentation of ninety-six exhibits. Moreover, the legal and factual complexity of this case did not prevent the district court from issuing a comprehensive, 102-page order within the forty-eight-hour window section 1-4-1204(4) requires.

¶85 In short, the district court admirably—and swiftly—discharged its duty to adjudicate this complex section 1-1-113 action, substantially complying with statutory deadlines while demonstrating the flexibility inherent in such a proceeding to address the various issues raised by Intervenors. And nothing about the district court's process suggests that President Trump was deprived of notice or opportunity to fully respond to the claim against him or to mount a vigorous defense. If any case suggests that it is *not* impossible to "fully litigate a

complex constitutional issue within days or weeks," this is it. *Frazier*, ¶ 18 n.3, 401 P.3d at 545 n.3.

¶86 For these reasons, we conclude that the Election Code allows Colorado's courts, through challenges brought under sections 1-4-1204(4) and 1-1-113, to assess the constitutional qualifications of a candidate—and to order the Secretary to exclude from the ballot candidates who are not qualified. These provisions advance Colorado's "legitimate interest in protecting the integrity and practical functioning of the political process" by allowing the Secretary to "exclude from the ballot [presidential] candidates who are constitutionally prohibited from assuming office." *Hassan*, 495 F. App'x at 948. Moreover, these provisions neither infringe on a political party's associational rights nor compromise the validity of a court's rulings on complex factual and legal issues. Rather, they provide a robust vehicle through which to protect the purity of Colorado's elections.[10] *See* Colo. Const. art. VII, § 11.

---

[10] We note that Colorado's Election Code differs from other states' election laws. Michigan's election law, for example, does not include the term "qualified candidate," does not establish a role for Michigan courts in assessing the qualifications of a presidential primary candidate, and strictly limits the Michigan Secretary of State's responsibilities in the context of presidential primary elections. *See* Mich. Comp. Laws §§ 168.613, 168.620a (governing presidential primary elections in Michigan). The Michigan code also excludes presidential and vice presidential candidates from the requirement to submit the "affidavit of identity" that other candidates must submit to indicate that they "meet[] the constitutional and statutory qualifications for the office sought." *See Davis v. Wayne Cnty. Election*

48

¶87 Because the Electors have properly invoked Colorado's section 1-1-113 process to challenge the listing of President Trump on the presidential primary ballot as a wrongful act, we proceed to the other threshold questions raised by Intervenors.

## C. The Disqualification Provision of Section Three Attaches Without Congressional Action

¶88 The Electors' challenge to the Secretary's ability to certify President Trump as a qualified candidate presumes that Section Three is "self-executing" in the sense that it is enforceable as a constitutional disqualification without implementing legislation from Congress. Because Congress has not authorized state courts to enforce Section Three, Intervenors argue that this court may not consider President Trump's alleged disqualification under Section Three in this section 1-1-113 proceeding.[11] We disagree.

---

*Comm'n*, No. 368615, 2023 WL 8656163, at *14 (Mich. Ct. App. Dec. 14, 2023) (unpublished order) (quoting Mich. Comp. Laws § 168.558(1)–(2)). Given these statutory constraints, it is unsurprising that the Michigan Court of Appeals recently concluded that the Michigan Secretary of State had no discretion to refrain from placing President Trump on the presidential primary ballot once his party identified him as a candidate. *Id.* at *16.

[11] Intervenors and their supporting amici occasionally assert that the Electors' claim is brought pursuant to Section Three and that the Section is not self-executing in the sense that it does not create an independent private right of action. But as mentioned above, the Electors do not bring any claim directly under Section Three. Their claim is brought under Colorado's Election Code, and resolution of that claim requires an examination of President Trump's qualifications in light of

49

¶89 The only mention of congressional power in Section Three is that "Congress may by a vote of two-thirds of each House, remove" the disqualification of a former officer who had "engaged in insurrection." U.S. Const. amend. XIV, § 3. Section Three does not determine who decides whether the disqualification has attached in the first place.

¶90 Intervenors, however, look to Section Five of the Fourteenth Amendment, which provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article," to argue that congressional authorization is necessary for any enforcement of Section Three. *Id.* at § 5. This argument does not withstand scrutiny.

¶91 The Supreme Court has said that the Fourteenth Amendment "is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances." *The Civil Rights Cases*, 109 U.S. 3, 20 (1883). To be sure, in the *Civil Rights Cases*, the Court was directly focused on the Thirteenth Amendment, so this statement could be described as dicta. But an examination of the Thirteenth, Fourteenth, and Fifteenth Amendments

Section Three. The question of "self-execution" that we confront here is not whether Section Three creates a cause of action or a remedy, but whether the disqualification from office defined in Section Three can be evaluated by a state court when presented with a proper vehicle (like section 1-1-113), without prior congressional authorization.

50

("Reconstruction Amendments") and interpretation of them supports the accuracy and broader significance of the statement.

¶92     Section Three is one of four substantive sections of the Fourteenth Amendment:

- Section One: "No State *shall* make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor *shall* any State deprive any person of life, liberty, or property, without due process of law . . . ."

- Section Two: "Representatives *shall* be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . . ."

- Section Three: "No person *shall* be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office . . . under the United States . . . who, having previously taken an oath . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same . . . ."

- Section Four: "The validity of the public debt of the United States . . . *shall* not be questioned."

U.S. Const. amend. XIV, §§ 1–4 (emphases added).  Section Five is then an enforcement provision that applies to each of these substantive provisions.  *Id.* at § 5.  And yet, the Supreme Court has held that Section One is self-executing.  *E.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) ("As enacted, the Fourteenth Amendment confers substantive rights against the States which, like the provisions of the Bill of Rights, are self-executing."), *superseded by statute*, Religious Land Use and Institutionalized Persons Act of 2000, 114 Stat. 803, *on other grounds*

*as recognized in Ramirez v. Collier*, 595 U.S. 411, 424 (2022). Thus, while Congress *may* enact enforcement legislation pursuant to Section Five, congressional action is not *required* to give effect to the constitutional provision. *See Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966) (holding that Section Five gives Congress authority to "determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," but not disputing that the Fourteenth Amendment is self-executing).

¶93 Section Two, moreover, was enacted to eliminate the constitutional compromise by which an enslaved person was counted as only three-fifths of a person for purposes of legislative apportionment. William Baude & Michael Stokes Paulsen, *The Sweep and Force of Section Three,* 172 U. Pa. L. Rev. (forthcoming 2024) (manuscript at 51–52), https://ssrn.com/abstract=4532751. The self-executing nature of that section has never been called into question, and in the reapportionment following passage of the Fourteenth Amendment, Congress simply treated the change as having occurred. *See* The Apportionment Act of 1872, 17 Stat. 28 (42nd Congress) (apportioning Representatives to the various states based on Section Two's command without mentioning, or purporting to enforce, the Fourteenth Amendment). Similarly, Congress never passed enabling legislation to effectuate Section Four.

¶94 The same is true for the Thirteenth Amendment, which abolished slavery and involuntary servitude. Section One provides the substantive provision: "Neither slavery nor involuntary servitude . . . *shall* exist within the United States . . . ." U.S. Const. amend. XIII, § 1 (emphasis added). Section Two provides the enforcement provision: "Congress shall have power to enforce this article by appropriate legislation." *Id.* at § 2. Discussing this Amendment, the Supreme Court recognized that "legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it," but that "[b]y its own unaided force it abolished slavery" and was "undoubtedly self-executing without any ancillary legislation." *The Civil Rights Cases*, 109 U.S. at 20.

¶95 Like the other Reconstruction Amendments, the Fifteenth Amendment, which established universal male suffrage, contains a substantive provision— "[t]he right of citizens of the United States to vote *shall* not be denied or abridged . . . on account of race, color, or previous condition of servitude"— followed by an enforcement provision—"[t]he Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XV, §§ 1–2 (emphasis added). As with Section One of both the Thirteenth and Fourteenth Amendments, the Supreme Court has explicitly confirmed that the Fifteenth Amendment is self-executing. *E.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (holding that Section One of the Fifteenth Amendment "has always been

53

treated as self-executing and has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are discriminatory on their face or in practice").

¶96 There is no textual evidence that Congress intended Section Three to be any different.[12] Furthermore, we agree with the Electors that interpreting any of the Reconstruction Amendments, given their identical structure, as not self-executing would lead to absurd results. If these Amendments required legislation to make them operative, then Congress could nullify them by simply not passing enacting legislation. The result of such inaction would mean that slavery remains legal; Black citizens would be counted as less than full citizens for reapportionment; non-white male voters could be disenfranchised; and any individual who engaged in insurrection against the government would nonetheless be able to serve in the

_____

[12] It would also be anomalous to say this disqualification for office-holding requires enabling legislation when the other qualifications for office-holding do not. *See* U.S. Const. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."); *id.* at § 3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen."); *id.* at art. II, § 1, cl. 5 ("No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.").

government, regardless of whether two-thirds of Congress had lifted the disqualification. Surely that was not the drafters' intent.

¶97 Intervenors argue that certain historical evidence requires a different conclusion as to Section Three. We generally turn to historical and other extrinsic evidence only when the text is ambiguous, which it is not here. Nonetheless, we will consider these historical claims in the interest of providing a thorough review.

¶98 Intervenors first highlight a statement Representative Thaddeus Stevens made during the Congressional framing debates: "[Section Three] will not execute itself, but as soon as it becomes a law, Congress at the next session will legislate to carry it out both in reference to the presidential and all other elections as we have the right to do." Cong. Globe, 39th Cong., 1st Sess. 2544 (1866); *see also* Kurt T. Lash, The Meaning and Ambiguity of Section Three of the Fourteenth Amendment 42 (Oct. 3, 2023) (unpublished manuscript), https://ssrn.com/abstract=4591838. But as one of the amici points out, this statement referenced a deleted portion of Section Three that disenfranchised all former Confederates until 1870. In any event, given the complex patchwork of perspectives and intentions expressed when drafting these constitutional provisions, we refuse to cherry-pick individual statements from extensive debates to ground our analysis. *See generally* Baude & Paulsen, *supra* (manuscript at 39–53).

55

¶99    Intervenors next direct us to the non-binding opinion written by Chief Justice Salmon Chase while he was riding circuit: *In re Griffin*, 11 F. Cas. 7 (C.C.D. Va. 1869) (No. 5,815) ("*Griffin's Case*").[13]   There, Caesar Griffin challenged his criminal conviction as null and void because under Section Three, the judge who had entered his conviction was disqualified from holding judicial office, having formerly sworn a relevant oath as a state legislator and then engaged in insurrection by continuing to serve as a legislator in Virginia's Confederate government. *Id.* at 22–23.  It was undisputed that the judge fell within Section Three's scope, but the question Chief Justice Chase sought to answer was whether Section Three "operat[ed] directly, without any intermediate proceeding whatever, upon all persons within the category of prohibition, and as depriving them at once, and absolutely, of all official authority and power." *Id.* at 23.

¶100    In interpreting the scope of the provision, Chief Justice Chase observed that, after the end of the Civil War but before the Fourteenth Amendment was ratified, many southern states had established, with the approval of the federal government, provisional governments to keep society functioning. *Id.* at 25; *see*

---

[13] Between 1789 and 1911, U.S. Supreme Court justices traveled across the country and, together with district court judges, sat on circuit courts to decide cases. *See generally* Joshua Glick, *On the Road: The Supreme Court and the History of Circuit Riding*, 24 Cardozo L. Rev. 1753 (2003).  Decisions written by the justices while they were riding circuit were not decisions of the Supreme Court.

*also* Baude & Paulsen, *supra* (manuscript at 36). And, within these provisional governments, many offices were filled with citizens who would fall within Section Three's scope. *Griffin's Case*, 11 F. Cas. at 25. Chief Justice Chase observed that giving Section Three a literal construction, as Griffin advocated, would "annul all official acts performed by these officers. No sentence, no judgment, no decree, . . . no official act [would be] of the least validity." *Id.* He reasoned that it would be "impossible to measure the evils which such a construction would add to the calamities which have already fallen upon the people of these states." *Id.*

¶101 And so, Chief Justice Chase turned to what he termed the "argument from inconveniences" and the interpretive canon that, when faced with two or more reasonable interpretations, the interpretation "is to be preferred which best harmonizes the amendment with the general terms and spirit of the act amended." *Id.* He then explained that, while it was not "improbable that one of the objects of this section was to provide for the security of the nation and of individuals, by the exclusion of a class of citizens from office," it could also "hardly be doubted that the main purpose was to inflict upon the leading and most influential characters who had been engaged in the Rebellion, exclusion from office as a punishment for the offense." *Id.* at 25–26. To find the provision self-executing under the circumstances, he argued, would be contrary to due process because it would, "at

once without trial, deprive[] a whole class of persons of offices held by them." *Id.* at 26.

¶102   Chief Justice Chase therefore concluded that the object of the Amendment— "to exclude from certain offices a certain class of persons"—was impossible to do "by a simple declaration, whether in the constitution or in an act of congress . . . . For, in the very nature of things, it must be ascertained what particular individuals are embraced by the definition, before any sentence of exclusion can be made to operate." *Id.* To accomplish "this ascertainment and ensure effective results, proceedings, evidence, decisions, and enforcements of decisions . . . are indispensable; and . . . can only be provided for by congress." *Id.* Thus, Chief Justice Chase concluded that Section Three was not self-executing. *Id.*

¶103   *Griffin's Case* concludes that congressional action is needed before Section Three disqualification attaches, but this one case does not persuade us of that point. Intervenors and amici assert that *Griffin's Case* "remains good law and has been repeatedly relied on." Because the case is not binding on us, the fact that it has not been reversed is of no particular significance. And the cases that cite it do so either with no analysis—*e.g.*, *State v. Buckley*, 54 Ala. 599 (1875), and *Rothermel v. Meyerle*, 136 Pa. 250 (1890)—or for the inapposite proposition that Section Three does not create a self-executing cause of action—*e.g.*, *Cale v. City of Covington*, 586 F.2d 311, 316 (4th Cir. 1978), and *Hansen v. Finchem*, CV 2022-004321 (Sup. Ct.

of Ariz., Maricopa Cnty. Apr. 22, 2022), *aff'd on other grounds,* 2022 WL 1468157 (May 9, 2022).  Moreover, *Griffin's Case* has been the subject of persuasive criticism. *See, e.g.*, Magliocca, *Amnesty and Section Three, supra*, at 105–08 (critiquing the case because the other provisions of the Fourteenth Amendment were understood as self-executing and the notion that Section Three was not self-executing was inconsistent with congressional behavior at the time); Baude & Paulsen, *supra* (manuscript at 37–49) (criticizing Chief Justice Chase's interpretation as wrong and constituting a strained interpretation based on policy and circumstances rather than established canons of construction).

¶104   Although we do not find *Griffin's Case* compelling, we agree with Chief Justice Chase that "it must be ascertained what particular individuals are embraced by the definition."  11 F. Cas. at 26.  While the disqualification of Section Three attaches automatically, the determination that such an attachment has occurred must be made before the disqualification holds meaning.  And Congress has the power under Section Five to establish a process for making that determination.  But the fact that Congress *may* establish such a process does not mean that disqualification pursuant to Section Three can be determined *only* through a process established by Congress.  Here, the Colorado legislature has established a process—a court proceeding pursuant to section 1-1-113—to make the determination whether a candidate is qualified to be placed on the presidential

primary ballot. And, for the reasons we have already explained, that process is sufficient to permit a judicial determination of whether Section Three disqualification has attached to a particular individual.

¶105 We are similarly unpersuaded by Intervenors' assertions that Congress created the only currently available mechanism for determining whether a person is disqualified pursuant to Section Three with the 1994 passage of 18 U.S.C. § 2383. That statute makes it a crime to "assist[] or engage[] in any rebellion or insurrection against the authority of the United States." True, with that enactment, Congress criminalized the same conduct that is disqualifying under Section Three. All that means, however, is that a person charged and convicted under 18 U.S.C. § 2383 would *also* be disqualified under Section Three. It cannot be read to mean that *only* those charged and convicted of violating that law are constitutionally disqualified from holding future office without assuming a great deal of meaning not present in the text of the law.

¶106 In summary, based on Section Three's plain language; Supreme Court decisions declaring its neighboring, parallel Reconstruction Amendments self-executing; and the absurd results that would flow from Intervenors' reading, we conclude that Section Three is self-executing in the sense that its disqualification provision attaches without congressional action. Intervenors' contrary arguments do not persuade us otherwise.

¶107   That said, our conclusion that implementing legislation from Congress is unnecessary for us to proceed under section 1-1-113 does not resolve the question of whether doing so would violate the separation of powers among the three branches of government. We turn to this justiciability question next.

## D. Section Three Is Justiciable

¶108   President Trump next asserts that presidential disqualification under Section Three presents a nonjusticiable political question. Again, we disagree.

¶109   "In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky*, 566 U.S. at 194 (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). The political question doctrine is a narrow exception to this rule, and a court may not avoid its responsibility to decide a case merely because it may have "political implications." *Id.* at 195–96 (quoting *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 943 (1983)).

¶110   A controversy involves a nonjusticiable political question when, as relevant here, "there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)); *see also Baker v. Carr*, 369 U.S. 186, 210, 217 (1962) (noting that "[t]he nonjusticiability of a political question is primarily a function of the separation of powers" and identifying the above-described instances, and four

61

others not relevant here, as examples of political questions). The requisite textual commitment must be "[p]rominent on the surface of any case." *Baker*, 369 U.S. at 217.

¶111 Here, President Trump argues that this case is nonjusticiable because, in his view, the Constitution and federal law commit the question of the qualifications of a presidential candidate to Congress. The Electors point out that President Trump did not argue before us that the questions presented in this appeal are also nonjusticiable based on a lack of judicially discoverable and manageable standards, and therefore, he arguably waived any such argument. We nevertheless address that issue, again in the interest of providing a thorough review.

### 1. No Textually Demonstrable Constitutional Commitment to Congress of Section Three Disqualification

¶112 Contrary to President Trump's assertions, we perceive no constitutional provision that reflects a textually demonstrable commitment to Congress of the authority to assess presidential candidate qualifications. Conversely, the Constitution commits certain authority concerning presidential elections to the states and in no way precludes the states from exercising authority to assess the qualifications of presidential candidates.

¶113 As discussed in Part B.4 above, Article II, Section 1, Clause 2 of the Constitution empowers state legislatures to direct how presidential electors are

appointed, and the Supreme Court has recognized that this provision affords the states "far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo*, 140 S. Ct. at 2324. In furtherance of this delegation of authority, "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections," the "selection and qualification of candidates," among other things. *Storer*, 415 U.S. at 730. The Election Code is an example of such a "comprehensive" code to regulate state and federal elections. And the fact that Article II, Section 1, Clause 4 authorizes Congress to determine the time for choosing the electors and the date on which they vote does not undermine the substantial authority provided to the states to regulate state and federal elections.

¶114 In our view, Section Three's text is fully consistent with our conclusion that the Constitution has not committed the matter of presidential candidate qualifications to Congress. As we have noted, although Section Three requires a "vote of two-thirds of each House" to remove the disqualification set forth in Section Three, it says nothing about who or which branch should determine disqualification in the first place. *See* U.S. Const. amend. XIV, § 3. Moreover, if Congress were authorized to decide by a simple majority that a candidate is qualified under Section Three, as President Trump asserts, then this would nullify Section Three's supermajority requirement.

¶115    President Trump's reliance on Article II, Section 1, Clause 5 of the Constitution and on the Twelfth, Fourteenth, and Twentieth Amendments is misplaced. We address each of these provisions, in turn.

¶116    Article II, Section 1, Clause 5 provides that no person shall be eligible to serve as President unless that person is "a natural born Citizen" who is at least thirty-five years of age and who has resided in the United States for at least fourteen years. This provision, however, says nothing about who or which branch should determine whether a candidate satisfies the qualification criteria either in the first instance or when a candidate's qualifications are challenged. *See id.*

¶117    The Twelfth Amendment charges the Electoral College with the task of selecting a candidate for President and then transmitting the electors' votes to the "seat of the government of the United States," and it provides the procedure by which the electoral votes are to be counted. U.S. Const. amend. XII. Nothing in the Twelfth Amendment, however, vests the Electoral College with the power to determine the eligibility of a presidential candidate. *See Elliott v. Cruz*, 137 A.3d 646, 650–51 (Pa. Commw. Ct. 2016), *aff'd*, 134 A.3d 51 (Pa. 2016) (mem.). Nor does the Twelfth Amendment give Congress "control over the process by which the President and Vice President are normally chosen, other than the very limited one of determining the day on which the electors were to 'give their votes.'" *Id.* at 651 (citing U.S. Const. amend. XII). And although the Twelfth Amendment provides

for the scenario in which no President is selected by March 4 and specifies that no person constitutionally ineligible to serve as President shall be eligible to serve as Vice President, the Amendment does not assign to Congress (nor to any other branch) the task of determining whether a candidate is qualified in the first place.

¶118 Section Five of the Fourteenth Amendment authorizes Congress to pass legislation to enforce the provisions of the Fourteenth Amendment, but as discussed above, the Fourteenth Amendment is self-executing, and congressional action under Section Five is not required to animate Section Three's disqualification of insurrectionist oath-breakers. Nor does Section Five delegate to Congress the authority to determine the qualifications of presidential candidates to hold office. U.S. Const. amend. XIV, § 5.

¶119 Finally, the Twentieth Amendment, in relevant part, empowers Congress to enact procedures to address the scenario in which neither the President nor the Vice President qualifies for office before the time fixed for the beginning of their terms. U.S. Const. amend. XX, § 3. By its express language, however, this Amendment applies post-election. *Id.* (referring to the "President elect" and "Vice President elect"). Moreover, the Amendment says nothing about who determines in the first instance whether the President and Vice President are qualified to hold office.

¶120    For these reasons, we perceive no textually demonstrable constitutional commitment to Congress of the authority to assess presidential candidate qualifications, and neither President Trump nor his amici identify any constitutional provision making such a commitment.  In reaching this conclusion, we are unpersuaded by the cases on which President Trump and his amici rely, which are predicated on inferences they assert can be drawn from one or more of the foregoing constitutional provisions or on the fact that the cases had political implications.  *See, e.g.*, *Taitz v. Democrat Party of Miss.*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *12–16 (S.D. Miss. Mar. 31, 2015); *Grinols v. Electoral Coll.*, No. 2:12-cv-02997-MCE-DAD, 2013 WL 2294885, at *5–7 (E.D. Cal. May 23, 2013), *aff'd*, 622 F. App'x 624 (9th Cir. 2015); *Kerchner v. Obama*, 669 F. Supp. 2d 477, 483 n.5 (D.N.J. 2009), *aff'd*, 612 F.3d 204 (3d Cir. 2010); *Robinson v. Bowen*, 567 F. Supp. 2d 1144, 1146–47 (N.D. Cal. 2008); *Keyes v. Bowen*, 117 Cal. Rptr. 3d 207, 216 (Cal. Ct. App. 2010); *Strunk v. N.Y. State Bd. of Elections*, No. 6500/11, 2012 WL 1205117, at *11–12 (N.Y. Sup. Ct. Apr. 11, 2012), *aff'd in part, dismissed in part*, 5 N.Y.S.3d 483 (N.Y. App. Div. 2015).  As noted above, such inferences are insufficient to establish the requisite clear textual commitment to a coordinate branch of government, *see Baker*, 369 U.S. at 217, and we may not avoid our duty to decide a case merely because it may have political implications, *Zivotofsky*, 566 U.S. at 195–96.

¶121 Moreover, we may not conflate "actions that are textually *committed*" to a coordinate political branch with "actions that are textually *authorized*." *Stillman v. Dep't of Defense*, 209 F. Supp. 2d 185, 202 (D.D.C. 2002), *rev'd on other grounds sub nom.*, *Stillman v. C.I.A.*, 319 F.3d 546 (D.C. Cir. 2003). The Supreme Court has prohibited courts from adjudicating only the former. *Zivotofsky*, 566 U.S. at 195. Absent an affirmative constitutional *commitment*, we cannot abdicate our responsibility to decide a case that is properly before us. *Id.* at 194.

## 2. Section Three Involves Judicially Discoverable and Manageable Standards

¶122 The question of whether there are judicially discoverable and manageable standards for determining a case is not wholly separate from the question of whether the matter has been textually committed to a coordinate political department. *Nixon*, 506 U.S. at 228. "[T]he lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* at 228–29.

¶123 As we have said, President Trump has not argued before us that Section Three lacks judicially discoverable and manageable standards, and we believe for good reason. Section Three disqualifies from certain delineated offices persons who have "taken an oath . . . to support the Constitution of the United States" as an "officer of the United States" and who have thereafter "engaged in insurrection or rebellion." U.S. Const. amend. XIV, § 3. Although, as we discuss below, the

meanings of some of these terms may not necessarily be precise, we can discern their meanings using "familiar principles of constitutional interpretation" such as "careful examination of the textual, structural, and historical evidence put forward by the parties." *Zivotofsky*, 566 U.S. at 201.

¶124 Indeed, in this and other contexts, courts have readily interpreted the terms that we are being asked to construe and have reached the substantive merits of the cases before them. *See, e.g.*, *United States v. Powell*, 27 F. Cas. 605, 607 (C.C.D.N.C. 1871) (No. 16,079) (defining "engage" as that term is used in Section Three); *United States v. Rhine*, No. 210687 (RC), 2023 WL 2072450, at *8 (D.D.C. Feb. 17, 2023) (defining "insurrection" in the context of ruling on a motion in limine in a criminal prosecution arising out of the events of January 6); *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1487 (S.D.N.Y. 1983) (defining "insurrection" in the context of an insurance policy exclusion); *Gitlow v. Kiely*, 44 F.2d 227, 233 (S.D.N.Y. 1930) (defining "insurrection" as that term is used in a section of the U.S. Code), *aff'd*, 49 F.2d 1077 (2d Cir. 1931); *Hearon v. Calus*, 183 S.E. 13, 20 (S.C. 1935) (defining "insurrection" as that term is used in a provision of the South Carolina constitution).

¶125 Accordingly, we conclude that interpreting Section Three does not "turn on standards that defy judicial application." *Zivotofsky*, 566 U.S. at 201 (quoting *Baker*, 369 U.S. at 211). In so concluding, we respectfully disagree with the Michigan

Court of Claims' finding that the interpretation of the terms now before us constitutes a nonjusticiable political question merely because "there are . . . many answers and gradations of answers." *Trump v. Benson*, No. 23000151-MZ, slip op. at 24 (Mich. Ct. Cl. Nov. 14, 2023), *aff'd sub nom. Davis v. Wayne Cnty. Election Comm'n*, No. 368615, 2023 WL 8656163 (Mich. Ct. App. Dec. 14, 2023). In our view, declining to decide an issue simply because it requires us to address difficult and weighty questions of constitutional interpretation would create a slippery slope that could lead to a prohibited dereliction of our constitutional duty to adjudicate cases that are properly before us.

¶126 For these reasons, we conclude that the issues presented here do not, either alone or together, constitute a nonjusticiable political question. We thus proceed to the question of whether Section Three applies to the President.

## E. Section Three Applies to the President

¶127 The parties debate the scope of Section Three. The Electors claim that this potential source of disqualification encompasses the President. President Trump argues that it does not, and the district court agreed. On this issue, we reverse the district court.

¶128 Section Three prohibits a person from holding any "office, civil or military, under the United States" if that person, as "an officer of the United States," took an oath "to support the Constitution of the United States" and subsequently

69

engaged in insurrection. U.S. Const. amend. XIV, § 3. Accordingly, Section Three applies to President Trump only if (1) the Presidency is an "office, civil or military, under the United States"; (2) the President is an "officer of the United States"; and (3) the presidential oath set forth in Article II constitutes an oath "to support the Constitution of the United States." *Id.* We address each point in turn.

### 1. The Presidency Is an Office Under the United States

¶129 The district court concluded that the Presidency is not an "office, civil or military, under the United States" for two reasons. *Anderson*, ¶¶ 303–04; *see* U.S. Const. amend. XIV, § 3. First, the court noted that the Presidency is not specifically mentioned in Section Three, though senators, representatives, and presidential electors are. The court found it unlikely that the Presidency would be included in a catch-all of "any office, civil or military." *Anderson*, ¶ 304; *see* U.S. Const. amend. XIV, § 3. Second, the court found it compelling that an earlier draft of the Section specifically included the Presidency, suggesting that the drafters intended to omit the Presidency in the version that passed. *See Anderson*, ¶ 303. We disagree with the district court's conclusion, as our reading of both the constitutional text and the historical record counsel that the Presidency is an "office . . . under the United States" within the meaning of Section Three.

¶130 When interpreting the Constitution, we prefer a phrase's normal and ordinary usage over "secret or technical meanings that would not have been

70

known to ordinary citizens in the founding generation." *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008). Dictionaries from the time of the Fourteenth Amendment's ratification define "office" as a "particular duty, charge or trust conferred by public authority, and for a public purpose," that is "undertaken by . . . authority from government or those who administer it." Noah Webster, An American Dictionary of the English Language 689 (Chauncey A. Goodrich ed., 1853); *see also* 5 Johnson's English Dictionary 646 (J.E. Worcester ed., 1859) (defining "office" as "a publick charge or employment; magistracy"); *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) ("An office is defined to be 'a public charge or employment,' . . . ."). The Presidency falls comfortably within these definitions.

¶131 We do not place the same weight the district court did on the fact that the Presidency is not specifically mentioned in Section Three. It seems most likely that the Presidency is not specifically included because it is so evidently an "office." In fact, no specific *office* is listed in Section Three; instead, the Section refers to "any office, civil or military." U.S. Const. amend. XIV, § 3. True, senators, representatives, and presidential electors are listed, but none of these positions is considered an "office" in the Constitution. Instead, senators and representatives are referred to as "members" of their respective bodies. *See* U.S. Const. art. I, § 5, cl. 1 ("Each House shall be the Judge of the Elections, Returns and Qualifications

71

of its own Members . . . ."); *id.* at § 6, cl. 2 ("[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."); *id.* at art. II, § 1, cl. 2 ("[N]o Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").

¶132   Indeed, even Intervenors do not deny that the Presidency is an office. Instead, they assert that it is not an office "under the United States." Their claim is that the President and elected members of Congress *are* the government of the United States, and cannot, therefore, be serving "under the United States." *Id.* at amend. XIV, § 3. We cannot accept this interpretation. A conclusion that the Presidency is something other than an office "under" the United States is fundamentally at odds with the idea that all government officials, including the President, serve "we the people." *Id.* at pmbl. A more plausible reading of the phrase "under the United States" is that the drafters meant simply to distinguish those holding federal office from those held "under any State." *Id.* at amend. XIV, § 3.

¶133   This reading of the language of Section Three is, moreover, most consistent with the Constitution as a whole. The Constitution refers to the Presidency as an "Office" twenty-five times. *E.g.*, *id.* at art. I, § 3, cl. 5 ("The Senate shall chuse [sic] their other Officers, and also a President pro tempore, in the Absence of the Vice

72

President, or when he shall exercise *the Office of President of the United States.*" (emphasis added)); *id.* at art. II, § 1, cl. 5 (providing that "[n]o Person except a natural born Citizen . . . shall be eligible to the *Office of President*" and "[t]he executive Power shall be vested in a President of the United States of America [who] shall hold *his Office* during the Term of four Years" (emphases added)). And it refers to an office "under the United States" in several contexts that clearly support the conclusion that the Presidency is such an office.

¶134    Consider, for example, the Impeachment Clause, which reads that Congress can impose, as a consequence of impeachment, a "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." *Id.* at art. I, § 3, cl. 7.  If the Presidency is not an "office . . . under the United States," then anyone impeached—including a President—could nonetheless go on to serve as President. *See id.*  This reading is nonsensical, as recent impeachments demonstrate.  The Articles of Impeachment brought against both President Clinton and President Trump asked for each man's "removal from office[,] and disqualification to hold and enjoy any office of honor, trust, or profit under the United States."  Articles of Impeachment Against William Jefferson Clinton, H. Res. 611, 105th Cong. (Dec. 19, 1998); *see also* Articles of Impeachment Against Donald J. Trump, H. Res. 755, 116th Cong. (Dec. 8, 2019); Articles of Impeachment Against Donald J. Trump, H. Res. 24, 117th Cong. (Jan 13, 2021).  Surely the impeaching members of Congress

73

correctly understood that either man, if convicted and subsequently disqualified from future federal office by the Senate, would be unable to hold the Presidency in the future.

¶135   Similarly, the Incompatibility Clause states that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."   U.S. Const. art. I, § 6, cl. 2.   To read "office under the United States" to exclude the Presidency would mean that a sitting President could also constitutionally occupy a seat in Congress, a result foreclosed by basic principles of the separation of powers.  *See Buckley v. Valeo*, 424 U.S. 1, 124 (1976) ("The principle of separation of powers . . . was woven into the [Constitution] . . . . The further concern of the Framers of the Constitution with maintenance of the separation of powers is found in the so-called 'Ineligibility' and 'Incompatibility' Clauses contained in Art. I, s 6 . . . ."), *superseded by statute on other grounds*, Bipartisan Campaign Reform Act of 2002, 116 Stat. 81, *as recognized in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

¶136   Finally, the Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States] shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."   U.S. Const. art. I, § 9, cl. 8.   To read the

Presidency as something other than an office under the United States would exempt the nation's chief diplomat from these protections against foreign influence. But Presidents have long sought dispensation from Congress to retain gifts from foreign leaders, understanding that the Emoluments Clause required them to do so.[14]

¶137 The district court found it compelling that an earlier draft of the proposed Section listed the Presidency, but the version ultimately passed did not. *Anderson*, ¶ 303. As a starting point, however, we are mindful that "it is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590. And the specifics of the change from the

---

[14] *See, e.g.*, H. Rep. No. 23-302, at 1–2 (Mar. 4, 1834) (discussing the receipt of gifts from the Emperor of Morocco and noting that the President's "surrender of the articles to the Government" satisfied the "constitutional provision in relation to their acceptance"); 14 Abridgement of the Debates of Congress from 1789 to 1856, 140–41 (Thomas Hart Benton ed., 6 1860) (displaying (1) a letter from the Secretary of State to the Imaum of Muscat indicating that the President "directed" the Secretary to refuse the Imaum's gifts "under existing constitutional provisions" and (2) a letter from the President requesting that Congress allow him to accept the gifts); An Act to authorize the sale of two Arabian horses, received as a present by the Consul of the United States at Zanzibar, from the Imaum of Muscat, Mar. 1, 1845, 5 Stat. 730 (providing that the President is "authorized" to sell some of the Imaum's gifts and place the proceeds in the U.S. Treasury); Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, Mar. 15, 1862, 12 Stat. 616 (directing the King of Siam's gifts and letters to be placed in "the collection of curiosities at the Department of the Interior").

earlier draft to what was ultimately passed do not demonstrate an intent to exclude the Presidency from the covered offices.

¶138 The draft proposal provided that insurrectionist oath-breakers could not hold "the office of President or Vice President of the United States, Senator or Representative in the national Congress, or any office now held *under appointment from the President of the United States, and requiring the confirmation of the Senate*." Cong. Globe., 39th Cong., 1st Sess. 919 (1866) (emphasis added). Later versions of the Section—including the enacted draft—removed specific reference to the President and Vice President and expanded the category of office-holder to include "any office, civil or military" rather than only those offices requiring presidential appointment and Senate confirmation. *See* U.S. Const. amend. XIV, § 3.

¶139 It is hard to glean from the limited available evidence what the changes across proposals meant. But we find persuasive amici's suggestion that Representative McKee, who drafted these proposals, most likely took for granted that his second proposal included the President. While nothing in Representative McKee's speeches mentions why his express reference to the Presidency was removed, his public pronouncements leave no doubt that his subsequent draft proposal still sought to ensure that rebels had absolutely no access to political power. Representative McKee explained that, under the proposed amendment,

76

"the loyal alone shall rule the country" and that traitors would be "cut[] off . . . from all political power in the nation." Cong. Globe, 39th Cong., 1st Sess. 2505 (1866); *see also* Mark Graber, *Section Three of the Fourteenth Amendment: Our Questions, Their Answers*, 22–23 (Univ. of Md. Legal Stud. Rsch. Paper No. 2023-16), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4591133 ("*Our Questions, Their Answers*"); Mark A. Graber, *Punish Treason, Reward Loyalty: The Forgotten Goals of Constitutional Reform After the Civil War* 106, 114 (2023) (indicating that Representative McKee desired to exclude all oath-breaking insurrectionists from all federal offices, including the Presidency). When considered in light of these pronouncements, the shift from specifically naming the President and Vice President in addition to officers appointed and confirmed to the broadly inclusive "any officer, civil or military" cannot be read to mean that the two highest offices in the government are excluded from the mandate of Section Three.

¶140    The importance of the inclusive language—"any officer, civil or military"— was the subject of a colloquy in the debates around adopting the Fourteenth Amendment. Senator Reverdy Johnson worried that the final version of Section Three did not include the office of the Presidency. He stated, "[T]his amendment does not go far enough" because past rebels "may be elected President or Vice President of the United States." Cong. Globe, 39th Cong., 1st Sess. 2899 (1866). So, he asked, "why did you omit to exclude them? I do not understand them to be

excluded from the privilege of holding the two highest offices in the gift of the nation." *Id.* Senator Lot Morrill fielded this objection. He replied, "Let me call the Senator's attention to the words 'or hold any office, civil or military, under the United States.'" *Id.* This answer satisfied Senator Johnson, who stated, "Perhaps I am wrong as to the exclusion from the Presidency; no doubt I am; but I was misled by noticing the specific exclusion in the case of Senators and Representatives." *Id.* This colloquy further supports the view that the drafters of this Amendment intended the phrase "any office" to be broadly inclusive, and certainly to include the Presidency.

¶141 Moreover, Reconstruction-Era citizens—supporters and opponents of Section Three alike—understood that Section Three disqualified oath-breaking insurrectionists from holding the office of the President. *See* Montpelier Daily Journal, Oct. 19, 1868 (writing that Section Three "excludes leading rebels from holding offices . . . from the Presidency downward"). Many supporters of Section Three defended the Amendment on the ground that it would exclude Jefferson Davis from the Presidency. *See* John Vlahoplus, *Insurrection, Disqualification, and the Presidency*, 13 Brit. J. Am. Legal Stud. (forthcoming 2023) (manuscript at 7–10), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4440157; *see also, e.g.*, *Rebels and Federal Officers*, Gallipolis J., Feb. 21, 1867, at 2 (arguing that foregoing

78

Section Three would "render Jefferson Davis eligible to the Presidency of the United States," and "[t]here is something revolting in the very thought").

¶142 Post-ratification history includes more of the same. For example, Congress floated the idea of blanket amnesty to shield rebels from Section Three. *See* Vlahoplus, *supra*, (manuscript at 7–9). In response, both supporters and dissenters acknowledged that doing so would allow the likes of Jefferson Davis access to the Presidency. *See id.*; *see also, e.g.*, The Pulaski Citizen, *The New Reconstruction Bill*, Apr. 13, 1871, at 4 (acknowledging as a supporter of amnesty that it would "make even Jeff. Davis eligible again to the Presidency"); The Chicago Tribune, May 24, 1872 (asserting that amnesty would make rebels "eligible to the Presidency of the United States"); Indiana Progress, Aug. 24, 1871 (similar).

¶143 We conclude, therefore, that the plain language of Section Three, which provides that no disqualified person shall "hold any office, civil or military, under the United States," includes the office of the Presidency. This textual interpretation is bolstered by constitutional context and by history surrounding the enactment of the Fourteenth Amendment.

## 2. The President Is an Officer of the United States

¶144 We next consider whether a President is an "officer of the United States." U.S. Const., amend. XIV, § 3. The district court found that the drafters of Section Three did not intend to include the President within the catch-all phrase "officer

of the United States," and, accordingly, that a current or former President can engage in insurrection and then run for and hold any office. *Anderson*, ¶ 312; *see* U.S. Const., amend. XIV, § 3. We disagree for four reasons.

¶145 First, the normal and ordinary usage of the term "officer of the United States" includes the President. As we have explained, the plain meaning of "office . . . under the United States" includes the Presidency; it follows then that the President is an "officer of the United States." *See Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1372 (Fed. Cir. 2006) (Gajarsa, J., concurring in part) ("An interpretation of the Constitution in which the holder of an 'office' is not an 'officer' seems, at best, strained."). Indeed, Americans have referred to the President as an "officer" from the days of the founding. *See, e.g.*, The Federalist No. 69 (Alexander Hamilton) ("The President of the United States would be an officer elected by the people . . . ."). And many nineteenth-century presidents were described as, or called themselves, "chief executive officer of the United States." *See* Vlahoplus, *supra* (manuscript at 17–18) (listing presidents).

¶146 Second, Section Three's drafters and their contemporaries understood the President as an officer of the United States. *See* Graber, *Our Questions, Their Answers*, *supra*, at 18–19 (listing instances); *see also* Cong. Globe, 39th Cong., 1st Sess. 915 (1866) (referring to the "chief executive officer of the country"); *The Floyd Acceptances*, 74 U.S. 666, 676–77 (1868) ("We have no *officers* in this government,

80

*from the President* down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority." (emphases added)).

¶147 President Trump concedes as much on appeal, stating that "[t]o be sure, the President is an officer." He argues, however, that the President is an officer of the Constitution, not an "officer of the United States," which, he posits, is a constitutional term of art. Further, at least one amicus contends that the above-referenced historical uses referred to the President as an officer only in a "colloquial sense," and thus have no bearing on the term's use in Section Three. We disagree.

¶148 The informality of these uses is exactly the point: If members of the Thirty-Ninth Congress and their contemporaries all used the term "officer" according to its ordinary meaning to refer to the President, we presume this is the same meaning the drafters intended it to have in Section Three. We perceive no persuasive contemporary evidence demonstrating some other, technical term-of-art meaning. And in the absence of a clear intent to employ a technical definition for a common word, we will not do so. *See Heller*, 554 U.S. at 576 (explaining that the "normal and ordinary as distinguished from technical meaning" should be favored (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931))).

¶149 We also find Attorney General Stanbery's opinions on the meaning of Section Three significant. In one opinion on the subject, Stanbery explained that

the term "'officer of the United States,' within [Section Three] . . . is used in its most general sense, and without any qualification, as legislative, or executive, or judicial." The Reconstruction Acts, 12 Op. Att'y. Gen. 141, 158 (1867) ("*Stanbery I*"). And in a second opinion on the topic, he observed that the term "Officers of the United States" includes "without limitation" any "person who has at any time prior to the rebellion held any office, civil or military, under the United States, and has taken an official oath to support the Constitution of the United States." The Reconstruction Acts, 12 Op. Att'y. Gen. 182, 203 (1867) ("*Stanbery II*").

¶150 Third, the structure of Section Three persuades us that the President is an officer of the United States. The first half of Section Three describes the offices protected and the second half addresses the parties barred from holding those protected offices. There is a parallel structure between the two halves: "Senator or Representative in Congress" (protected office) corresponds to "member of Congress" (barred party); "any office . . . under the United States" (protected office) corresponds to "officer of the United States" (barred party); and "any office . . . under any State" (protected office) also has a corresponding barred party in "member of any State legislature, or as an executive or judicial officer of any State." U.S. Const. amend. XIV, § 3. The only term in the first half of Section Three that has no corresponding officer or party in the second half is "elector of President and Vice President," which makes sense because electors do not take

constitutionally mandated oaths so they have no corresponding barred party. *Id.*;

*see also id.* at art. II, § 1 (discussing a presidential elector's duties without reference

to an oath); *id.* at art. VI (excluding presidential electors from the list of positions

constitutionally obligated to take an oath to support the Constitution).  Save

electors, there is a perfect parallel structure in Section Three.  *See* Baude & Paulsen,

*supra* (manuscript at 106).

¶151    Fourth, the clear purpose of Section Three—to ensure that disloyal officers

could never again play a role in governing the country—leaves no room to

conclude that "officer of the United States" was used as a term of art.  *Id.*  The

drafters of Section Three were motivated by a sense of betrayal; that is, by the

existence of a broken oath, not by the type of officer who broke it: "[A]ll of us

understand the meaning of the third section," Senator John Sherman stated, "[it

includes] those men who have once taken an oath of office to support the

Constitution of the United States and have violated that oath in spirit by taking up

arms against the Government of the United States are to be deprived for a time at

least of holding office . . . ."  Cong. Globe, 39th Cong., 1st Sess. 2899 (1866); *see also*

*id.* at 2898 (Senator Thomas Hendricks of Indiana, who opposed the Fourteenth

Amendment, agreeing that "the theory" of Section Three was "that persons who

have violated the oath to support the Constitution of the United States ought not

to be allowed to hold any office."); *id.* at 3035–36 (Senator John B. Henderson

explaining that "[t]he language of this section is so framed as to disfranchise from office . . . the leaders of any rebellion hereafter to come."); *Powell*, 27 F. Cas. at 607 (summarizing the purpose of Section Three: "[T]hose who had been once trusted to support the power of the United States, and proved false to the trust reposed, ought not, as a class, to be entrusted with power again until congress saw fit to relieve them from disability."). A construction of Section Three that would nevertheless *allow* a former President who broke his oath, not only to participate in the government again but to run for and hold the highest office in the land, is flatly unfaithful to the Section's purpose.

¶152 We therefore conclude that "officer of the United States," as used in Section Three, includes the President.

### 3. The Presidential Oath Is an Oath to Support the Constitution

¶153 Finally, we consider whether the oath taken by the President to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8, is an oath "to support the Constitution of the United States," *id.* at amend. XIV, § 3. The district court found that, because the presidential oath's language is more particular than the oath referenced in Section Three, the drafters did not intend to include former Presidents. *Anderson*, ¶ 313. We disagree.

¶154 Article VI of the Constitution provides that "all executive and judicial Officers . . . of the United States . . . shall be bound by Oath or Affirmation, to

support this Constitution."[15] U.S. Const. art. VI, cl. 3. Article II specifies that the President shall swear an oath to "preserve, protect and defend the Constitution." *Id.* at art. II, § 1, cl. 8. Intervenors contend that because the Article II oath does not include a pledge to "support" the Constitution, an insurrectionist President cannot be disqualified from holding future office under Section Three on the basis of that oath.

¶155 This argument fails because the President is an "executive . . . Officer[]" of the United States under Article VI, albeit one for whom a more specific oath is prescribed. *Id.* at art. VI, cl. 3 ("The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . ."). This conclusion follows logically from the accepted fact that the Vice President is also an executive officer. True, the Vice President takes the more general oath prescribed by federal law, *see* 5 U.S.C. § 3331 (noting that anyone "except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take" an oath including a pledge to "support and defend the Constitution"),

---

[15] Article VI, however, does not provide any specific form of oath or affirmation.

but it makes no sense to conclude that the Vice President is an executive officer under Article VI but the President is not.

¶156 The language of the presidential oath—a commitment to "preserve, protect, and defend the Constitution"—is consistent with the plain meaning of the word "support." U.S. Const. art. II, § 1, cl. 8. Modern dictionaries define "support" to include "defend" and vice versa. *See, e.g.*, *Support*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/*support* [https://perma.cc/WGH6-D8KU] (defining "support" as "to uphold or defend as valid or right"); *see also Defend,* at *id.*, https://www.merriam-webster.com/dictionary/*defend* [https://perma.cc/QXQ7-LRKX] (defining "defend" as "to maintain or support in the face of argument or hostile criticism"). So did dictionaries from the time of Section Three's drafting. *See, e.g.*, Samuel Johnson, A Dictionary of the English Language (5th ed. 1773) ("defend": "to stand in defense of; to protect; to support"); Noah Webster, An American Dictionary of the English Language 271 (Chauncey A. Goodrich, ed., 1857) ("defend": "to support or maintain").

¶157 The specific language of the presidential oath does not make it anything other than an oath to support the Constitution. Indeed, as one Senator explained just a few years before Section Three's ratification, "the language in [the presidential] oath of office, that he shall protect, support [sic], and defend the Constitution, makes his obligation more emphatic and more obligatory, if possible,

than ours, which is simply to support the Constitution." Cong. Globe, 37th Cong., 3d Sess. 89 (1862). And, in fact, several nineteenth-century Presidents referred to the presidential oath as an oath to "support" the Constitution. *See* James D. Richardson, A Compilation of the Messages and Papers of the Presidents, 1789–1897, Vol. 1 at 232, 467 (Adams, Madison), Vol. 2 at 625 (Jackson), Vol. 8 at 381 (Cleveland).

¶158 In sum, "[t]he simplest and most obvious interpretation of a Constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." *Lake County v. Rollins*, 130 U.S. 662, 671 (1889). The most obvious and sensible reading of Section Three, supported by text and history, leads us to conclude that (1) the Presidency is an "office under the United States," (2) the President is an "officer . . . of the United States," and (3) the presidential oath under Article II is an oath to "support" the Constitution.

¶159 President Trump asks us to hold that Section Three disqualifies every oath-breaking insurrectionist *except the most powerful one* and that it bars oath-breakers from virtually every office, both state and federal, *except the highest one in the land*. Both results are inconsistent with the plain language and history of Section Three.

¶160 We therefore reverse the district court's finding that Section Three does not apply to a President and conclude that Section Three bars President Trump from

holding the office of the President if its other provisions are met; namely, if President Trump "engaged in insurrection." U.S. Const. amend. XIV, § 3.

¶161 Before addressing the district court's findings that President Trump engaged in insurrection, however, we consider President Trump's challenge to the admissibility of a congressional report on which the district court premised some of its findings.

## F. The District Court Did Not Err in Admitting Portions of the January 6 Report

¶162 President Trump asserts that the district court wrongly admitted into evidence thirty-one findings from a congressional report drafted by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee"), which recounted the Committee's investigation of the facts, circumstances, and causes of the attack on the Capitol. *See* H.R. Rep. No. 117-663 (Dec. 22, 2022) ("the Report"). In President Trump's view, the Report is an untrustworthy, partisan political document and therefore constituted inadmissible hearsay under Rule 803(8)(C) of the Colorado Rules of Evidence. We are unpersuaded. Under the deferential standard of review that governs, we perceive no error by the district court in admitting portions of the Report into evidence at trial.

¶163 We review a district court's evidentiary rulings for an abuse of discretion. *Zapata v. People*, 2018 CO 82, ¶ 25, 428 P.3d 517, 524. "A court abuses its discretion

only if its decision is 'manifestly arbitrary, unreasonable, or unfair.'" *Churchill v. Univ. of Colo. at Boulder*, 2012 CO 54, ¶ 74, 285 P.3d 986, 1008 (quoting *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 899 (Colo. 2008)). We may not consider "whether we would have reached a different result," but only "whether the trial court's decision fell within a range of reasonable options." *Id.* (quoting *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo. App. 2006)).

¶164  Hearsay statements are out-of-court statements offered in court for the truth of the matter asserted. CRE 801(c). Such statements are generally inadmissible, CRE 802, but CRE 803(8) creates an exception for "reports . . . of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law." This exception, however, applies only if the report is trustworthy. *Id.*

¶165  The Federal Rules of Evidence (on which our evidentiary rules were modeled) contain a near-identical exception to Colorado Rule 803(8), *see* Fed. R. Evid. 803(8), so we may look to federal case law interpreting the federal rule for guidance on how to assess trustworthiness, *see Garcia v. Schneider Energy Servs., Inc.*, 2012 CO 62, ¶ 10, 287 P.3d 112, 115 (noting that, although we are "not bound to interpret our rules . . . the same way the United States Supreme Court has interpreted its rules, we do look to the federal rules and federal decisions

89

interpreting those rules for guidance"); *Harding Glass Co. v. Jones*, 640 P.2d 1123, 1125 n.3 (Colo. 1982) ("[C]ase law interpreting the federal rule is persuasive in analysis of the Colorado rule."). Under federal law, courts are instructed to "assume[] admissibility in the first instance." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988). Thus, "the party challenging the admissibility of a public or agency report . . . bears the burden of demonstrating that the report is not trustworthy." *Barry v. Trs. of Int'l Ass'n*, 467 F. Supp. 2d 91, 96 (D.D.C. 2006). The federal courts have also identified four non-exclusive factors to help courts determine trustworthiness: "(1) the timeliness of the investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems." *Id.* at 97; *see Beech Aircraft*, 488 U.S. at 167 n.11.

¶166 The district court employed the foregoing presumption and four factors to analyze the Report.[16] The court determined that "the first three *Barry* factors weigh

---

[16] We also review a district court's trustworthiness analysis for an abuse of discretion. *See United States v. Versaint*, 849 F.2d 827, 831–32 (3d Cir. 1988) ("Under [Fed. R. Evid. 803(8)], this Court must decide whether the district court abused its discretion by '[g]iving undue weight to trustworthiness factors of slight relevance while disregarding factors more significant.'"(quoting *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 266 (3d Cir. 1983))); *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22 (6th Cir. 1984) ("Rule 803(8)(C) also requires that the report not be subject to circumstances indicating a lack of trustworthiness. This determination is within the discretion of the trial court."); *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821–22 (10th Cir. 1981) ("We believe that 'the trial court

strongly in favor of reliability." *Anderson*, ¶ 24. President Trump focuses his admissibility challenge on the fourth factor: "possible motivation problems." *Barry*, 467 F. Supp. 2d at 97.

¶167 First, President Trump claims the Report was biased against him because all nine Committee members voted in favor of impeaching him before their investigation began. Timothy Heaphy, Chief Investigative Counsel for the Committee, testified at trial, however, that although members "certainly had . . . hypotheses that were a starting point," such hypotheses did not impair the members' ability to be fair and impartial. *Anderson*, ¶ 26. The district court found "Mr. Heaphy's testimony on this subject to be credible and h[eld] that any perceived animus of the committee members towards [President] Trump did not taint the conclusions of the January 6th Report in such a way that would render them unreliable." *Id.* We see no abuse of discretion. *See People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000) ("It is the function of the trial court, and not the reviewing court, to weigh evidence and determine the credibility of the witnesses.").

¶168 Second, President Trump believes that the political backdrop against which the Report was created makes it unreliable. This argument proves too much. All

is the first and best judge of whether tendered evidence meets th[at] standard of trustworthiness and reliability . . .' and [w]e cannot say the trial court abused its discretion by refusing to admit the report." (quoting *Franklin v. Skelly Oil Co.*, 141 F.2d 568, 572 (10th Cir. 1944))).

91

congressional reports contain some level of political motivation, yet neither CRE 803(8) nor the corresponding federal rule declares such reports per se inadmissible; instead, as the district court explained, a court is at liberty to admit what it deems trustworthy. *See Anderson*, ¶ 28; *see, e.g., Barry*, 467 F. Supp. 2d at 101 (admitting report from a Senate investigation); *Mariani v. United States*, 80 F. Supp. 2d 352, 361 (M.D. Pa. 1999) (admitting minority report from a Congressional investigation)*; Hobson v. Wilson*, 556 F. Supp. 1157, 1183 (D.D.C. 1982) (admitting Congressional Committee report), *aff'd in part, rev'd in part*, 737 F.2d 1 (D.C. Cir. 1984).

¶169 Third, President Trump asserts that because Democrats outnumbered Republicans seven to two on the Committee, the Report's findings are necessarily biased. The district court determined that although the Report "would have further reliability had there been greater Republican participation," that deficit did not demonstrate "motivation problems." *Anderson*, ¶¶ 29–30. The district court observed that House Republicans opted to boycott the Committee after then-Speaker of the House Nancy Pelosi agreed to seat only three of the five Republicans recommended to her. *Id.* at ¶ 30. Despite then-Speaker Pelosi's "unprecedented" move, *id.*, the district court noted that "the two Republicans who did sit . . . were both duly elected Republicans," *id.* at ¶ 31; "[t]he investigative staff included . . . many Republican[]" lawyers, *id.* at ¶ 32; "the staffing decisions did

92

not include any inquiry into political affiliation," *id.*; and "[t]he overwhelming majority of witnesses . . . were [President] Trump administration officials and Republicans," *id.* at ¶ 33. The court reasoned that "[t]hese facts all cut against Intervenors' argument that lack of participation of the minority party resulted in . . . unreliable conclusions." *Id.* at ¶ 34.

¶170 Again, we perceive no abuse of discretion. CRE 803(8) assumes admissibility, *Barry*, 467 F. Supp. 2d at 96, and President Trump has not met his burden of demonstrating that, contrary to the evidence the district court highlighted, the Report suffered from motivation problems. *See id.* Moreover, we remain mindful that this is a four-factor inquiry. No single factor is dispositive. Instead, any perceived shortcomings as to one must be weighed against the strengths of the others. Whatever the "possible motivation problems," the weight of the other three factors remains. As the district court explained, (1) passage of time does not impugn the Report, as the investigation began six months after the attack and was completed in under two years; (2) the investigative staff consisted of highly skilled lawyers, including two former U.S. Attorneys; and (3) there was a formal ten-day hearing in which seventy witnesses testified under oath. *Anderson*, ¶ 24. So, not only was the court's analysis of the fourth factor reasonable, but it also did not abuse its discretion in reaching its broader conclusion that the Report was trustworthy.

93

¶171   President Trump nonetheless argues that, even if the Report is generally

admissible under the CRE 803(8) exception, there were eleven admitted findings

within the Report that remained independently inadmissible.  Even if the general

admissibility of the Report does not necessarily give a green light to multiple

layers of hearsay, we conclude that only two of the eleven challenged findings

constituted hearsay within hearsay.[17]  And even if there was error in admitting

those findings, neither is of sufficient consequence to warrant reversal.  *See*

*Liggett v. People*, 135 P.3d 725, 733 (Colo. 2006) (explaining that, under harmless

error review, we will reverse only if, viewing the evidence as a whole, the error

substantially influenced the outcome or impaired the fairness of the trial and that,

---

[17] The nine remaining statements fall into three categories: statements made (1) by President Trump, (2) to President Trump, and (3) by his supporters during chants. First, President Trump's own statements are not hearsay under the party-opponent rule.  *See* CRE 801(d)(2)(A).  Second, various statements made to President Trump on January 6 are not hearsay because they were offered to show the statements' effect on the listener (i.e., that President Trump had knowledge of certain issues).  *See* CRE 801(c); *People v. Vanderpauye*, 2023 CO 42 ¶ 21 n.4, 530 P.3d 1214, 1221 n.4 (accepting that a "statement was not hearsay because it was offered for its effect on the listener . . . not for the truth of the matter asserted").  Third, chants by President Trump's supporters were not offered to prove the truth of the chants, but simply to establish that the statements were made.  That is not hearsay. CRE 801(c); *see People v. Dominguez*, 2019 COA 78 ¶ 20, 454 P.3d 364, 369 (stating that "verbal acts aren't hearsay" because such a statement is "offered not for its truth, but to show that it was made").  Thus, none of the findings in these three classes constitutes hearsay within the Report.

"[i]n the context of a bench trial, the prejudicial effect of improperly admitted evidence is generally presumed innocuous").

¶172 First, the Report cited a newspaper article stating that the election was called for President Biden. Although this is hearsay, the district court did not rely on the statement in its analysis, so President Trump was not prejudiced by any error in admitting this statement. *See Raile v. People*, 148 P.3d 126, 136 (Colo. 2006) ("[T]here is no reasonable probability that Raile was prejudiced by the admission of the statements; thus, the trial court's error was harmless.").

¶173 Second, the Report explained that Chief of Staff Mark Meadows told White House Counsel Pat Cipollone that President Trump "doesn't want to do anything" to stop the violence. H.R. Rep. No. 117 663, at 110. The fact that this statement is hearsay is irrelevant: The district court expressly noted that "it has only considered those portions of the January 6th Report which are referenced in this Order and has considered no other portions in reaching its decision," *Anderson*, ¶ 38, and it did not mention this statement in its order, nor did it rely on it to reach any conclusions. Thus, President Trump's embedded hearsay argument is unavailing.

¶174 For these reasons, we conclude that the district court did not abuse its discretion by admitting portions of the Report into evidence.

¶175 We now consider the district court's findings that President Trump "engaged in" an "insurrection" within the meaning of Section Three.

## G. President Trump Engaged in Insurrection

¶176 President Trump challenges the district court's findings that he "engaged in" an "insurrection." The Constitution leaves these terms undefined. Therefore, we must make a legal determination regarding what the drafters and ratifiers meant when they chose to deploy these words in Section Three. Mindful of the deferential standard of review afforded a district court's factual findings, we conclude that the district court did not clearly err in concluding that the events of January 6 constituted an insurrection and that President Trump engaged in that insurrection.

### 1. Standard of Review

¶177 As a general matter, we review findings of fact under either a clear error or abuse of discretion standard, and we review legal conclusions de novo. *E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000); *accord State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 2023 CO 23, ¶ 33, 529 P.3d 599, 607. When, however, the issue before an appellate court presents a mixed question of law and fact, Colorado courts have taken different approaches, depending on the circumstances. *455 Co.*, 3 P.3d at 22. For example, courts have sometimes treated the ultimate conclusion as one of fact and applied the clear error standard. *Id.* In other cases, courts have concluded that a mixed question of law and fact mandates de novo review. *Id.* And when a trial court made evidentiary findings of fact in

support of its application of a legal principle from another jurisdiction, we have found it appropriate to conduct an abuse of discretion review of the evidentiary factual findings supporting the legal conclusion and a de novo review of the legal conclusion itself. *Id.* at 23.

¶178 For our purposes here, where we are called on to review the district court's construction of certain terms used in Section Three to the facts established by the evidence, we will review the district court's factual findings for clear error and its legal conclusions de novo.

## 2. "Insurrection"

¶179 Dictionaries (both old and new), the district court's order, and the briefing by the parties and the amici curiae suggest several definitions of the word "insurrection."

¶180 For example, Noah Webster's dictionary from 1860 defined "insurrection" as:

> A rising against civil or political authority; the open and active opposition of a number of persons to the execution of law in a city or state. It is equivalent to SEDITION, except that *sedition* expresses a less extensive rising of citizens. It differs from REBELLION, for the latter expresses a revolt, or an attempt to overthrow the government, to establish a different one, or to place the country under another jurisdiction.

Noah Webster, An American Dictionary of the English Language 613 (1860);

*accord* John Bouvier, A Law Dictionary Adapted to the Constitution and Laws of

the United States of America and of the Several States to the American Union (6th ed. 1856), available at https://wzukusers.storage.googleapis.com/user-32960741/documents/5ad525c314331myoR8FY/1856_bouvier_6.pdf [https://perma.cc/PXK4-M75N] (defining "insurrection" as "[a] rebellion of citizens or subjects of a country against its government").

¶181    Webster's Third New International Dictionary defines "insurrection" as "an act or instance of revolting against civil or political authority or against an established government" or "an act or instance of rising up physically." *Insurrection*, Webster's Third New International Dictionary (2002).

¶182    In light of these and other proffered definitions, the district court concluded that "an insurrection as used in Section Three is (1) a public use of force or threat of force (2) by a group of people (3) to hinder or prevent execution of the Constitution of the United States." *Anderson*, ¶ 240.

¶183    Finally, we note that at oral argument, President Trump's counsel, while not providing a specific definition, argued that an insurrection is more than a riot but less than a rebellion. We agree that an insurrection falls along a spectrum of related conduct. *See The Brig Amy Warwick (The Prize Cases)*, 67 U.S. (2 Black) 635, 666 (1862) ("Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government."); *Case of Davis*, 7 F. Cas. 63, 96 (C.C.D. Va.

1871) (No. 3,621a) ("Although treason by levying war, in a case of civil war, may involve insurrection or rebellion, and they are usually its first stages, they do not necessarily reach to the actual levying of war."); 77 C.J.S. *Riot; Insurrection* § 36, Westlaw (database updated August 2023) ("Insurrection is distinguished from rout, riot, and offenses connected with mob violence by the fact that, in insurrection, there is an organized and armed uprising against authority or operations of government, while crimes growing out of mob violence, however serious they may be and however numerous the participants, are simply unlawful acts in disturbance of the peace which do not threaten the stability of the government or the existence of political society."). But we part company with him when he goes one step further. No authority supports the position taken by President Trump's counsel at oral argument that insurrectionary conduct must involve a particular length of time or geographic location.

¶184 Although we acknowledge that these definitions vary and some are arguably broader than others, for purposes of deciding this case, we need not adopt a single, all-encompassing definition of the word "insurrection." Rather, it suffices for us to conclude that any definition of "insurrection" for purposes of Section Three would encompass a concerted and public use of force or threat of force by a group of people to hinder or prevent the U.S. government from taking the actions necessary to accomplish a peaceful transfer of power in this country.

The required force or threat of force need not involve bloodshed, nor must the dimensions of the effort be so substantial as to ensure probable success. *In re Charge to Grand Jury*, 62 F. 828, 830 (N.D. Ill. 1894). Moreover, although those involved must act in a concerted way, they need not be highly organized at the insurrection's inception. *See Home Ins. Co. of N.Y. v. Davila*, 212 F.2d 731, 736 (1st Cir. 1954) ("[A]t its inception an insurrection may be a pretty loosely organized affair. . . . It may start as a sudden surprise attack upon the civil authorities of a community with incidental destruction of property by fire or pillage, even before the military forces of the constituted government have been alerted and mobilized into action to suppress the insurrection.").

¶185 The question thus becomes whether the evidence before the district court sufficiently established that the events of January 6 constituted a concerted and public use of force or threat of force by a group of people to hinder or prevent the U.S. government from taking the actions necessary to accomplish the peaceful transfer of power in this country. We have little difficulty concluding that substantial evidence in the record supported each of these elements and that, as the district court found, the events of January 6 constituted an insurrection.

¶186 It is undisputed that a large group of people forcibly entered the Capitol and that this action was so formidable that the law enforcement officers onsite could not control it. Moreover, contrary to President Trump's assertion that no evidence

in the record showed that the mob was armed with deadly weapons or that it attacked law enforcement officers in a manner consistent with a violent insurrection, the district court found—and millions of people saw on live television, recordings of which were introduced into evidence in this case—that the mob was armed with a wide array of weapons. *See Anderson*, ¶ 155. The court also found that many in the mob stole objects from the Capitol's premises or from law enforcement officers to use as weapons, including metal bars from the police barricades and officers' batons and riot shields and that throughout the day, the mob repeatedly and violently assaulted police officers who were trying to defend the Capitol. *Id.* at ¶¶ 156–57. The fact that actual and threatened force was used that day cannot reasonably be denied.

¶187 Substantial evidence in the record further established that this use of force was concerted and public. As the district court found, with ample record support, "The mob was coordinated and demonstrated a unity of purpose . . . . They marched through the [Capitol] building chanting in a manner that made clear they were seeking to inflict violence against members of Congress and Vice President Pence." *Id.* at ¶ 243. And upon breaching the Capitol, the mob immediately pursued its intended target—the certification of the presidential election—and reached the House and Senate chambers within minutes of entering the building. *Id.* at ¶ 153.

¶188 Finally, substantial evidence in the record showed that the mob's unified purpose was to hinder or prevent Congress from counting the electoral votes as required by the Twelfth Amendment and from certifying the 2020 presidential election; that is, to preclude Congress from taking the actions necessary to accomplish a peaceful transfer of power. As noted above, soon after breaching the Capitol, the mob reached the House and Senate chambers, where the certification process was ongoing. *Id.* This breach caused both the House and the Senate to adjourn, halting the electoral certification process. In addition, much of the mob's ire—which included threats of physical violence—was directed at Vice President Pence, who, in his role as President of the Senate, was constitutionally tasked with carrying out the electoral count. *Id.* at ¶¶ 163, 179–80; *see* U.S. Const. art. I, § 3, cl. 4; *id.* at art. II, § 1, cl. 3. As discussed more fully below, these actions were the product of President Trump's conduct in singling out Vice President Pence for refusing President Trump's demand that the Vice President decline to carry out his constitutional duties. *Anderson*, ¶¶ 148, 170, 172–73.

¶189 In short, the record amply established that the events of January 6 constituted a concerted and public use of force or threat of force by a group of people to hinder or prevent the U.S. government from taking the actions necessary to accomplish the peaceful transfer of power in this country. Under any viable

102

definition, this constituted an insurrection, and thus we will proceed to consider whether President Trump "engaged in" this insurrection.

### 3. "Engaged In"

¶190 Dictionaries, historical evidence, and case law all shed light on the meaning of "engaged in," as that phrase is used in Section Three.

¶191 Noah Webster's dictionary from 1860 defined "engage" as "to embark in an affair." Noah Webster, An American Dictionary of the English Language 696 (1860). Similarly, Webster's Third New International Dictionary defines "engage" as "to begin and carry on an enterprise" or "to take part" or "participate." *Engage*, Webster's Third New International Dictionary (2002). And Merriam-Webster defines "engage" as including both "to induce to participate" and "to do or take part in something." *Engage*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/engage [https://perma.cc/7JDM-4XSB].

¶192 Attorney General Stanbery's opinions on the meaning of "engage," which he issued at the time the Fourteenth Amendment was being debated, are in accord with these historical and modern definitions. Attorney General Stanbery opined that a person may "engage" in insurrection or rebellion "without having actually levied war or taken arms." *Stanbery I*, 12 Op. Att'y Gen. at 161. Thus, in Attorney General Stanbery's view, when individuals acting in their official capacities act "in

103

the furtherance of the common unlawful purpose" or do "any overt act for the purpose of promoting the rebellion," they have "engaged" in insurrection or rebellion for Section Three disqualification purposes. *Id.* at 161–62; *see also Stanbery II*, 12 Op. Att'y. Gen. at 204 (defining "engaging in rebellion" to require "an overt and voluntary act, done with the intent of aiding or furthering the common unlawful purpose"). Accordingly, "[d]isloyal sentiments, opinions, or sympathies would not disqualify; but when a person has, by speech or by writing, incited others to engage in rebellion, [h]e must come under the disqualification." *Stanbery II*, 12 Op. Att'y. Gen. at 205; *accord Stanbery I*, 12 Op. Att'y Gen. at 164.

¶193 Turning to case law construing the meaning of "engaged in" for purposes of Section Three, although we have found little precedent directly on point, cases concerning treason that had been decided by the time the Fourteenth Amendment was ratified provide some insight into how the drafters of the Fourteenth Amendment would have understood the term "engaged in." For example, in *Ex parte Bollman*, 8 U.S. 75, 126 (1807), Chief Justice Marshall explained that "if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." In other words, an individual need not directly

104

participate in the overt act of levying war or insurrection for the law to hold him accountable as if he had:

> [I]t is not necessary to prove that the individual accused, was a direct, personal actor in the violence. If he was present, directing, aiding, abetting, counselling, or countenancing it, he is in law guilty of the forcible act. Nor is even his personal presence indispensable. Though he be absent at the time of its actual perpetration, yet if he directed the act, devised or knowingly furnished the means, for carrying it into effect, instigating others to perform it, he shares their guilt. In treason there are no accessories.

*In re Charge to Grand Jury-Treason*, 30 F. Cas. 1047, 1048 (C.C.E.D. Pa. 1851).

¶194 We find the foregoing definitions and authorities to be generally consistent, and we believe that the definition adopted and applied by the district court is supported by the plain meaning of the term "engaged in," as well as by the historical authorities discussed above. Accordingly, like the district court, we conclude that "engaged in" requires "an overt and voluntary act, done with the intent of aiding or furthering the common unlawful purpose." *Anderson*, ¶ 254.

¶195 In so concluding, we hasten to add that we do not read "engaged in" so broadly as to subsume mere silence in the face of insurrection or mere acquiescence therein, at least absent an affirmative duty to act. Rather, as Attorney General Stanbery observed, "The force of the term to *engage* carries the idea of active rather than passive conduct, and of voluntary rather than compulsory action." *Stanbery I*, 12 Op. Att'y Gen. at 161; *see also* Baude & Paulsen, *supra* (manuscript at 67) (noting that "passive acquiescence, resigned acceptance,

105

silence, or inaction is not typically enough to have 'engaged in' insurrection or rebellion . . . [unless] a person possesses an affirmative duty to speak or act").

¶196 The question remains whether the record supported the district court's finding that President Trump engaged in the January 6 insurrection by acting overtly and voluntarily with the intent of aiding or furthering the insurrectionists' common unlawful purpose. Again, mindful of our applicable standard of review, we conclude that it did, and we proceed to a necessarily detailed discussion of the evidence to show why this is so.

¶197 Substantial evidence in the record showed that even before the November 2020 general election, President Trump was laying the groundwork for a claim that the election was rigged. For example, at an August 17, 2020 campaign rally, he said that "the only way we're going to lose this election is if the election is rigged." *Anderson*, ¶ 88. Moreover, when asked at a September 23, 2020 press briefing whether he would commit to a peaceful transfer of power after the election, President Trump refused to do so. *Id.* at ¶ 90.

¶198 President Trump then lost the election, and despite the facts that his advisors repeatedly advised him that there was no evidence of widespread voter fraud and that no evidence showed that he himself believed the election was wrought with fraud, President Trump ramped up his claims that the election was stolen from him and undertook efforts to prevent the certification of the election

results. For example, in a December 13, 2020 tweet, he stated, "Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime." *Id.* at ¶ 101. And President Trump sought to overturn the election results by directly exerting pressure on Republican officeholders in various states. *Id.* at ¶ 103.

¶199 On this point, and relevant to President Trump's intent in this case, many of the state officials targeted by President Trump's efforts were subjected to a barrage of harassment and violent threats by his supporters. *Id.* at ¶ 104. President Trump was well aware of these threats, particularly after Georgia election official Gabriel Sterling issued a public warning to President Trump to "stop inspiring people to commit potential acts of violence" or "[s]omeone's going to get killed." *Id.* President Trump responded by retweeting a video of Sterling's press conference with a message repeating the very rhetoric that Sterling warned would result in violence. *Id.* at ¶ 105.

¶200 And President Trump continued to fan the flames of his supporters' ire, which he had ignited, with ongoing false assertions of election fraud, propelling the "Stop the Steal" movement and cross-country rallies leading up to January 6. *Id.* at ¶ 106. Specifically, between Election Day 2020 and January 6, Stop the Steal organizers held dozens of rallies around the country, proliferating President

Trump's election disinformation and recruiting attendees, including members of violent extremist groups like the Proud Boys, the Oath Keepers, and the Three Percenters, QAnon conspiracy theorists, and white nationalists, to travel to Washington, D.C. on January 6. *Id.* at ¶ 107.

¶201 Stop the Steal leaders also joined two "Million MAGA Marches" in Washington, D.C. on November 14, 2020, and December 12, 2020. *Id.* at ¶ 108. Again, as relevant to President Trump's intent here, after the November rally turned violent, President Trump acknowledged the violence but justified it as self-defense against "ANTIFA SCUM." *Id.* at ¶ 109.

¶202 With full knowledge of these sometimes-violent events, President Trump sent the following tweet on December 19, 2020, urging his supporters to travel to Washington, D.C. on January 6: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6. Be there, will be wild!" *Id.* at ¶ 112.

¶203 At this point, the record established that President Trump's "plan" was that when Congress met to certify the election results on January 6, Vice President Pence could reject the true electors who voted for President Biden and certify a slate of fake electors supporting President Trump or he could return the slates to the states for further proceedings. *Id.* at ¶ 113.

¶204 Far right extremists and militias such as the Proud Boys, the Oath Keepers, and the Three Percenters viewed President Trump's December 19, 2020 tweet as a

"call to arms," and they began to plot activities to disrupt the January 6 joint session of Congress. *Id.* at ¶ 117. In the meantime, President Trump repeated his invitation to come to Washington, D.C. on January 6 at least twelve times. *Id.* at ¶ 118.

¶205 On December 26, 2020, President Trump tweeted:

> If a Democrat Presidential Candidate had an Election Rigged & Stolen, with proof of such acts at a level never seen before, the Democrat Senators would consider it an act of war, and fight to the death. Mitch [McConnell] & the Republicans do NOTHING, just want to let it pass. NO FIGHT!

*Id.* at ¶ 121.

¶206 And on January 1, 2021, President Trump retweeted a post from Kylie Jane Kremer, an organizer of the scheduled January 6 March for Trump, that stated, "The calvary [sic] is coming, Mr. President! JANUARY 6 | Washington, D.C." President Trump added to his retweet, "A great honor!" *Id.* at ¶ 119.

¶207 The foregoing evidence established that President Trump's messages were a call to his supporters to fight and that his supporters responded to that call. Further supporting such a conclusion was the fact that multiple federal agencies, including the Secret Service, identified significant threats of violence in the days leading up to January 6. *Id.* at ¶ 123. These threats were made openly online, and they were widely reported in the press. *Id.* Agency threat assessments thus stated

that domestic violent extremists planned for violence on January 6, with weapons including firearms and enough ammunition to "win a small war." *Id.*

¶208 Along the same lines, the Federal Bureau of Investigation received many tips regarding the potential for violence on January 6. *Id.* at ¶ 124. One tip said:

> They think they will have a large enough group to march into DC armed and will outnumber the police so they can't be stopped . . . . They believe that since the election was "stolen" it's their constitutional right to overtake the government and during this coup no U.S. laws apply. Their plan is to literally kill. Please, please take this tip seriously and investigate further.

*Id.*

¶209 The record reflects that President Trump had reason to know of the potential for violence on January 6. As President, he oversaw the agencies reporting the foregoing threats. *Id.* at ¶ 123. In addition, Katrina Pierson, a senior advisor to both of President Trump's presidential campaigns, testified, on behalf of President Trump, that at a January 5, 2021 meeting, President Trump chose the speakers for the January 6 event at which he, too, would speak (avoiding at least some extremist speakers) and that he knew that radical political extremists were going to be in Washington, D.C. on January 6 and would likely attend his speech. *Id.* at ¶¶ 48, 126.

¶210 January 6 arrived, and in the early morning, President Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even

110

fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!" *Id.* at ¶ 127. He followed this tweet later that morning with another that said, "All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!" *Id.*

¶211 These tweets had the obvious effect of putting a significant target on Vice President Pence's back, focusing President Trump's supporters on the Vice President's role in overseeing the counting of the electoral votes and certifying the 2020 presidential election to ensure the peaceful transfer of power. *Id.* at ¶¶ 128, 291.

¶212 At about this same time, tens of thousands of President Trump's supporters began gathering around the Ellipse for his speech. *Id.* at ¶ 129. To enter the Ellipse itself, attendees were required to pass through magnetometers. *Id.* at ¶ 130. Notably, from the approximately 28,000 attendees who passed through these security checkpoints, the Secret Service confiscated hundreds of weapons and other prohibited items, including knives or blades, pepper spray, brass knuckles, tasers, body armor, gas masks, and batons or blunt instruments. *Id.* at ¶¶ 130–31. Approximately 25,000 additional attendees remained outside the Secret Service perimeter, thus avoiding the magnetometers. *Id.* at ¶ 132.

¶213 President Trump then gave a speech in which he literally exhorted his supporters to fight at the Capitol. Among other things, he told the crowd:

- "We're gathered together in the heart of our nation's capital for one very, very basic reason: to save our democracy." *Id.* at ¶ 135.

- "Republicans are constantly fighting like a boxer with his hands tied behind his back. It's like a boxer. And we want to be so nice. We want to be so respectful of everybody, including bad people. And we're going to have to fight much harder." *Id.*

- "Now, it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down, and I'll be there with you . . . ." *Id.*

- "[W]e're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. Because you'll never take back our country with weakness. You have to show strength and you have to be strong." *Id.*

- "When you catch somebody in a fraud, you're allowed to go by very different rules." *Id.*

- "This the most corrupt election in the history, maybe of the world. . . . This is not just a matter of domestic politics—this is a matter of national security." *Id.*

- "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore." *Id.*

¶214 Unsurprisingly, the crowd at the Ellipse reacted to President Trump's words with calls for violence. Indeed, after President Trump instructed his supporters to march to the Capitol, members of the crowd shouted, "[S]torm the capitol!"; "[I]nvade the Capitol Building!"; and "[T]ake the Capitol!" *Id.* at ¶ 141. And before he had even concluded his speech, President Trump's supporters followed his instructions. *Id.* at ¶ 146. The crowd marched to the Capitol, many carrying

112

Revolutionary War flags and Confederate battle flags; quickly breached the building; and immediately advanced to the House and Senate chambers to carry out their mission of blocking the certification of the 2020 presidential election. *Id.* at ¶¶ 146–53.

¶215 By 1:21 p.m., President Trump was informed that the Capitol was under attack. *Id.* at ¶ 169. Rather than taking action to end the siege, however, approximately one hour later, at 2:24 p.m., he tweeted, "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" *Id.* at ¶ 170.

¶216 This tweet was read over a bullhorn to the crowd at the Capitol, and produced further violence, necessitating the evacuation of Vice President Pence from his Senate office to a more secure location to ensure his physical safety. *Id.* at ¶¶ 171–75.

¶217 President Trump's next public communications were two tweets sent at 2:38 p.m. and 3:13 p.m., encouraging the mob to "remain peaceful" and to "[s]tay peaceful" (obviously, the mob was not at all peaceful), but neither tweet condemned the violence nor asked the mob to disperse. *Id.* at ¶ 178 (alteration in original).

¶218 Throughout these several hours, President Trump ignored pleas to intervene and instead called on Senators, urging them to help delay the electoral count, which is what the mob, upon President Trump's exhortations, was also trying to achieve. *Id.* at ¶ 180. And President Trump took no action to put an end to the violence. To the contrary, as mentioned above, when told that the mob was chanting, "Hang Mike Pence," President Trump responded that perhaps the Vice President deserved to be hanged. *Id.* President Trump also rejected pleas from House Republican Leader Kevin McCarthy, imploring him to tell his supporters to leave the Capitol, stating, "Well, Kevin, I guess these people are more upset about the election than you are." *Id.*

¶219 Finally, at 4:17 p.m., President Trump released a video urging the mob "to go home now." *Id.* at ¶ 186. Even then, he did not condemn the mob's actions. *Id.* at ¶ 187. Instead, he sympathized with those who had violently overtaken the Capitol, telling them that he knew their pain. *Id.* at ¶¶ 186–87. He told them that he loved them and that they were "very special." *Id.* at ¶ 186. And he repeated his false claim that the election had been stolen notwithstanding his "landslide" victory, thereby further endorsing the mob's effort to try to stop the peaceful transfer of power. *Id.* at ¶¶ 186–87.

¶220 A short while later, President Trump reiterated this supportive message to the mob by justifying its actions, tweeting at 6:01 p.m., "These are the things and

114

events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace." *Id.* at ¶ 189. President Trump concluded by encouraging the country to "[r]emember this day forever!" *Id.*

¶221 We conclude that the foregoing evidence, the great bulk of which was undisputed at trial, established that President Trump engaged in insurrection. President Trump's direct and express efforts, over several months, exhorting his supporters to march to the Capitol to prevent what he falsely characterized as an alleged fraud on the people of this country were indisputably overt and voluntary. Moreover, the evidence amply showed that President Trump undertook all these actions to aid and further a common unlawful purpose that he himself conceived and set in motion: prevent Congress from certifying the 2020 presidential election and stop the peaceful transfer of power.

¶222 We disagree with President Trump's contentions that the record does not support a finding that he engaged in an insurrection because (1) "engage" does not include "incite," and (2) he did not have the requisite intent to aid or further the insurrectionists' common unlawful purpose.

¶223 As our detailed recitation of the evidence shows, President Trump did not merely incite the insurrection. Even when the siege on the Capitol was fully

underway, he continued to support it by repeatedly demanding that Vice President Pence refuse to perform his constitutional duty and by calling Senators to persuade them to stop the counting of electoral votes. These actions constituted overt, voluntary, and direct participation in the insurrection.

¶224 Moreover, the record amply demonstrates that President Trump fully intended to—and did—aid or further the insurrectionists' common unlawful purpose of preventing the peaceful transfer of power in this country. He exhorted them to fight to prevent the certification of the 2020 presidential election. He personally took action to try to stop the certification. And for many hours, he and his supporters succeeded in halting that process.

¶225 For these reasons, we conclude that the record fully supports the district court's finding that President Trump engaged in insurrection within the meaning of Section Three.

## H. President Trump's Speech on January 6 Was Not Protected by the First Amendment Right to Freedom of Speech

¶226 President Trump contends that his speech on January 6 was protected by the First Amendment and, therefore, cannot be used to justify his disqualification from office under Section Three. The district court concluded that this speech was unprotected by the First Amendment. *Anderson*, ¶ 298. We agree with the district court.

116

## 1. Standard of Review

¶227 In considering President Trump's First Amendment challenge, we undertake an "independent review of the record . . . to be sure that the speech in question actually falls within [an] unprotected category" of communication. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984). We have interpreted this independent review as being akin to de novo review. *See Air Wis. Airlines Corp. v. Hoeper*, 2012 CO 19, ¶ 46, 320 P.3d 830, 841, *rev'd on other grounds*, 571 U.S. 237 (2014); *Lewis v. Colo. Rockies Baseball Club, Ltd.*, 941 P.2d 266, 271 (Colo. 1997). *Bose* recognizes, however, that we may give some "presumption of correctness" to factual findings, 466 U.S. at 500, especially those that do not involve the application of standards of law, *id.* at 500 n.16, or those that arise from complex cases such as this one, where the district judge has "lived with the controversy," *id.* at 500. Focusing on the findings by the district court, we therefore "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." *Id.* at 508 (first alteration in original) (quoting *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946)).

## 2. First Amendment Protections and Incitement

¶228 The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. This

robust protection for speech functions to "invite dispute," *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949), and "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484 (1957); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

¶229 Even so, "the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). The First Amendment does not protect, for example, true threats, *Watts v. United States*, 394 U.S. 705, 708 (1969); speech essential to criminal conduct, *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017); or speech that incites lawless action, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). It is this last strand of First Amendment jurisprudence that the parties debate here.

¶230 As the Supreme Court explained in *Brandenburg*, the First Amendment's "constitutional guarantees of free speech . . . do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447. Under *Brandenburg* and its progeny, the modern test to determine whether speech is unprotected under the First Amendment because it incited lawless action is whether (1) the speech explicitly or implicitly encouraged the use of violence or lawless action; (2) the

speaker intended that the speech would result in the use of violence or lawless action; and (3) the imminent use of violence or lawless action was the likely result of the speech. *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018); *accord Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015).[18]

### 3. Applying the *Brandenburg* Test

### a. Context

¶231 President Trump contends that the district court erred by examining the broader context in which President Trump's speech was made, thereby "expand[ing] the context relevant to a *Brandenburg* analysis beyond anything recognized in precedent." He asserts that we should examine his speech only in the narrow context in which it was made. We disagree.

¶232 In *Schenck v. United States*, 249 U.S. 47, 52 (1919), the Supreme Court addressed, for the first time, advocacy of illegal conduct, and it recognized the

---

[18] This tripartite formulation incorporates the holdings from *Brandenburg* and its progeny. *See Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech . . . do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."); *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973) (holding there was "no evidence or *rational inference* from the *import* of the language" that the defendant's words were intended to produce imminent disorder and thereby indicating that although illegal action must be imminent, advocacy of lawless action could be implicit (emphases added)); *NAACP v. Claiborne Hardware*, 458 U.S. 886, 928 (1982) ("When such [emotional] appeals [for unity and action in a common cause] do not incite lawless action, they must be regarded as protected speech.").

importance of context in holding that "the character of every act depends upon the circumstances in which it is done." Although the Supreme Court has said little about how to analyze incitement since *Brandenburg*, it offered some guidance regarding a court's use of other statements for context in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

¶233 In *Claiborne Hardware*, the Court considered speeches given by Charles Evers, the field secretary of the Mississippi NAACP, in connection with the NAACP's boycott of white merchants in Claiborne County from 1966 to 1969. 458 U.S. at 890. Evers declared to Black residents of Claiborne County that "blacks who traded with white merchants would be *answerable to him*," and that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people." *Id.* at 900 n.28. Evers's statements also included that "boycott violators would be 'disciplined' by their own people," and he "warned that the Sheriff could not sleep with boycott violators at night." *Id.* at 902. The Court held that Evers's speeches were protected by the First Amendment but said that "[i]f there [was] other evidence of [Evers's] authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929. By considering and placing value in the *absence* of corroborating evidence of Evers's violent intentions, the Court implied that courts may look to circumstances beyond the speech itself to determine intent. *See United States v. White*, 610 F.3d

120

956, 961–62 (7th Cir. 2010) (relying on *Claiborne Hardware* in denying a motion to dismiss in a solicitation case based on the existence of "further evidence of . . . the relationship between [the defendant] and his followers which will show the posting was a specific request to [the defendant's] followers").

¶234 While incitement precedent is sparse, the case law on "true threats" is instructive regarding the importance of context. True threats and incitement are doctrinally distinct,[19] but true threats are the "closest cousin" to incitement under the First Amendment. *Counterman v. Colorado*, 600 U.S. 66, 97 (2023) (Sotomayor, J., concurring in part); *accord United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983) ("The line between the two forms of speech [incitement and true threats] may be difficult to draw in some instances . . . ."); *see also* G. Robert Blakey & Brian J. Murray, *Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law*, 2002 B.Y.U. L. Rev. 829, 1069 (2002) (explaining that both exceptions involve exhortations regarding violence that derive from *Schenck*'s "clear and present danger" test).

---

[19] *Compare Brandenburg*, 395 U.S. at 447 (defining unprotected incitement as that "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action"), *with Virginia v. Black*, 538 U.S. 343, 359 (2003) (defining true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals").

¶235   And multiple federal circuit courts conducting a true-threat analysis confirm what common sense suggests: When assessing whether someone means to threaten another with unlawful violence, we sometimes need to consider more than the behavior exhibited on one occasion. *See, e.g.*, *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002) (rejecting an argument that "'context' means the direct circumstances surrounding delivery of the threat," and instead concluding that "[w]e, and so far as we can tell, other circuits as well, consider the whole factual context and 'all of the circumstances' in order to determine whether a statement is a true threat" (internal citation omitted) (quoting *United States v. Merrill*, 746 F.2d 458, 462 (9th Cir. 1984), *overruled on other grounds by Planned Parenthood*, 290 F.3d at 1066–77, *and United States v. Hanna*, 293 F.3d 1080, 1088 n.5 (9th Cir. 2002))); *United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000) (considering "whether the maker of the threat had made similar statements to the victim on other occasions" and "whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence" when determining whether a true threat exists).  So too with incitement.  Context matters.

¶236   This is not to say, as President Trump contends the district court found, that we "may consider *any speech ever uttered* by [President Trump]" in evaluating incitement.  Of course, there are limits.  But we need not define those outer limits

122

now. Instead, we simply conclude that it was appropriate for the district court to consider President Trump's "history of courting extremists and endorsing political violence as legitimate and proper, as well as his efforts to undermine the legitimacy of the 2020 election results and hinder the certification of the Electoral College results in Congress." *Anderson*, ¶ 289.

¶237 With this in mind, we review the district court's application of *Brandenburg*'s three-pronged test.

### b. Encouraging the Use of Violence or Lawless Action

¶238 Again, the first prong of the test for incitement is that "the speech explicitly or implicitly encouraged the use of violence or lawless action." *Nwanguma*, 903 F.3d at 609.

¶239 The district court made dozens of findings regarding the general atmosphere of political violence that President Trump created before January 6, many of which we have already outlined in discussing why the district court concluded that President Trump "engaged in" insurrection. We incorporate those observations here by reference and supplement them with other illuminating evidence from the record below. For example, the district court found that "[a]t [a] February 2016 rally, [President] Trump told his supporters that in the 'old days,' a protester would be 'carried out on a stretcher' and that he would like to 'punch him in the face.'" *Anderson*, ¶ 68. In March 2016, President Trump

123

responded to questions about his supporters' violence by saying it was "very, very appropriate" and "we need a little bit more of" it. *Id.* at ¶ 69. And during the 2020 election cycle, "President Trump threatened to deploy 'the Military' to Minneapolis to shoot 'looters' amid protests over the police killing of George Floyd," *id.* at ¶ 76, and told the Proud Boys to "stand back and stand by" during a debate for the 2020 presidential election. *id.* at ¶ 77.

¶240 The district court also credited the testimony of Professor Peter Simi, a professor of sociology at Chapman University, whom it had "qualified . . . as an expert in political extremism, including how extremists communicate, and how the events leading up to and including the January 6 attack relate to longstanding patterns of behavior and communication by political extremists." *Id.* at ¶ 42. He testified, according to the court's summary, that (1) "violent far-right extremists understood that [President] Trump's calls to 'fight,' which most politicians would mean only symbolically, were, when spoken by [President] Trump, literal calls to violence by these groups, while [President] Trump's statements negating that sentiment were insincere and existed to obfuscate and create plausible deniability," *id.* at ¶ 84; and that (2) "[President] Trump's speech took place in the context of a pattern of [President] Trump's knowing 'encouragement and promotion of violence' to develop and deploy a shared coded language with his violent supporters," *id.* at ¶ 142.

124

¶241 As we described in the foregoing section, the district court further found that President Trump encouraged and supported violence before and after the 2020 election by telling his supporters that "the only way we're going to lose this election is if the election is rigged. Remember that," *id.* at ¶ 88; that the election was "a fraud on the American public," *id.* at ¶ 92; *see also id.* at ¶ 101 ("Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime"); and that the Democrats had stolen an election that rightfully belonged to President Trump and his supporters, *id.* at ¶¶ 93, 96. The district court also found that "[m]any of the state officials targeted by [President] Trump's campaign of intimidation were subject to a barrage of harassment and violent threats by [his] supporters—prompting Georgia election official Gabriel Sterling to issue a public warning to [President] Trump to 'stop inspiring people to commit potential acts of violence' or '[s]omeone's going to get killed.'" *Id.* at ¶ 104 (last alteration in original); *see also id.* at ¶ 105 (finding that "[f]ar-right extremists understood [President] Trump's refusal to condemn the violence [Sterling condemned] . . . as an endorsement of the use of violence to prevent the transfer of presidential power").

¶242 The district court then identified specific incendiary language in President Trump's speech at the Ellipse on January 6, some of which we alluded to earlier in

this opinion. To reiterate: President Trump announced, "we're going to walk down, and I'll be with you, we're going to walk down . . . to the Capitol . . . ." *Id.* at ¶ 135. He "used the word 'fight' or variations of it [twenty] times during his Ellipse speech." *Id.* at ¶ 137; *see also, e.g., id.* at ¶ 135 ("And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore."). He declared, "[w]hen you catch somebody in a fraud," a sentiment he had repeatedly said had occurred with the 2020 election, "you're allowed to go by very different rules." *Id.* at ¶ 135; *see also id.* at ¶ 138 ("You don't concede when there's theft involved."). And he claimed that "our election victory [was] stolen by emboldened radical-left Democrats . . . ." *Id.* at ¶ 135.

¶243 In short, the district court found that President Trump's speech at the Ellipse "was understood by a portion of the crowd as, a call to arms." *Id.* at ¶ 145. And the district court here is not the first or only court to reach this conclusion. In *Thompson v. Trump*, 590 F. Supp. 3d 46, 118 (D.D.C. 2022), the U.S. District Court for the District of Columbia found that President Trump

> invited his supporters to Washington, D.C., after telling them for months that corrupt and spineless politicians were to blame for stealing an election from them; retold that narrative when thousands of them assembled on the Ellipse; and directed them to march on the Capitol building . . . where those very politicians were at work to certify an election that he had lost.

126

The court concluded that President Trump's speech was, therefore "plausibly . . . a positive instigation of a mischievous act."[20] *Id.* (quoting John Stuart Mill, On Liberty 100 (London, John W. Parker & Son, 2d ed. 1859)). Our independent review of the record in this case brings us to the same conclusion: President Trump incited and encouraged the use of violence and lawless action to disrupt the peaceful transfer of power. The tenor of President Trump's messages to his supporters in exhorting them to travel to Washington, D.C. on January 6 was obvious and unmistakable: the allegedly rigged election was an act of war and those victimized by it had an obligation to fight back and to fight aggressively. And President Trump's supporters did not miss or misunderstand the message: the cavalry was coming to fight.

¶244 The fact that, at one point during his speech, President Trump said that "everyone here will soon be marching to the Capitol building to *peacefully and patriotically* make your voices heard" does not persuade us that the district court erred in finding that the first prong of the *Brandenberg* test was met. *See Thompson*, 590 F. Supp. 3d at 113–14. This isolated reference "cannot inoculate [President

---

[20] *Thompson* involved a motion to dismiss. As a result, the court determined only that President Trump's speech "plausibly [involved] words of incitement not protected by the First Amendment." *Thompson*, 590 F. Supp. 3d at 115; *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (requiring plaintiffs to show that their complaints are plausible to survive a motion to dismiss for failure to state a claim).

Trump] against the conclusion that his exhortation, made nearly an hour later, to 'fight like hell' immediately before sending rally-goers to the Capitol, within the context of the larger Speech and circumstances, was not protected expression." *Id.* at 117.

### c. Intent to Produce Violent or Lawless Action

¶245 The second prong of the test for incitement is that "the speaker intends that his speech will result in the use of violence or lawless action." *Nwanguma*, 903 F.3d at 609. The Supreme Court has interpreted this second prong of the *Brandenburg* test to require specific intent.[21] *Counterman*, 600 U.S. at 79, 81 (establishing that "when incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge," and defining acting purposely as "'consciously desir[ing]' a result"). So, we must consider whether President Trump's exhortations at the Ellipse on January 6 to "fight like hell," and his

---

[21] There is some uncertainty as to whether *specific intent* to incite imminent lawless action is needed in civil cases such as the one before us now because most of the modern incitement cases arose in a criminal context. *See Counterman*, 600 U.S. at 70; *Hess*, 414 U.S. at 105; *Brandenburg*, 395 U.S. at 444; *but see Claiborne Hardware*, 458 U.S. at 890 (adjudicating complainants' request for injunctive relief and damages). The *Counterman* Court's justification for the specific intent standard was therefore tied to criminal liability. *Counterman*, 600 U.S. at 81 ("A strong intent requirement . . . was a way to ensure that efforts to *prosecute* incitement would not bleed over . . . to dissenting political speech at the First Amendment's core." (emphasis added)). But we need not resolve the issue because, regardless of whether it is required, we agree with the district court that President Trump acted with specific intent.

urgings that his followers "go[] to the Capitol" and that they would get to "go by 'very different rules,'" were intended to produce imminent lawless action.

¶246 The district court concluded that President Trump exhibited the requisite intent here. It found that, before the January 6 rally, "[President] Trump knew that his supporters were angry and prepared to use violence to 'stop the steal' including physically preventing Vice President Pence from certifying the election," *Anderson*, ¶ 128, and that President Trump's response to the events following his speech "support . . . that [President] Trump endorsed and intended the actions of the mob on January 6," *id.* at ¶ 193 (second alteration in original). Based on these findings of fact, the court "conclude[d] that [President] Trump acted with the specific intent to incite political violence and direct it at the Capitol with the purpose of disrupting the electoral certification." *Id.* at ¶ 293.

¶247 The district court found that President Trump knew, before he gave his speech, that there was the potential for violence on January 6. It found that "[President] Trump himself agrees that his supporters 'listen to [him] like no one else,'" *id.* at ¶ 63 (second alteration in original), and that federal agencies that President Trump oversaw identified threats of violence ahead of January 6, including "threats to storm the U.S. Capitol and kill elected officials," *id.* at ¶¶ 123–24.

¶248 The court also found that President Trump's conduct and tweets, which we outlined above, from the time he was told of the attack on the Capitol at 1:21 p.m. until Congress reconvened later that night, indicated his intent to produce lawless or violent conduct. *See id.* at ¶¶ 169–73, 178, 183, 186, 189.

¶249 In conducting our independent review of the district court's factual findings, we agree that President Trump intended that his speech would result in the use of violence or lawless action on January 6 to prevent the peaceful transfer of power. Despite his knowledge of the anger that he had instigated, his calls to arms, his awareness of the threats of violence that had been made leading up to January 6, and the obvious fact that many in the crowd were angry and armed, President Trump told his riled-up supporters to walk down to the Capitol and fight. He then stood back and let the fighting happen, despite having the ability and authority to stop it (with his words or by calling in the military), thereby confirming that this violence was what he intended.

¶250 We therefore conclude that the second prong of the *Brandenburg* test has also been met.

### d. Likely to Incite or Produce Imminent Lawless Action

¶251 Finally, for speech to be unprotected, we must conclude that "the imminent use of violence or lawless action is the likely result of the speech." *Nwanguma*, 903 F.3d at 609.

130

¶252    The district court found that:

> Professor Simi reviewed [President] Trump's relationship with his
> supporters over the years, identified a pattern of calls for violence that
> his supporters responded to, and explained how that long experience
> allowed [President] Trump to know how his supporters responded to
> his calls for violence using a shared language that allowed him to
> maintain plausible deniability with the wider public.

*Id.* at ¶ 62.

¶253    Professor Simi then "testified about . . . examples of [these] patterns of call-and-response that [President] Trump developed and used to incite violence by his supporters."  *Id.* at ¶ 64.  In one such instance, a November 2015 political rally, "[President] Trump . . . t[old] his supporters to 'get [a protester] the hell out of here' and the protester was then assaulted.  When asked about the attack the next day, Trump said 'maybe [the protester] should have been roughed up.'"  *Id.* at ¶ 66 (third and fourth alterations in original).

¶254    Further, the district court found that "on January 1, 2021, [President] Trump retweeted a post from Kylie Jane Kremer, an organizer of March for Trump on January 6, saying, 'The calvary [sic] is coming, Mr. President!'"  *Id.* at ¶ 119.  It found that, according to Professor Simi, "[President] Trump's December 19, 2020 ['will be wild'] tweet had an immediate effect on far-right extremists and militias . . . , who viewed the tweet as a 'call to arms' and began to plot activities to disrupt the January 6, 2021 joint session."  *Id.* at ¶ 117.

¶255 These findings support the conclusion that President Trump's calls for imminent lawlessness and violence during his speech were likely to incite such imminent lawlessness and violence. When President Trump told his supporters that they were "allowed to go by very different rules" and that if they did not "fight like hell," they would not "have a country anymore," it was likely that his supporters would heed his encouragement and act violently. We therefore hold that this final prong of the *Brandenburg* test has been met.

¶256 In sum, we conclude that President Trump's speech on January 6 was not protected by the First Amendment.

## IV. Conclusion

¶257 The district court erred by concluding that Section Three does not apply to the President. We therefore reverse the district court's judgment. As stated above, however, we affirm much of the district court's reasoning on other issues. Accordingly, we conclude that because President Trump is disqualified from holding the office of President under Section Three, it would be a wrongful act under the Election Code for the Secretary to list President Trump as a candidate on the presidential primary ballot. Therefore, the Secretary may not list President Trump's name on the 2024 presidential primary ballot, nor may she count any write-in votes cast for him. *See* § 1-7-114(2), C.R.S. (2023) ("A vote for a write-in candidate shall not be counted unless that candidate is qualified to hold the office

132

for which the elector's vote was cast.").  But we stay our ruling until January 4, 2024 (the day before the Secretary's deadline to certify the content of the presidential primary ballot).  If review is sought in the Supreme Court before the stay expires, it shall remain in place, and the Secretary will continue to be required to include President Trump's name on the 2024 presidential primary ballot until the receipt of any order or mandate from the Supreme Court.

**CHIEF JUSTICE BOATRIGHT** dissented.

**JUSTICE SAMOUR** dissented.

**JUSTICE BERKENKOTTER** dissented.

CHIEF JUSTICE BOATRIGHT dissenting.

¶258 I agree with the majority that an action brought under section 1-1-113, C.R.S. (2023) of Colorado's election code ("Election Code") may examine whether a candidate is qualified for office under the U.S. Constitution. But section 1-1-113 has a limited scope. *Kuhn v. Williams,* 2018 CO 30M, ¶ 1 n.1, 418 P.3d 478, 480 n.1 (per curiam, unanimous) (emphasizing "the narrow nature of our review under section 1-1-113"). In my view, the claim at issue in this case exceeds that scope. The voters' (the "Electors") action to disqualify former President Donald J. Trump under Section Three of the Fourteenth Amendment presents uniquely complex questions that exceed the adjudicative competence of section 1-1-113's expedited procedures. Simply put, section 1-1-113 was not enacted to decide whether a candidate engaged in insurrection. In my view, this cause of action should have been dismissed. Accordingly, I respectfully dissent.

## I. The Electors' Challenge Is Incompatible with a Section 1-1-113 Proceeding

¶259 Section 1-1-113 provides for the resolution of potential election code violations in a timely manner. In many scenarios, Colorado voters can challenge the Secretary of State's (the "Secretary") certification of a candidate's qualifications. *Carson v. Reiner*, 2016 CO 38, ¶ 17, 370 P.3d 1137, 1141 (acknowledging that section 1-1-113 "clearly comprehends challenges to a broad range of wrongful acts committed by [Colorado's election] officials charged with

1

duties under the code [and] comprehends a specific challenge to a designated election official's certification of a candidate"). While section 1-1-113 only offers voters a "narrow opportunity," *Kuhn*, ¶ 28, 418 P.3d at 484, that opportunity has proven effective as voters have compelled the Secretary to omit from the ballot unqualified candidates whom they would have otherwise listed. *E.g.*, *id.* at ¶ 57, 418 P.3d at 489 (barring a candidate from the ballot because his petition circulator was not a Colorado resident). Section 1-1-113's grant of discretionary review to this court has also vindicated voters' rights by preventing a decision that would have compelled the Secretary to place an unqualified candidate on the ballot. *Griswold v. Ferrigno Warren*, 2020 CO 34, ¶ 26, 462 P.3d 1081, 1087 (barring a candidate from the ballot because she failed to gather sufficient signatures).

¶260 Further, our election code suggests that a petitioner may base a challenge to the Secretary's certification of an aspiring presidential primary candidate on federal law. *Compare* § 1-4-1203(2)(a), C.R.S. (2023) (stating that a candidate must be "qualified"), *with* §1-4-1201, C.R.S. (2023) (declaring that the code conforms to federal law); *see also Coats v. Dish Network, LLC*, 2015 CO 44, ¶ 20, 350 P.3d 849, 853 (relying on federal law to interpret "lawful activity" in a Colorado statute). We have previously held, however, that some federal law claims cannot be adjudicated under section 1-1-113. *E.g.*, *Frazier v. Williams*, 2017 CO 85, ¶ 19,

2

401 P.3d 541, 545 (concluding that a 42 U.S.C. § 1983 claim cannot be the basis of, or joined to, a section 1-1-113 action).

¶261 But not all federal questions exceed the scope of section 1-1-113. A qualification challenge under Article II, Section 1[1] or the Twenty-Second Amendment[2] lends itself to section 1-1-113's procedures. Although a claim that a candidate is not thirty-five years old may be easier to resolve than a claim that a candidate is not a natural born citizen, these presidential qualifications are characteristically objective, discernible facts. Age, time previously served as president, and place of birth all parallel core qualification issues under Colorado's election code.[3] Conversely, all these questions pale in comparison to the complexity of an action to disqualify a candidate for engaging in insurrection.

---

[1] U.S. Const. art. II, § 1, cl. 5 provides the presidential qualifications:

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

[2] U.S. Const. amend. XXII, § 1 provides further presidential qualifications:

> No person shall be elected to the office of the President more than twice, and no person who has held the office of President, or acted as President, for more than two years of a term to which some other person was elected President shall be elected to the office of the President more than once.

[3] *See also* Colorado Secretary of State, *Presidential Primary 2024 Candidate Qualification Guide* 3, https://www.coloradosos.gov/pubs/elections/

¶262    Far from presenting a straightforward biographical question, Section Three of the Fourteenth Amendment proscribes insurrectionist U.S. officers from again holding office. U.S. Const. amend. XIV, § 3. Unlike qualifications such as age and place of birth, an application of Section Three requires courts to define complex terms, determine legislative intent from over 150 years ago, and make factual findings foreign to our election code. The Electors contend that there is nothing "particularly unusual about a section 1-1-113 proceeding raising constitutional issues." However, the framework that section 1-1-113 offers for identifying qualified candidates is not commensurate with the extraordinary determination to disqualify a candidate because they engaged in insurrection against the Constitution. *See* Dis. op. ¶ 352 (Berkenkotter, J., dissenting) (noting that "the historical application of section 1-1-113 . . . has been limited to challenges involving relatively straightforward issues, like whether a candidate meets a residency requirement for a school board election."). Recognizing this limitation of section 1-1-113 is not novel. *See Kuhn*, ¶ 1 n.1, 418 P.3d at 480 n.1 (emphasizing "the narrow nature of our review under section 1-1-113" and declining to address a First Amendment challenge to Colorado's residency requirement for petition

Candidates/packets/2024PresidentialPrimaryGuide.pdf [https:// perma.cc/ KK3L-X8BM] (listing the "basic qualifications" for the presidency including the qualifications from Article II and the Twenty-Second Amendment but not mentioning the Fourteenth Amendment's disqualification for insurrectionists).

circulators "because such claims exceed this court's jurisdiction in a section 1-1-113 action").

¶263   Dismissal is particularly appropriate here because the Electors brought their challenge without a determination from a proceeding (e.g., a prosecution for an insurrection-related offense) with more rigorous procedures to ensure adequate due process.   Instead, the Electors relied on section 1-1-113 and its "breakneck pace" to declare President Trump a disqualified insurrectionist.  *See Frazier*, ¶ 11, 401 P.3d at 544.

## II.  As Demonstrated by the Proceeding Below, the Statutory Timeline for a Section 1-1-113 Proceeding Does Not Permit a Claim as Complex as the Electors'

¶264   In addition to qualitative incompatibilities, the complexity of the Electors' claims cannot be squared with section 1-1-113's truncated timeline for adjudication.  Section 1-1-113 actions for presidential primary ballots fulfill a need for speed by requiring the district court to hold a hearing within *five days* and issue its decision within forty-eight hours of the hearing:

> Any such challenge must provide notice in a summary manner of an alleged impropriety that gives rise to the complaint.  No later than five days after the challenge is filed, a hearing must be held at which time the district court shall hear the challenge and assess the validity of all alleged improprieties.  The district court shall issue findings of fact and conclusions of law no later than forty-eight hours after the hearing.  The party filing the challenge has the burden to sustain the challenge by a preponderance of the evidence.

§ 1-4-1204, C.R.S. (2023). This speed comes with consequences, namely, the absence of procedures that courts, litigants, and the public would expect for complex constitutional litigation. As President Trump, argues and the Electors do not contest, section 1-1-113's procedures do not provide common tools for complex fact-finding: preliminary evidentiary or pre-trial motions hearings, subpoena powers, basic discovery, depositions, and time for disclosure of witnesses and exhibits. This same concern was raised in *Frazier*; the then-Secretary argued that "it is impossible to fully litigate a complex constitutional issue within days or weeks, as is typical of a section 1-1-113 proceeding." ¶ 18 n.3, 401 P.3d at 545 n.3. While we avoided deciding if a claim could be too complex for a section 1-1-113 proceeding in *Frazier*, that question is unavoidable here, and it demands that we reconcile the complexity of this issue with the breakneck pace of a section 1-1-113 procedure. In my view, the answer to this question is dispositive.

¶265 This case's procedural history proves my point. Despite clear requirements, the district court did not follow section 1-4-1204's statutory timeline for section 1-1-113 claims. The proceeding below involved two delays that, respectively, violated (1) the requirement that the merits hearing be held within five days of the challenge being lodged, and (2) the requirement that the district court issue its order within forty-eight hours of the merits hearing.

¶266 The Electors filed their challenge on September 6, 2023. Although the question of whether this action should be removed to federal court was resolved by September 14, the district court did not hold an evidentiary hearing until October 30. The majority appears to imply that a "status conference" on September 18 fulfills the statutory requirement that the hearing be held within five days of the Electors' challenge. Maj. op. ¶ 83. However, a status conference plainly does not satisfy the requirement: "No later than five days after the challenge is filed, a hearing must be held *at which time the district court shall hear the challenge and assess the validity of all alleged improprieties*." § 1-4-1204 (emphasis added); *see Carson*, ¶ 21, 370 P.3d at 1142 (ruling that section 1-1-113 "does not permit a challenge to an election official's certification of a candidate to the ballot, solely on the basis of the certified candidate's qualification, once the period . . . for challenging the qualification of the candidate directly has expired . . . ."). It is no mystery why the statutory timeline could not be enforced: This claim was too complex.[4] The fact it took a week shy of two months to hold a hearing that "must" take place within five days proves that section 1-1-113 is an incompatible vehicle

---

[4] The intervals between the challenge and the hearing, and the hearing and the order, should not cast aspersions on the district court, which made valiant efforts to add some process above and beyond what the election code provides. However, the Colorado General Assembly, not the district court, decides when and how to change statutory requirements.

for this claim. The majority recognizes the five-day requirement, Maj. op. ¶ 38, but it does not acknowledge the violation of section 1-4-1204's timeline or give consequence to that violation.

¶267 Nonetheless, the majority touts the fact that a hearing was held and lauds the district court's timely issuance of its decision as evidence that this matter was not too complex for a section 1-1-113 proceeding. Maj. op. ¶¶ 84–85. But was the order timely issued? Substantially, I think not. *Compare* Maj. op. ¶ 22 ("The trial began, as scheduled, on October 30 [a Monday]. The evidentiary portion lasted five days [through Friday, November 3], with closing arguments almost two weeks later, on November 15. . . . The court issued its written final order on November 17 . . . ."), *with* § 1-4-1204 ("The district court shall issue findings of fact and conclusions of law no later than forty-eight hours after the hearing."). Section 1-4-1204 only mandates two deadlines, and neither were honored. After all the evidence had been presented at a week-long hearing, the court suspended proceedings for two weeks. I find nothing in the record offering a reason grounded in the election code for the interval between the five consecutive days of the hearing and the solitary closing arguments. However, I understand the necessity to postpone the closing arguments for one reason: The complexity of the case required more time than "no later than forty-eight hours after the hearing" for the court to draft its 102-page order. Thus, while the district court formally

8

issued its order within forty-eight hours of the closing arguments, the interval between the evidentiary hearings and the closing arguments was not in compliance with section 1-4-1204.

¶268 The majority condoned the district court's failure to observe the statutory timeline by concluding that it "substantially compl[ied]." *See* Maj. op. ¶ 85. This renders the statute's five-day and forty-eight-hour requirements meaningless. *Contra Ferrigno Warren*, ¶ 20, 462 P.3d at 1085 (holding that, under Colorado's election code, a "specific statutory command could not be ignored in the name of substantial compliance"); *Gallegos Fam. Props., LLC v. Colo. Groundwater Comm'n*, 2017 CO 73, ¶ 25, 398 P.3d 599, 608 ("Where the language is clear, we must apply the language as written."). If a court must contort a special proceeding's statutory timeline to process a claim, then that claim is not proper for the special proceeding.

¶269 From my perspective, just because a hearing was held and Intervenors participated, it doesn't mean that due process was observed. Nor should it be inferred that section 1-1-113's statutory procedures, which were not followed, were up to the task. I cannot agree with the majority that the district court's extra-statutory delays and select procedure augmentations indicate that the Electors' claim was fit for adjudication under sections 1-4-1204(4) and 1-1-113. *Contra*, Maj. op. ¶ 81 ("In short, the district court admirably—and swiftly— discharged its duty to adjudicate this complex section 1-1-113 action."). Dragging

someone through a "makeshift proceeding" is not an indication that it was an appropriate process. *See* Dis. op. ¶ 274 (Samour, J., dissenting). Importantly, the Electors were not rushed into the process; they didn't have to file their challenge until they were prepared. Only Intervenors arguably had inadequate time to prepare.

¶270 Finally, only a two-thirds majority of both houses of Congress can overturn a Section Three disqualification. U.S. Const. amend. XIV, § 3. This remedy is extraordinary and speaks volumes about the gravity of the disqualification. Such a high bar indicates that an expedited hearing absent any discovery procedures and with a preponderance of the evidence standard is not the appropriate means for adjudicating a matter of this magnitude.[5] *See Frazier*, ¶¶ 17–18, 401 P.3d at 545 (holding that "inconsistencies" between the procedures of section 1-1-113 and a claim under 42 U.S.C. § 1983 "reinforce" the conclusion that not all federal law claims can be raised in section 1-1-113 proceedings).

---

[5] Although the district court made its findings using the clear and convincing standard, the election code calls for a preponderance standard. § 1-4-1204 ("The party filing the challenge has the burden to sustain the challenge by a preponderance of the evidence.").

## III. Conclusion

¶271 My opinion that this is an inadequate cause of action is dictated by the facts of this case, particularly the absence of a criminal conviction for an insurrection-related offense.

¶272 The questions presented here simply reach a magnitude of complexity not contemplated by the Colorado General Assembly for its election code enforcement statute. The proceedings below ran counter to the letter and spirit of the statutory timeframe because the Electors' claim overwhelmed the process. In the absence of an insurrection-related conviction, I would hold that a request to disqualify a candidate under Section Three of the Fourteenth Amendment is not a proper cause of action under Colorado's election code. Therefore, I would dismiss the claim at issue here. Accordingly, I respectfully dissent.

JUSTICE SAMOUR dissenting.

> Now it is undoubted that those provisions of the constitution which deny to the legislature power to deprive any person of life, liberty, or property, without due process of law, or to pass a bill of attainder or an ex post facto, are inconsistent in their spirit and general purpose with a provision which, at once without trial, deprives a whole class of persons of offices . . . for cause, however grave.

*In re Griffin*, 11 F. Cas. 7, 26 (C.C.D. Va. 1869) (No. 5,815) ("*Griffin's Case*").

¶273 These astute words, uttered by U.S. Supreme Court Chief Justice Salmon P. Chase a century and a half ago, eloquently describe one of the bedrock principles of American democracy: Our government cannot deprive someone of the right to hold public office without due process of law. Even if we are convinced that a candidate committed horrible acts in the past—dare I say, engaged in insurrection—there must be procedural due process before we can declare that individual disqualified from holding public office. Procedural due process is one of the aspects of America's democracy that sets this country apart.

¶274 The decision to bar former President Donald J. Trump ("President Trump")—by all accounts the current leading Republican presidential candidate (and reportedly the current leading overall presidential candidate)—from Colorado's presidential primary ballot flies in the face of the due process doctrine. By concluding that Section Three of the Fourteenth Amendment is self-executing, the majority approves the enforcement of that federal constitutional provision by our state courts through the truncated procedural mechanism that resides in our

1

state Election Code.[1]  Thus, based on its interpretation of Section Three, our court sanctions these makeshift proceedings employed by the district court below—which lacked basic discovery, the ability to subpoena documents and compel witnesses, workable timeframes to adequately investigate and develop defenses, and the opportunity for a fair trial—to adjudicate a federal constitutional claim (a complicated one at that) masquerading as a run-of-the-mill state Election Code claim.  And because most other states don't have the Election Code provisions we do, they won't be able to enforce Section Three.  That, in turn, will inevitably lead to the disqualification of President Trump from the presidential primary ballot in less than all fifty states, thereby risking chaos in our country. This can't possibly be the outcome the framers intended.

¶275  I agree that Section Three bars from public office anyone who, having previously taken an oath as an officer of the United States to support the federal Constitution, engages in insurrection.  But Section Three doesn't spell out the

---

[1] As pertinent here, Section Three provides that:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office . . . under the United States, or under any State, who, having previously taken an oath . . . as an officer of the United States . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same . . . .

U.S. Const. amend. XIV, § 3.

procedures that must be followed to determine whether someone has engaged in insurrection after taking the prerequisite oath. That is, it sheds no light on whether a jury must be empaneled or a bench trial will suffice, the proper burdens of proof and standards of review, the application of discovery and evidentiary rules, or even whether civil or criminal proceedings are contemplated. This dearth of procedural guidance is not surprising: Section Five of the Fourteenth Amendment specifically gives Congress absolute power to enact legislation to enforce Section Three. My colleagues in the majority concede that there is currently no legislation enacted by Congress to enforce Section Three. This is of no moment to them, however, because they conclude that Section Three is self-executing, and that the states are free to apply their own procedures (including compressed ones in an election code) to enforce it.[2] That is hard for me to swallow.

---

[2] The majority repeatedly uses "self-executing" to describe Section Three, but then reasons that this part of the Fourteenth Amendment is enforceable in Colorado only because of the procedures our legislature has enacted as part of the state's Election Code. This strikes me as an oxymoron. If a constitutional provision is truly *self-executing*, it needs no legislation to be enforced. *See Self-executing*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/self-executing [https://perma.cc/4X7W-Y8AR] (defining "self-executing" as "taking effect immediately without implementing legislation"); *see also Self-enforcing*, Black's Law Dictionary (11th ed. 2019) ("self-enforcing" means "effective and applicable without the need for any other action; self-executing"). Much like Inigo Montoya advised Vizzini, "I do not think [self-executing] means what [my colleagues in the majority] think it means." *The Princess Bride* (20th Century Fox 1987) ("You keep using that word [inconceivable]. I do not think it means what you think it means.").

¶276 Significantly, there is a federal statute that specifically criminalizes insurrection and requires that anyone convicted of engaging in such conduct be fined or imprisoned *and be disqualified from holding public office. See* 18 U.S.C. § 2383. If any federal legislation arguably enables the enforcement of Section Three, it's section 2383. True, President Trump has not been charged under that statute, so it is not before us. But the point is that this is the only federal legislation in existence at this time to potentially enforce Section Three. Had President Trump been charged under section 2383, he would have received the full panoply of constitutional rights that all defendants are afforded in criminal cases. More to the point for our purposes, had he been so charged, I wouldn't be writing separately to call attention to the substandard due process of law he received in these abbreviated Election Code proceedings.

¶277 I recognize the need to defend and protect our democracy against those who seek to undermine the peaceful transfer of power. And I embrace the judiciary's solemn role in upholding and applying the law. But that solemn role necessarily includes ensuring our courts afford everyone who comes before them (in criminal and civil proceedings alike) due process of law. Otherwise, as relevant here, how can we ever be confident that someone who is declared ineligible to hold public office pursuant to Section Three actually engaged in insurrection or rebellion after taking the prerequisite oath?

¶278 In my view, what transpired in this litigation fell woefully short of what due process demands. Because I perceive the majority's ruling that Section Three is self-executing to be the most concerning misstep in today's lengthy opinion, I focus on that aspect of the legal analysis.

¶279 Context is key here. The Fourteenth Amendment was designed to address a particular juncture in American history. William Baude & Michael Stokes Paulsen, *The Sweep and Force of Section Three*, 172 U. Pa. L. Rev. (forthcoming 2024) (manuscript at 3), https://ssrn.com/abstract=4532751. The postbellum framers were confronted with the unprecedented nexus of historical events that gave rise to and shaped secession, the Civil War, and Reconstruction. Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President into Section 3*, 28(2) Tex. Rev. L. & Pol. (forthcoming 2024) (manuscript at 214–15), https://ssrn.com/abstract=4568771. And their response, in some measure, sounded the clarion call of "a constitutional revolution." *Id.* at 99.

¶280 Indeed, the Fourteenth Amendment ushered in an expansion of federal power that undercut traditional state power. *See United States v. Washington*, 20 F. 630, 631 (C.C.W.D. Tex. 1883) ("The fourteenth amendment is a limitation upon the powers of the state and an enlargement of the powers of congress."); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 255 (1995) (Stevens, J., dissenting) ("The Fourteenth Amendment directly empowers Congress at the same time it expressly

limits the States."). Forefront in the minds of the framers was the evident concern that the states would again seek to undermine the national government. In short, the states—state institutions, state officials, and state courts—were not to be trusted. *Ex parte Virginia*, 100 U.S. 339, 346 (1879) ("The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power.").

¶281 Thus, the indelible trespass of the former confederate states was met squarely by an overarching goal to render federal institutional authority paramount. Such is the contextual framework informing my view of the instant matter. To my mind, it compels the conclusion, soundly supported by the framers' intent and the weight of the relevant authorities, that Section Three of the Fourteenth Amendment is not self-executing, and that Congress alone is empowered to pass any enabling legislation.

¶282 My colleagues in the majority turn Section Three on its head and hold that it licenses states to supersede the federal government. Respectfully, they have it backwards. Because no federal legislation currently exists to power Section Three and propel it into action, because President Trump has not been charged under section 2383, and because there is absolutely no authority permitting Colorado state courts to use Colorado's Election Code as an engine to provide the necessary

thrust to effectuate Section Three, I respectfully dissent.[3] I would affirm the district court's judgment in favor of President Trump, but I would do so on other grounds.[4]

## I. Analysis

## A. Pertinent Procedural Posture

¶283 The district court gave short shrift to the question of whether Section Three is self-executing. In its Omnibus Order, which denied President Trump's September 29 motion to dismiss, the court found the issue "irrelevant." The court ruled, in conclusory fashion, that states are empowered to execute Section Three via their own enabling legislation and that Colorado's Election Code constitutes such an enactment. This analytical shortcut, though convenient, is inconsistent with both the text of the Fourteenth Amendment and persuasive authority interpreting it.

¶284 *Griffin's Case* is the jumping-off point for any Section Three analysis.

---

[3] There is a colorable argument that the majority incorrectly holds that Section Three applies to the President of the United States. Other parts of the majority's analysis, including the determinations that President Trump engaged in insurrection and that his remarks deserve no shelter under the First Amendment's rather expansive protective canopy, are at least questionable. Because I conclude that Section Three is not self-executing, and because that conclusion is dispositive, I don't address any other issue.

[4] The district court decided that Section Three does not apply to the President of the United States.

## B. *Griffin's Case*: The Fountainhead

¶285     In 1869, less than a year after the ratification of the Fourteenth Amendment, U.S. Supreme Court Chief Justice Chase presided over *Griffin's Case* in the federal circuit court for the district of Virginia.[5] *Griffin's Case* is the wellspring of Section Three jurisprudence. And, given the temporal proximity of Chief Justice Chase's pronouncements on the topic of self-execution to the passage and ratification of the Fourteenth Amendment, I consider the holding in *Griffin's Case* compelling.

¶286     Judge Hugh W. Sheffey presided over Caesar Griffin's criminal trial after the Fourteenth Amendment went into effect. *Griffin's Case*, 11 F. Cas. at 22. Before the Civil War, Sheffey held a Section Three-triggering position, and so, had taken an oath to support the Constitution of the United States. *Id.* Subsequently, Sheffey served in Virginia's confederate legislature. *Id.* It was not until after the war that Sheffey was appointed to a state court judgeship, the position he held at the time of Griffin's trial. *Id.* at 16. Following the jury's guilty verdict on the charge of assault with intent to kill, Judge Sheffey sentenced Griffin to two years' imprisonment. *Id.* at 22–23.

¶287     Griffin filed a collateral attack in federal district court. He argued that his sentence was null because Section Three had "instantly, on the day of its

---

[5] At the time, Supreme Court justices rode the circuit and sat in regional federal courts.

promulgation, vacated all offices held by persons within the category of prohibition," thereby rendering Judge Sheffey ineligible to be on the bench. *Id.* at 24. More specifically, Griffin claimed that Sheffey was disqualified from being a judge because he had engaged in conduct prohibited by Section Three. *Id.* The federal district court agreed and ordered Griffin's immediate discharge from custody. *Id.*

¶288 On appeal, Chief Justice Chase framed the issue in the following terms: "[W]hether upon a sound construction of the amendment, it must be regarded as operating directly, *without any intermediate proceeding whatever*, upon all persons within the category of prohibition, and as depriving them at once, and absolutely, of all official authority and power." *Id.* at 23 (emphasis added). Chief Justice Chase grounded his resolution of this self-execution inquiry in the "character of the third section of the amendment." *Id.* at 25. In other words, he focused on the context in which the disqualification clause of the Fourteenth Amendment was enacted. Of course, he recognized that the ultimate object of this part of the Fourteenth Amendment was "to exclude from certain offices a certain class of persons." *Id.* at 26. But his prefatory statements echo the bugle blow of constitutional revolution: "The amendment itself was the first of the series of measures proposed or adopted by congress with a view to the reorganization of state governments acknowledging the constitutional supremacy of the national

9

government, in those states which had attempted . . . to establish an independent Confederacy." *Id.* at 25.

¶289  Crucially, he observed that "it is obviously impossible to [disqualify certain officers] by a simple declaration, whether in the constitution or in an act of congress." *Id.* at 26.  He added that to carry out Section Three's punitive mandate and enforce "any sentence of exclusion," it must first "be ascertained what particular individuals are embraced by the definition." *Id.*  Chief Justice Chase explained that "[t]o accomplish this ascertainment and ensure effective results," considerable procedural and normative mechanisms would need to be introduced; certainly, "proceedings, evidence, decisions, and enforcements of decisions, more or less formal, are indispensable." *Id.*  And here's the kicker, the beating heart of *Griffin's Case*: Chief Justice Chase declared that these indispensable mechanisms "*can only be provided for by congress.*" *Id.* (emphasis added).

¶290  It was the very language of the Fourteenth Amendment, Chief Justice Chase continued, that put this proposition beyond doubt: "Now, the necessity of this is recognized by the amendment itself, in its fifth and final section, which declares that 'congress shall have power to enforce, *by appropriate legislation*, the provision[s] of this article.'" *Id.* (emphasis added) (quoting U.S. Const. amend. XIV, § 3).  Chief Justice Chase noted that Section Five "qualifies [Section Three] to the same extent as it would if the whole amendment consisted of these two

sections." *Id.* And pivoting back to Section Three, he pointed out that, consistent with Section Five, its final clause "gives to congress absolute control of the whole operation of the amendment." *Id.*; *see* U.S. Const. amend. XIV, § 3 ("But Congress may by a vote of two-thirds of each House, remove such disability.").

¶291 Chief Justice Chase, therefore, concluded:

> Taking the third section then, in its completeness with this final clause, *it seems to put beyond reasonable question* the conclusion that the intention of the people of the United States, in adopting the fourteenth amendment, was to create a disability, to be removed in proper cases by a two-thirds vote, and *to be made operative in other cases by the legislation of congress in its ordinary course.*

*Griffin's Case*, 11 F. Cas. at 26 (emphases added).

¶292 I extract three seminal, and related, takeaways from this review of *Griffin's Case*. First, Section Three is not self-executing. Second, only Congress can pass the "appropriate legislation" needed to execute it. And third, this grant of power to Congress was not merely formalistic; it was also pragmatic. Indeed, it was indicative of the complex nature of the disqualification function. Chief Justice Chase perceived that Section Three would require an array of mechanisms—procedural, evidentiary, and definitional—to ascertain who was subject to disqualification and how they could be disqualified. More on this third notion later.

¶293 For now, though, it is worth stressing that, despite detractors in some quarters, the other premises have withstood the test of time: Section Three is not

11

self-executing, and Congress has the exclusive authority to enforce it. *See Cale v. City of Covington*, 586 F.2d 311, 316 (4th Cir. 1978) (citing *Griffin's Case* for the proposition that Section Three is "not self-executing absent congressional action"); *State v. Buckley*, 54 Ala. 599, 616–17 (1875) (same); *Hansen v. Finchem*, No. CV-22-0099-AP/EL, 2022 WL 1468157, *1 (Ariz. May 9, 2022) (affirming the lower court's ruling against disqualification on state law grounds but stating that "Section 5 of the Fourteenth Amendment appears to expressly delegate to Congress the authority to devise the method to enforce the Disqualification Clause"); *see also* Va. Op. Att'y Gen. No. 21-003, at 3 (Jan. 22, 2021) (citing *Griffin's Case* and stating that "the weight of authority appears to be that Section 3 of the Fourteenth Amendment is not 'self-executing'").

¶294 I now address the criticisms launched by the Electors against the enduring vintage of *Griffin's Case*. For the reasons I articulate, I am not persuaded by any of the contentions advanced.

## C. Harmonizing *Griffin's Case* and *Case of Davis*

¶295 The Electors argue that Chief Justice Chase took the opposite tack on Section Three a couple of years before deciding *Griffin's Case*. *See Case of Davis*, 7 F. Cas. 63 (C.C.D. Va. 1871). But *Griffin's Case* was decided after *Case of Davis*, and unlike

12

*Griffin's Case*, *Case of Davis* is a two-judicial-officer, unwritten, split decision.[6]

Hence, to put it mildly, *Case of Davis* is of questionable precedential value. Indeed,

the majority doesn't rely on *Case of Davis* in its attempt to undermine *Griffin's Case*.

¶296  In *Case of Davis*, Chief Justice Chase, again sitting as a circuit court judge,

presided over the treason prosecution of former confederate president, Jefferson

Davis. *Id.* The question before the court was whether Section Three displaced the

federal criminal treason charges levied against Davis. *Id.* at 102. Defense counsel

asserted that Section Three provided the exclusive punishment for those within its

reach, thus foreclosing prosecution under the federal treason statute. *Id.* at 90–91.

Furthermore, defense counsel maintained that Section Three "executes itself" and

"needs no legislation on the part of congress to give it effect." *Id.* at 90.

¶297  Due to the structure of the federal judiciary at the time, the case was heard

by both a federal district court judge and Chief Justice Chase sitting together. *See*

Judiciary Act of 1802, 2 Stat. 156, 159, § 6. The judicial officers, however, failed to

reach consensus on the defense's motion to quash the indictment. *Case of Davis*,

---

[6] Although the year in the citation for *Case of Davis* (1871) postdates the year in the citation for *Griffin's Case* (1869), it was in fact *Case of Davis* that came first. *See* Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 100 n.66 (2021). Chief Justice Chase announced on December 5, 1868, that the court had failed to reach consensus in *Case of Davis*. *Case of Davis*, 7 F. Cas. at 102; Certificate of Division, *Case of Jefferson Davis*, 7 F. Cas. 63 (C.C.D. Va. 1867–1871) (No. 324), https://joshblackman.com/wp-content/uploads/2023/08/5220.pdf [https://perma.cc/K7QC-4YZJ].

7 F. Cas. at 102. Accordingly, a certificate of disagreement was submitted for review by the Supreme Court at its next session. *Id.* Notably, though, the case was never heard by the Supreme Court because President Johnson issued a proclamation of general amnesty in December 1868, effectively disposing of the treason charges. *Id.*

¶298 Although the certificate of disagreement did not indicate the judicial officers' votes, the final sentence in the 1894 report of the case in the *Federal Reports* states that Chief Justice Chase "instructed the reporter to record him as having been of opinion on the disagreement, that the indictment should be quashed, and all further proceedings barred by the effect of the fourteenth amendment to the constitution of the United States." *Id.* Over the years, some have clung to this hearsay to posit that Chief Justice Chase was inconsistent in his application of Section Three, waffling on the issue of self-execution.

¶299 Certain legal scholars have sought to explain this purported incongruence by surmising that Chief Justice Chase's application of Section Three in *Griffin's Case* was politically motivated. Consequently, they criticize *Griffin's Case* as wrongly decided and the result of flawed logic. *See* Baude & Paulsen, *supra* (manuscript at 35–49). Other legal scholars, however, question whether the statement quoted above from the *Federal Reports* accurately represented Chief Justice Chase's views. They point out that the case reporter, a former confederate

14

general, was the very attorney who represented Judge Sheffey in *Griffin's Case*.[7] *See* Blackman & Tillman, *supra* (manuscript at 15). Even assuming *Case of Davis* warrants any consideration at all, there is no need to join this affray because these cases can be reconciled in a principled manner by recognizing that there are two distinct senses of self-execution. *Id.* at 19. I find this distinction both helpful and borne out by the case law.

¶300 First, there is self-execution as a *shield*, allowing individuals to raise the Constitution defensively, in response to an action brought by a third party. Second, there is self-execution as a *sword*—such as when individuals invoke the Constitution in advancing a theory of liability or cause of action that supports affirmative relief. When acting as a *shield*, the Fourteenth Amendment is self-executing. *Cale*, 586 F.2d at 316. The Fourteenth Amendment, however, cannot act as a self-executing *sword*; rather, an individual seeking affirmative relief under the Amendment must rely on legislation from Congress. *Id.*

¶301 The Fourth Circuit aptly adopted this distinction in *Cale*, thereby reconciling any apparent inconsistencies in Fourteenth Amendment jurisprudence. That case

---

[7] *Griffin's Case* was decided in 1869 and the statement from the case reporter regarding *Case of Davis* appeared in the 1894 *Federal Reports*. Blackman & Tillman, *supra* (manuscript at 140).

implicated a wrongful discharge action in which the plaintiff asked the court to sanction an implied cause of action arising under the Fourteenth Amendment's due process clause. *Id.* at 313. In examining whether an implied cause of action exists under the due process clause of the Fourteenth Amendment, the court turned to cases that have construed Section Five. It began by discussing *Ex parte Virginia*, where the Supreme Court explained that the Fourteenth Amendment derives much of its force from Section Five, which envisions enabling legislation from Congress to effectuate the prohibitions of the amendment:

> It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged[.] *Congress is authorized to enforce the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective.*

*Ex parte Virginia*, 100 U.S. at 345–46 (first emphasis in original, second emphasis added).

¶302 But shortly after deciding *Ex parte Virginia*, the Supreme Court declared the Fourteenth Amendment to be "undoubtedly self-executing without any ancillary legislation," while simultaneously making the seemingly inconsistent statement that Section Five "invests Congress with power to enforce" the Fourteenth Amendment "in order that the national will, thus declared, may not be a mere brutum fulmen." *The Civil Rights Cases*, 109 U.S. 3, 11, 20 (1883). Although at first

16

blush the opinion in the *Civil Rights Cases* appears to be both internally inconsistent and inconsistent with *Ex parte Virginia*, the *Cale* court did not so hold. *Cale*, 586 F.2d at 316. Instead, the *Cale* court resolved any apparent inconsistencies by distinguishing between, on the one hand, "the protection the Fourteenth Amendment provide[s] of its own force as a shield under the doctrine of judicial review," and on the other, affirmative relief sought under the amendment as a sword, which is unavailable without legislation from Congress. *Id.*

¶303 In supporting this distinction, the *Cale* court found refuge in the *Slaughter-House Cases*. 83 U.S. 36 (1872). There, the defendants invoked the Fourteenth Amendment as a shield by arguing that a local law restricting where animals could be slaughtered deprived the city's butchers of their "right to exercise their trade." *Id.* at 60. The Supreme Court, however, held that given the history of the Reconstruction Amendments and their purpose of preventing discrimination against the newly liberated enslaved people, the butchers' "right to exercise their trade" was not a right that fell within the purview of the privileges-and-immunities provision of Section One of the Fourteenth Amendment. *Id.* at 81. Of particular interest for our purposes is the fact that the Court did not reject the use of the Fourteenth Amendment as a self-executing shield, but rather rejected the argument that the particular right in question fit within the Fourteenth Amendment's protection.

¶304 Importantly, based on its examination of *Ex parte Virginia*, the *Civil Rights Cases*, and the *Slaughter-House Cases*, the *Cale* court observed that "the Congress and Supreme Court of the time were in agreement that affirmative relief under the amendment should come from Congress." *Cale*, 586 F.2d at 316. The *Cale* court added that it's only when state laws or proceedings are asserted "in hostility to rights and privileges" that the Fourteenth Amendment, and specifically Section One, may be raised as a self-executing defense to those laws or proceedings. *Id.* (discussing the *Civil Rights Cases*, 109 U.S. at 46 (Harlan, J., dissenting)); *see also The Slaughter-House Cases*, 83 U.S. at 81 (explaining that when "it is a State that is to be dealt with, and not alone the validity of its laws," the matter should be left in the hands of Congress).

¶305 The defensive-offensive dynamic of the Fourteenth Amendment is best exemplified by the interplay between 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908). *See Cale*, 586 F.2d at 316–17. In *Ex parte Young*, multiple railroad companies wielded the Fourteenth Amendment's due process clause as a shield to request enjoinment of the future enforcement of Minnesota's mandatory railroad rates. 209 U.S. at 130. The Court ruled in their favor, holding that they could prospectively bring suit against a state official to prevent the enforcement of an act that violated the federal constitution. *Id.* at 167. But an *Ex parte Young* claim is not so much an affirmative cause of action as it is a defense that may be asserted in

18

anticipation of the enforcement of state laws alleged to be unconstitutional. *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). Hence, *Ex parte Young* provides a means of vindicating Fourteenth Amendment rights without violating the grant of exclusive enforcement power to Congress. When a party wishes to assert its Fourteenth Amendment rights offensively, however, it must bring a cause of action under legislation enacted by Congress, such as section 1983.

¶306 Between affirmative relief provided by Congress and defensive *Ex parte Young* claims, constitutional rights are "protected in all instances." *Cale*, 586 F.2d at 316–17. Not surprisingly, after declining to find an implied cause of action permitting affirmative relief within the Fourteenth Amendment, the Fourth Circuit in *Cale* remanded to the district court with instructions to determine whether the plaintiff's wrongful discharge claim could be brought under section 1983, the proper enforcement mechanism. *Id.* at 312.

¶307 The majority devotes all of one sentence to *Cale* and disregards most of the Supreme Court jurisprudence to which that thoughtful opinion is moored. Maj. op. at ¶ 103. It is true that *Cale* was a Section One, not a Section Three, case. But *Cale* cited to *Griffin's Case* (a Section Three case) in determining that the Fourteenth Amendment cannot be used as a self-executing sword, thus tethering the distinction to both Sections. *Cale*, 586 F.2d at 316. Accordingly, while courts have

19

seldom had occasion to interpret Section Three, the case law on Section One is instructive on the issue of self-execution.

¶308 Critically, the Supreme Court has affirmed that the Fourteenth Amendment, while offering protection under certain circumstances, does not provide a self-executing cause of action. *Ownbey v. Morgan*, 256 U.S. 94, 112 (1921) ("[I]t cannot rightly be said that the Fourteenth Amendment furnishes a universal and self-executing remedy. Its function is negative, [n]ot affirmative, and it carries no mandate for particular measures of reform."). Moreover, as pertinent here, the Supreme Court has retreated from recognizing implied causes of action, instead holding that for a cause of action to exist, Congress must expressly authorize it. *Alexander v. Sandoval*, 532 U.S. 275, 276 (2001) (refusing to recognize a private right of action because, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress").

¶309 The majority nevertheless protests that interpreting any section of the Fourteenth Amendment as requiring legislation yields absurd results because the rest of the Reconstruction Amendments are self-executing. Maj. op. ¶ 96. I do not dispute that the Thirteenth and Fifteenth Amendments are self-executing. But I disagree that Section Three must therefore be deemed self-executing as well. The Thirteenth and Fifteenth Amendments, on the one hand, and the Fourteenth Amendment, on the other, are different.

¶310   The Thirteenth and Fifteenth Amendments speak in affirmative, universal terms to abolish slavery, create the right to vote, and restrain not only government actors, but also private individuals.  *See* George Rutherglen, *State Action, Private Action, and the Thirteenth Amendment*, 94 Va. L. Rev. 1367, 1367 (2008); *Guinn v. United States*, 238 U.S. 347, 363 (1915) (recognizing "the right of suffrage" created by the Fifteenth Amendment's "generic character").  The Fourteenth Amendment, however, was born out of a deep suspicion of the states and acts as a negative policing mechanism intended solely to curtail state power.  *Adarand*, 515 U.S. at 255 (Stevens, J. dissenting) ("The Fourteenth Amendment directly empowers Congress at the same time it expressly limits the States."); *The Civil Rights Cases*, 109 U.S. at 11 (holding that the Fourteenth Amendment applies to state action, not private action).  This curtailment applies both to state laws or actions abridging rights and to a state's selection of government officials.  To give effect to this amendment while respecting our federalist system, courts have turned to the sword-shield paradigm of self-execution, thereby striking "a balance between delegated federal power and reserved state power" without forsaking the protection of constitutional rights "in all instances."  *Michigan Corr. Org.*, 774 F.3d at 900; *Cale*, 586 F.2d at 317.

¶311   To draw a yet deeper line in the sand, unlike the Thirteenth and Fifteenth Amendments, Section Three does not indelibly ensure a right but instead allows

the federal government to act as a protective check against a state's selection of government officials so as to preclude elected insurrectionists and safeguard democracy. This shift in power between the authority of the states to choose their own government officials and the authority of the federal government as a last defense is all the more reason to require a congressionally created cause of action to direct the execution of this federal oversight.

¶312 In sum, Chief Justice Chase's holding in *Griffin's Case* appears consistent and in alignment with both his alleged vote in *Case of Davis* and our framework for Fourteenth Amendment litigation. Griffin wielded Section Three as a self-executing sword, invoking the provision as a cause of action to disqualify Judge Sheffey. Davis, on the other hand, took a defensive posture and invoked Section Three as a self-executing shield, arguing that it provided the exclusive punishment for insurrection, thus displacing the federal criminal treason charges brought against him.

¶313 Having said that, I do not rely solely on *Griffin's Case*. Congress's own actions corroborate my understanding of Section Three.

## D. Erstwhile Enabling Legislation

¶314 The majority's ruling that Section Three self-executes without the need for any federal enforcement legislation is further undermined by Congress's promulgation of just such legislation. One year after *Griffin's Case* was decided,

and perhaps in response to it, Congress enacted the Enforcement Act of 1870.  The Enforcement Act contained two provisions for the specific purpose of *enforcing Section Three*.  Enforcement Act of 1870, ch. 114, 16 Stat. 140, 143–44.  The first provided a quo warranto mechanism whereby a federal district attorney could bring a civil suit in federal court to remove from office a person who was disqualified by Section Three.  *Id.* at 143.  The second permitted a criminal prosecution for knowingly accepting or holding office in violation of Section Three, and included punishment by imprisonment of not more than a year, a fine of not more than $1,000, or both.  *Id.* at 143–44.

¶315    The enforcement purpose behind the Act was evident in the congressional debates held on these very two provisions.  Speaking in support of their adoption, Senator Lyman Trumbull, referring to Section Three, stated, "But notwithstanding that constitutional provision we know that hundreds of men are holding office who are disqualified by the Constitution.  *The Constitution provides no means for enforcing itself, and this is merely a bill to give effect to the fundamental law embraced in the Constitution*."  Cong. Globe, 41st Cong., 1st Sess. 626 (1869) (emphasis added).  He later reiterated this point as he explained that "[s]ome statute is certainly necessary to enforce the constitutional provision."  *Id.*  The debate on the floor focused not on whether the provisions were necessary for enforcing Section Three—that seemed to be a foregone conclusion—but instead on whether the

23

second provision and its attendant punishments were necessary. The need for the first provision was so self-evident that it was not even debated. As Senator Garrett Davis put it, the first provision simply provided an "adequate remedy to prevent any of the criminals under the fourteenth amendment of the Constitution from holding office in defiance of its letter." *Id.* at 627.

¶316 While the quo warranto provision in the Enforcement Act would have provided a civil cause of action to challenge President Trump's eligibility to appear on Colorado's presidential primary ballot, Congress repealed it in 1948. *See* Myles S. Lynch, *Disloyalty & Disqualification: Reconstructing Section 3 of the Fourteenth Amendment*, 30 Wm. & Mary Bill Rts. J. 153, 206 n.365 (2021) (citing Act of June 25, 1948, ch. 646, § 39, 62 Stat. 869, 993); *see also* Act of June 25, 1948, ch. 645, § 2383, 62 Stat. 683, 808. The Enforcement Act's criminal provision, however, appears to have survived: As best I can tell, 18 U.S.C. § 2383 is its descendant. *Id.*

¶317 Presumably recognizing the civil-action gap created by the 1948 repeal, just months after the January 6, 2021 incident, legislation was proposed to allow the Attorney General of the United States to bring a civil action "against any Officeholder who engages in insurrection or rebellion, including any Officeholder who, after becoming an Officeholder, engaged in insurrection or rebellion." H.R. 1405, 117th Cong. (2021). H.R. 1405 would have disqualified such an Officeholder from federal or state office. *Id.* Furthermore, it would have provided

24

what has been so apparently lacking from this state proceeding—clear designations of the appropriate procedures, forum, and standard of evidence, as well as the definition of "insurrection or rebellion." *Id.*

¶318 H.R. 1405 made it no further than introduction in the House. But the relevant point for our purposes remains: As recently as 2021, just months after the January 6 incident, Congress considered legislation to enforce Section Three through a civil proceeding. Why would Congress do so if, as the majority insists, Section Three is self-executing? Along the same lines, if the majority is correct that Section Three is self-executing, why did Congress pass the *Enforcement* Act to begin with (on the heels of *Griffin's Case*) and then allow it to remain in effect in its entirety until 1948? The majority offers no salient explanation.

¶319 If there is any enforcing legislation for Section Three currently on the books, it is arguably what remains from the Enforcement Act, 18 U.S.C. § 2383. Similar to its ancestor, that statute states that:

> Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this title or imprisoned not more than ten years, or both; and shall be incapable of holding any office under the United States.

While section 2383 might provide an enforcement mechanism for Section Three, it is not presently before us. That's because President Trump has never been charged

25

with, let alone convicted of, violating it. The instant litigation feels to me like an end run around section 2383.

¶320 To the extent there is interest in seeking to disqualify President Trump from holding public office (one of the mandatory punishments provided in section 2383) based on the allegation that he engaged in insurrection (one of the acts prohibited by section 2383), why wasn't he charged under section 2383? And, relatedly, why isn't he entitled to more due process than that which he received in this constricted Election Code proceeding? To be sure, unlike section 2383, Section Three prescribes neither a fine nor a term of imprisonment as a consequence for engaging in an insurrection after taking the prerequisite oath. So, I'm not suggesting that President Trump should have been afforded all the rights to which a defendant would be entitled in a criminal case. But here, the district court found that he engaged in insurrection after taking the prerequisite oath, despite affording him subpar due process (even under civil-procedure standards).

¶321 Compellingly, although H.R. 1405 wouldn't have called for a criminal proceeding, it would have provided more due process than that available in a civil action. For example, H.R. 1405 would have required any action brought to be "heard and determined by a district court of three judges." H.R. 1405, § 1(d)(1). Additionally, any allegation of insurrection would have demanded proof by clear and convincing evidence, and any final order or injunction would have been

26

reviewable by appeal directly to the U.S. Supreme Court. *Id.* at § (1)(d)(1)–(4). I infer from these provisions that at least some members of Congress acknowledged the need to provide ample due process (more than is available in typical civil cases) to anyone alleged to have violated Section Three.

¶322 My colleagues in the majority necessarily view as acceptable the diminished due process afforded President Trump as a result of enforcing Section Three through our Election Code. Instead, they prioritize their fear that a ruling disallowing the disqualification of President Trump from the primary ballot pursuant to Section Three would mean that "Colorado could not exclude from the ballot even candidates who plainly do not satisfy the age, residency, and citizenship requirements of the Presidential Qualifications Clause of Article II." Maj. op. ¶ 68. They see this as a more insidious evil. As I discuss in the following section, however, my colleagues are mistaken in their understanding of the law, and their worry is therefore unjustified.

### E. Section Three of the Fourteenth Amendment Is Unlike Other Constitutional Qualification Clauses

¶323 The U.S. Supreme Court has acknowledged a non-exhaustive list of constitutional Qualification Clauses. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 787 n.2 (1995) (quoting *Powell v. McCormack*, 395 U.S. 486, 520 n.41 (1969), which lists "qualifications" codified in the following provisions of the U.S. Constitution: (1) Art. I, § 2, cl. 2; (2) Art. I, § 3, cl. 7; (3) Art. I, § 6, cl. 2; (4) Art. IV,

27

§ 4; (5) Art. VI, cl. 3; and (6) Amend. XIV, § 3). This list can fairly be expanded to include Article II, Section One, Clause Five, and perhaps also Section One of the Twenty-Second Amendment. *See* U.S. Const. art. II, § 1, cl. 5 (laying out three presidential eligibility requirements related to birth ("natural born Citizen"), age ("thirty five Years"), and residency ("fourteen Years a Resident"), which are similar to those specified in Art. I, § 2, cl. 2); U.S. Const. amend. XXII, § 1 (using the same "No person shall" language found in Art. I, § 2, cl. 2 and specifying a two-term limit for the presidency).

¶324 Although Section Three was included in *Powell* among the so-called Qualification Clauses, closer scrutiny reveals that it is unique and deserving of different treatment. That's because Section Three is the only one that is "qualifie[d]" by the following language: "[C]ongress shall have power to enforce, *by appropriate legislation*, the provision[s] of this article." *Griffin's Case*, 11 F. Cas. at 26 (emphasis added) (quoting U.S. Const. amend. XIV, § 5 and stating that "[t]he fifth section qualifies the third"). None of the other Qualification Clauses—even when viewed in the context of the original Articles in toto—contains the "appropriate legislation" modifier. Indeed, that modifier only appears in certain other Amendments, none of which are objectively relevant to the instant matter. I need not contemplate what bearing, if any, this has on the self-executing nature of constitutional provisions more generally. While that might be an open question,

*see* Blackman & Tillman, *supra* (manuscript at 23) (noting that there appears to be "no deep well of consensus that constitutional provisions are automatically self-executing or even presumptively self-executing"), the demands of the instant matter counsel in favor of limiting my exposition to the Constitution's presidential qualifications, especially those found in Article II, Section One, Clause Five.

¶325 Here, once again, the interplay between Sections Three and Five of the Fourteenth Amendment is of great significance. *See Griffin's Case*, 11 F. Cas. at 26. As mentioned, Article II, Section One, Clause Five contains nothing akin to the "appropriate legislation" language in Section Five of the Fourteenth Amendment. Thus, unlike Section Three's disqualification clause, which is modified by Section Five's "appropriate legislation" language, the Article II presidential qualifications do not appear to have a constitutionally mandated reliance on congressional enabling legislation.

¶326 We are not at liberty to ignore this blistering lacuna in Article II's language. But that is exactly what my colleagues in the majority do. And in so doing, they err. Even if the presidential qualifications contained in Article II are self-executing or allow for state enabling legislation—thereby providing the Electors with a cause of action to enjoin the Secretary of State ("the Secretary") from certifying a candidate disqualified by birth, age, or residency, to the Colorado presidential primary ballot, *see, e.g.*, *Hassan v. Colorado*, 870 F. Supp. 2d 1192, 1194–95 (D. Colo.

2012), *aff'd*, 495 F. App'x 947 (10th Cir. 2012); *see also* § 1-4-1203(2)(a), C.R.S. (2023)—the same does not hold true for Section Three's disqualification clause.

¶327 Moreover, I detect a principled reason underlying this discrepancy in the language of Article II and Section Three. It relates to what I previously identified as my third takeaway from *Griffin's Case*. Recall that the Fourteenth Amendment's grant of absolute power to Congress vis-à-vis Section Three's enforcement was pragmatic, not merely formalistic. It was motivated by the complex nature of the disqualification function. Chief Justice Chase presciently observed that to "ascertain what particular individuals are embraced" by Section Three's disqualifying function, and to "ensure effective results" in a disqualification case, considerable "proceedings, evidence, decisions, and enforcements of decisions . . . are indispensable." *Griffin's Case*, 11 F. Cas. at 26. In my view, the unwieldy experience of the instant litigation proves beyond any doubt the foresight of Chief Justice Chase's pronouncements. It doesn't require much process, procedure, or legal acumen to determine whether a candidate is barred by the binary and clerical requirements of birth, age, residency, and term limits. Typically, a notarized statement of intent will do the trick. *See* § 1-4-1204(1)(c), C.R.S. (2023). By contrast, Section Three disqualification necessarily requires substantial procedural and normative mechanisms to ensure a fair and constitutionally compliant outcome. These include, to name but a few, instruction on discovery and evidentiary rules;

guidance as to whether a jury must be empaneled or a bench trial will suffice; direction as to the proper standards of review and burdens of proof; and clarification about whether civil or criminal proceedings are contemplated. Additionally, there's a vital need for definitional counsel on such questions as who is an "officer of the United States"? What is an "insurrection"? What does it mean to "engage[] in" the same? Does "incitement" count?

¶328 By no means do I intend to undermine the sacred role of the judiciary in directing the course of similar issues through precedential pathways. Nor would I have the third branch hamstrung in its task of setting the metes and bounds of litigation practice. But when the enforcement power of a punitive constitutional mandate is delegated to Congress in such unequivocal terms, it would appear decidedly outside the judicial bailiwick to furnish the scaffolding that only "appropriate legislation" can supply. Because the Constitution gives this job to Congress, *and only Congress*, I consider it equally improper—indeed, constitutionally impossible—for state legislatures, in the absence of federal legislation, to create pseudo causes of action pursuant to Section Three's disqualification clause. This is precisely what the framers sought to prevent.

¶329 For this reason, the cases cited by the district court for the proposition that "states can, and have, applied Section [Three] pursuant to state statute without federal legislation" do not alter my analysis. *See Worthy v. Barrett*, 63 N.C. 199, 200

31

(1869), *appeal dismissed sub no. Worthy v. Comm'rs*, 76 U.S. 611 (1869); *In re Tate*, 63 N.C. 308, 309 (1869); *State ex rel. Sandlin v. Watkins*, 21 La. Ann. 631, 631–34 (La. 1869); *State v. Griffin*, No. D-101-CV-2022-00473, 2022 WL 4295619, at *15–22 (N.M. Dist. Sept. 6, 2022); *Rowan v. Greene*, No. 2222582-OSAH-SECSTATE-CE-57-Beaudrot, 1 (Ga. Off. Admin. Hearings May 6, 2022).  To the extent other state courts have concluded that their own state statutes allow them to adjudicate Section Three claims, I respectfully submit that they are flat out wrong.  Unfortunately, the majority joins company with these misguided decisions and holds that our General Assembly not only can, but has, empowered Colorado's state courts to adjudicate Section Three claims via our Election Code.[8]  Maj. op. ¶ 88 n.11.  I turn next to why Colorado's Election Code cannot rescue the majority.

### F. Colorado's Election Code Cannot Supply What Congress Has Withheld

¶330    There is zero authority permitting state legislatures to do that which, though delegated to it, Congress has declined to do.  The majority, however, holds that the Electors' Fourteenth Amendment claim can be brought under sections 1-1-113

---

[8] Interestingly, the majority does not explain what should happen moving forward if nobody challenges a candidate whom the Secretary believes previously engaged in insurrection after taking the prerequisite oath.  Without the state courts' involvement, is the Secretary supposed to decide on her own whether the candidate is disqualified from public office by Section Three?  And if so, how would the Secretary go about doing that?  Would the majority expect her to act as investigator, prosecutor, and adjudicator in that type of situation?

32

and 1-4-1204(4), C.R.S. (2023), of the Colorado Election Code because the Secretary's listing of a constitutionally disqualified candidate on the presidential primary ballot would be a "wrongful act," as that term is used in section 1-1-113. *See* § 1-1-113(1). Maj. op. ¶¶ 4–5. But the truncated procedures and limited due process provided by sections 1-1-113 and 1-4-1204(4) are wholly insufficient to address the constitutional issues currently at play.

¶331 Section 1-1-113(1) provides that "when any eligible elector files a verified petition . . . alleging that a person charged with a duty *under this code* has committed or is about to commit a breach or neglect of duty or other *wrongful act*, . . . upon a finding of good cause, the district court shall issue an order requiring substantial compliance with the provisions of this code." (Emphases added.) Section 1-4-1204(4) outlines the procedures to be followed when a section 1-1-113 challenge concerns the listing of a candidate on the presidential primary ballot. It provides that the challenge "must be made in writing and filed with the district court . . . no later than five days after the filing deadline for candidates." § 1-4-1204(4). The written challenge "must provide notice in a summary manner of an alleged impropriety that gives rise to the complaint." *Id.* Once the challenge is filed, the district court must hold a hearing within five days. *Id.* At that hearing, the district court must "hear the challenge and assess the validity of all alleged improprieties." *Id.* The filing party has the burden of sustaining the challenge by

a preponderance of the evidence. *Id.* After the hearing, the district court must issue its findings of fact and conclusions of law within forty-eight hours. *Id.* An appeal from the district court's ruling must be brought before this court within three days of the district court's order, and this court has discretion to accept or decline jurisdiction over the case. § 1-4-1204(4); § 1-1-113(3).

¶332 As these statutory provisions make clear, a section 1-1-113 challenge to the certification of a candidate to the presidential primary ballot is meant to be handled on an expedited basis. *See Frazier v. Williams*, 2017 CO 85, ¶ 11, 401 P.3d 541, 544 ("[S]ection 1-1-113 is a summary proceeding designed to quickly resolve challenges brought by electors, candidates, and other designated plaintiffs against state election officials prior to election day."). Indeed, "such proceedings generally move at a breakneck pace." *Id.* It's unsurprising, then, that this court has previously limited the types of claims that can be brought under section 1-1-113 to those "alleging a breach or neglect of duty or other wrongful act *under the Colorado Election Code*." *Id.* at ¶ 10, 401 P.3d at 543 (emphasis added).

¶333 Because section 1-1-113 constitutes a modest grant of power, until today, this court has expressly declined to use that section's reference to "other wrongful act[s]" to expand its scope to include constitutional claims and other claims that do not arise specifically under the Election Code. *Id.* at ¶ 14, 401 P.3d at 544. The "accelerated" nature of a section 1-1-113 proceeding and the limited remedy

34

available in such a proceeding (i.e., an order requiring "substantial compliance with the provisions of [the Election Code]") render the statute incompatible with complex constitutional claims such as the one involved here. *See id.* at ¶¶ 16–18, 401 P.3d at 544–45.

¶334 An examination of the proceedings below highlights why a section 1-1-113 proceeding is a mismatch for a constitutional claim rooted in Section Three. The Electors filed their verified petition on September 6, 2023. The verified petition, far from being a "summary" notice of the alleged impropriety, *see* § 1-4-1204(4), was 105 pages in length. The district court did not hold a hearing within five days as required by section 1-4-1204(4). In fact, the court didn't hold its first status conference until September 18, twelve days after the verified petition was filed.[9] During that status conference, the court set deadlines for initial briefing. The district court gave the parties just four days, or until September 22, to file initial motions to dismiss with briefing on those motions to be completed by October 6. *Cf.* C.R.C.P. 12(b) (allowing twenty-one days from service of the complaint in a civil case to file motions to dismiss). The court also scheduled a five-day hearing to begin on October 30, or roughly eight weeks after the verified petition was filed.

---

[9] I recognize that the case was removed to federal court on September 7, the day after it was filed. But the federal court returned the case to the state court on September 12, six days before the first status conference was held.

That's fifty-four days, which is nearly ten times the amount of time permitted by the Election Code. *See* § 1-4-1204(4) ("No later than five days after the challenge is filed, a hearing must be held . . . .").

¶335 At the next status conference, on September 22, the court set more deadlines, this time related to exhibit lists, expert disclosures, and proposed findings of fact and conclusions of law. With respect to expert disclosures, the court ordered the Electors to provide expert reports by October 6, or twenty-four days before the hearing. *Cf.* C.R.C.P. 26(a)(2)(C)(I) (providing that in a civil case the claiming party's expert disclosures are typically due "at least 126 days (18 weeks) before the trial date"). It ordered President Trump to provide his expert reports no later than October 27, three days before the hearing was to begin. *Cf.* C.R.C.P. 26(a)(2)(C)(II) (stating that a defending party in a civil case is generally not required to provide expert reports "until 98 days (14 weeks) before the trial date"). And even though it was apparent from very early on in these proceedings that the Electors would rely heavily on expert testimony regarding both legal and factual matters to attempt to prove their challenge, the district court did not allow experts to be deposed. *Cf.* C.R.C.P. 26(b)(4)(A) (setting forth the default rule on the deposition of experts in civil cases: "A party may depose any person who has been identified as an expert disclosed pursuant to subsection 26(a)(2) of this Rule whose opinions may be presented at trial."). Instead, the court ordered that expert reports must

be "fulsome" and that experts would not be allowed to testify to anything outside their reports.

¶336 As planned, the hearing began on October 30 and concluded on November 3. The district court gave each side eighteen hours to present its case. The parties presented closing arguments on November 15, and the court issued its final order on November 17, two weeks after the hearing concluded and seventy-two days after the verified petition was filed.

¶337 This was a severe aberration from the deadlines set forth in the Election Code, *see* § 1-4-1204(4), which require a district court to issue its ruling no more than forty-eight hours after the hearing and roughly a week after the verified petition is filed. Despite this clear record, my colleagues in the majority curiously conclude that the district court "substantially compl[ied]" with all the statutory deadlines. Maj. op. ¶ 85. That's simply inaccurate (unless the majority views complete failure as substantial compliance). The majority's reading of the record, while creative, doesn't hold water.

¶338 Given the complexity of the legal and factual issues presented in this case, it's understandable why the district court may have felt that adhering to the deadlines in section 1-4-1204(4) wouldn't allow the parties to adequately litigate the issues. But the district court didn't have the discretion to ignore those statutory deadlines. Section 1-4-1204(4) states that "a hearing *must* be held" no later than

37

five days after a challenge is filed and that the district court "*shall* issue findings of fact and conclusions of law no later than forty-eight hours after the hearing." *See Waddell v. People*, 2020 CO 39, ¶ 16, 462 P.3d 1100, 1106 ("[T]he 'use of the word "shall" in a statute generally indicates [the legislature's] intent for the term to be mandatory.'" (alteration in original) (quoting *People v. Hyde*, 2017 CO 24, ¶ 28, 393 P.3d 962, 969)); *Ryan Ranch Cmty. Ass'n v. Kelley*, 2016 CO 65, ¶ 42, 380 P.3d 137, 146 (noting that "shall" and "must" both "connote[] a mandatory requirement").

¶339 Rather than recognize that the Section Three challenge brought by the Electors was a square constitutional peg that could not be jammed into our Election Code's round hole, the district court forged ahead and improvised as it went along, changing the statutory deadlines on the fly as if they were mere suggestions. If, as the majority liberally proclaims, sections 1-1-113 and 1-4-1204(4) provide such a "robust vehicle" for handling the constitutional claim brought here, Maj. op. ¶ 86, why didn't the district court just drive it? Why, instead, did the district court feel compelled to rebuild such a "robust vehicle" by modifying the procedural provisions of the Election Code? I submit that, in reality, while sections 1-1-113 and 1-4-1204(4) are plenty adequate to handle ordinary challenges arising under the Election Code, they did not measure up to the task of addressing the Electors' Section Three claim. The result was a proceeding that was neither the

38

"summary proceeding" envisioned by section 1-1-113 nor a full-blown trial; rather, it was a procedural Frankenstein created by stitching together fragments from sections 1-1-113 and 1-4-1204(4) and remnants of traditional civil trial practice.

¶340 Even with the unauthorized statutory alterations made by the district court, the aggressive deadlines and procedures used nevertheless stripped the proceedings of many basic protections that normally accompany a civil trial, never mind a criminal trial. There was no basic discovery, no ability to subpoena documents and compel witnesses, no workable timeframes to adequately investigate and develop defenses, and no final resolution of many legal issues affecting the court's power to decide the Electors' claim before the hearing on the merits.

¶341 There was no fair trial either: President Trump was not offered the opportunity to request a jury of his peers; experts opined about some of the facts surrounding the January 6 incident and theorized about the law, including as it relates to the interpretation and application of the Fourteenth Amendment generally and Section Three specifically; and the court received and considered a partial congressional report, the admissibility of which is not beyond reproach.

¶342 I have been involved in the justice system for thirty-three years now, and what took place here doesn't resemble anything I've seen in a courtroom. In my experience, in our adversarial system of justice, parties are always allowed to

conduct discovery, subpoena documents and compel witnesses, and adequately prepare for trial, and experts are never permitted to usurp the role of the judge by opining on how the law should be interpreted and applied.

¶343 The majority tries to excuse the due process shortcomings I have discussed by noting that section 1-1-113 proceedings "move quickly out of necessity" because "[l]ooming elections trigger a cascade of deadlines . . . that cannot accommodate protracted litigation schedules, particularly when the dispute concerns a candidate's access to the ballot." Maj. op. ¶ 81. But that's exactly my point. The necessarily expedited nature of section 1-1-113 proceedings is precisely why the Electors should not have been allowed to piggyback a Section Three claim—an admittedly complex constitutional claim—on their Election Code claim in the first place. In any event, the majority's acknowledgement that section 1-1-113 proceedings "cannot accommodate protracted litigation" seems to directly contradict its determination that the Election Code endowed the district court with the "flexibility" to adequately accommodate the needs of this complex litigation. *Id.* at ¶¶ 81, 85.[10] The majority can't have its cake and eat it too.

_____

[10] Even if the majority were correct about the district court's "flexibility" to accommodate a constitutional claim, the "limit[ed] appellate review" available under the letter of section 1-1-113 further demonstrates why the Election Code is not an appropriate avenue for the prosecution of a Section Three claim. *Frazier*, ¶ 18, 401 P.3d at 545. This court has the sole discretion to review section 1-1-113 proceedings, § 1-1-113(3); § 1-4-1204(4), so, whenever we decline such review, "the

¶344 The irregularity of these proceedings is particularly troubling given the stakes. The Electors ask us to hold that President Trump engaged in insurrection and is thus disqualified from being placed on the ballot for this upcoming presidential primary.[11]

¶345 Today's decision will have sweeping consequences beyond just this election. The majority's ruling that President Trump is disqualified under Section Three means that he can never again run for a Senate or House of Representatives position, or become an elector, or hold any office (civil or military) under the United States or under any state. In other words, he will be barred from holding any public office, state or federal, for the rest of time. His only possible out is if Congress at some point decides to remove the disqualification through a two-thirds vote by each House (which is no small feat). "A declaration that a person is permanently barred from any future public office raises constitutional issues that simple removal from office does not . . . . The serious nature of any such holding

---

decision of the district court shall be final and not subject to further appellate review," *Frazier*, ¶ 18, 401 P.3d at 545 (quoting § 1-1-113(3)). Imagine, then, if we had declined to review the instant matter. Alarmingly, the adjudication of *federal* constitutional provisions, disqualifying President Trump from office, would have met its road's end in state district court. How can this court give its imprimatur to such an inverted conception of the supremacy doctrine? I, for one, cannot.

[11] This same ask has been made of other courts based on their state election codes. *See, e.g.*, *Trump v. Benson*, No. 23-00151-MZ (Mich. Ct. Cl. Nov. 14, 2023); *Growe v. Simon*, 997 N.W.2d 81 (Minn. 2023). Ours is the first to take the bait.

demands that the rules of procedural due process be complied with strictly."

*Bohannan v. Arizona ex rel Smith*, 389 U.S. 1, 4 (1967) (Douglas, J., dissenting).

¶346 There was no strict compliance with procedural due process here. How is this result fair? And how can we expect Coloradans to embrace this outcome as fair?

¶347 I cannot agree with the majority that the chimeric proceedings below gave President Trump process commensurate to the interest of which he has been deprived. Nor did the proceedings below protect the interest Coloradans have in voting for a candidate of their choosing. Of course, if President Trump committed a heinous act worthy of disqualification, he should be disqualified for the sake of protecting our hallowed democratic system, regardless of whether citizens may wish to vote for him in Colorado. But such a determination must follow the appropriate procedural avenues. Absent adequate due process, it is improper for our state to bar him from holding public office.

¶348 More broadly, I am disturbed about the potential chaos wrought by an imprudent, unconstitutional, and standardless system in which each state gets to adjudicate Section Three disqualification cases on an ad hoc basis. Surely, this enlargement of state power is antithetical to the framers' intent.

## II. Conclusion

¶349    In the first American Declaration of Rights in 1776, George Mason wrote that "no free government, nor the blessings of liberty, can be preserved to any people, but by . . . the recognition by all citizens that they have . . . rights, and that such rights cannot be enjoyed save in a society where law is respected and due process is observed."  Va. Const. art. I, § 15.  Some two and a half centuries later, those words still ring true.  In 2023, just as in 1776, all, including those people who may have committed horrendous acts, are entitled to procedural due process.

¶350    Because I cannot in good conscience join my colleagues in the majority in ruling that Section Three is self-executing and that the expedited procedures in our Election Code afforded President Trump adequate due process of law, I respectfully dissent.  Given the current absence of federal legislation to enforce Section Three, and given that President Trump has not been charged pursuant to section 2383, the district court should have granted his September 29 motion to dismiss.  It erred in not doing so.  I would therefore affirm its judgment on other grounds.

JUSTICE BERKENKOTTER dissenting.

¶351 Today, the majority holds that former President Donald J. Trump ("President Trump") cannot be certified to Colorado's presidential primary ballot. Maj. op. ¶ 5. He is, the majority concludes, disqualified from being President of the United States again because he, as an officer of the United States, took an oath to support the Constitution and thereafter engaged in insurrection. *See* U.S. Const. amend. XIV, § 3[1]; Maj. op. ¶¶ 4–5. In reaching this conclusion, the majority determines as an initial matter that a group of Colorado Republican and unaffiliated electors eligible to vote in the Republican presidential primary ("the Electors") asserted a proper claim for relief under Colorado's Election Code ("Election Code"). *See* §§ 1-1-101 to 1-13-804, C.R.S. (2023); Maj. op. ¶ 57.

---

[1] Section Three of the Fourteenth Amendment is a Civil War era amendment to the United States Constitution that was ratified in 1868. Its aim was to prohibit loyalists to the confederacy who had taken an oath to support the Constitution from taking various state and federal offices. It provides:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

1

¶352 I write separately to dissent because I disagree with the majority's initial conclusion that the Election Code—as currently written—authorizes Colorado courts to decide whether a presidential primary candidate is disqualified under Section Three of the Fourteenth Amendment to the U.S. Constitution ("Section Three") from being listed on Colorado's presidential primary ballot. Maj. op. ¶¶ 62–63, 66. In my view, the majority construes the court's authority too broadly. Its approach overlooks some of part 12 of the Election Code's plain language and is at odds with the historical application of section 1-1-113, C.R.S. (2023), which up until now has been limited to challenges involving relatively straightforward issues, like whether a candidate meets a residency requirement for a school board election. Plus, the majority's approach seems to have no discernible limits.

¶353 To explain why the majority—to my mind—is wrong, first, I explain the process for challenging the listing of a candidate on the presidential primary ballot in Colorado and describe sections 1-1-113 and 1-4-1204(4), C.R.S. (2023), since those sections of the Election Code define the scope of the district court's authority to hear the case below. Then, I lay out the procedural history of this case. After that, I turn to the question of whether the district court erred in interpreting these two statutes and consider the majority's analysis with respect to each. In doing so, I conclude that the General Assembly has not granted courts the authority the

2

district court exercised in this case and that the court, accordingly, erred in denying President Trump's motion to dismiss.

## I. The Process for Challenging the Listing of a Candidate on the Presidential Primary Ballot in Colorado

¶354 Part 12 of the Election Code charges Jena Griswold, in her official capacity as Colorado's Secretary of State ("the Secretary"), with certifying the names and party affiliations of the candidates to be placed on presidential primary ballots no later than sixty days before the presidential primary election. *See* § 1-4-1204(1). Section 1-4-1204(4) details the process through which an eligible petitioner can challenge a candidate's listing on the presidential primary ballot. It states:

> Any challenge to the listing of any candidate on the presidential primary election ballot must be made in writing and filed with the district court in accordance with section 1-1-113(1) no later than five days after the filing deadline for candidates. Any such challenge must provide notice in a summary manner of an alleged impropriety that gives rise to the complaint. No later than five days after the challenge is filed, a hearing must be held at which time the district court shall hear the challenge and assess the validity of all alleged improprieties. The district court shall issue findings of fact and conclusions of law no later than forty-eight hours after the hearing. The party filing the challenge has the burden to sustain the challenge by a preponderance of the evidence. Any order entered by the district court may be reviewed in accordance with section 1-1-113(3).

§ 1-4-1204(4).

¶355 Section 1-1-113 is Colorado's fast-track procedural process under the Election Code that allows candidates; political parties; individuals who have made nominations; and, as pertinent here, eligible electors to file section 1-4-1204(4) and

3

other challenges in court, alleging that the Secretary or one of Colorado's sixty-four county clerks and recorders has committed or is about to commit a breach or neglect of duty or other wrongful act. It provides:

> When any controversy arises between any official charged with any duty or function under this code and any candidate, or any officers or representatives of a political party, or any persons who have made nominations or *when any eligible elector files a verified petition in a district court of competent jurisdiction alleging that a person charged with a duty under this code has committed or is about to commit a breach or neglect of duty or other wrongful act*, after notice to the official which includes an opportunity to be heard, upon a finding of good cause, the district court shall issue an order requiring substantial compliance with the provisions of this code. The order shall require the person charged to forthwith perform the duty or to desist from the wrongful act or to forthwith show cause why the order should not be obeyed. The burden of proof is on the petitioner.

§ 1-1-113(1) (emphasis added).

## II. Procedural History

### A. The Electors' Petition

¶356 On September 6, 2023, the Electors sued the Secretary under sections 1-1-113 and 1-4-1204(4) of the Election Code, alleging that the Secretary certifying President Trump to the primary ballot would constitute an "impropriety" under section 1-4-1204(4), and thus a "breach or neglect of duty or other wrongful act" under section 1-1-113(1) because Section Three—which disqualifies insurrectionists from holding office—prohibits him from being listed. The Secretary's "breach or neglect of duty or other wrongful act," the Electors argued,

4

authorized the district court to "issue an order requiring" the Secretary to "substantial[ly] compl[y]" with the Election Code by not certifying President Trump to the ballot. *See* § 1-1-113(1).

## B. The Parties' Arguments in the District Court

¶357 Before trial, President Trump moved to dismiss the Electors' complaint. He argued that the court's authority to determine a claim under section 1-4-1204(4) is limited to the three criteria explicitly identified in section 1-4-1204(1)(b) and (c), which provide that the only candidates whose names shall be placed on the ballots for election are those who:

> (b) Are seeking the nomination for president of a political party as a bona fide candidate for president of the United States pursuant to political party rules and are affiliated with a major political party that received at least twenty percent of the votes cast by eligible electors in Colorado at the last presidential election; and

> (c) Have submitted to the secretary, not later than eighty-five days before the date of the presidential primary election, a notarized candidate's statement of intent together with either a nonrefundable filing fee of five hundred dollars or a petition signed by at least five thousand eligible electors affiliated with the candidate's political party who reside in the state. Candidate petitions must meet the requirements of parts 8 and 9 of this article 4, as applicable.

¶358 President Trump acknowledged that the Secretary's "Major Candidates Statement of Intent" form requires a candidate to affirm that they meet the three

5

qualifications set forth in Article II of the U.S. Constitution,[2] but emphasized that the form says nothing about Section Three. Thus, he urged the court to adopt a very narrow reading of section 1-4-1204(4): So long as a party candidate (1) is a bona fide presidential candidate; (2) timely submits a notarized statement of intent affirming that they meet the three Article II qualifications; and (3) pays the $500 fee, the Secretary must certify the candidate to the presidential primary ballot, thus fulfilling her duty under the Election Code.

¶359 Challenges based on anything other than those three criteria, including but not limited to a Section Three challenge, President Trump asserted in his motion, fall outside the court's authority to decide and fail to state a proper claim for relief under sections 1-4-1204(4) and 1-1-113. Any such claim, he posited, must be dismissed.

¶360 The Electors countered in their response to the motion to dismiss that section 1-4-1204(4) must be read in conjunction with the other provisions of the Election Code, including, specifically, section 1-4-1201, C.R.S. (2023), which states

---

[2] Article II, Section 1, Clause 5 of the U.S. Constitution states:

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

that "it is the intent of the People of the State of Colorado that the provisions of this part 12 conform to the requirements of *federal law* and national political party rules governing presidential primary elections . . . ." § 1-4-1201 (emphasis added).

¶361 The Electors also pointed to section 1-4-1203(2)(a), C.R.S. (2023), which states:

> Except as provided for in subsection (5) of this section, each political party that has a *qualified candidate* entitled to participate in the presidential primary election pursuant to this section is entitled to participate in the Colorado presidential primary election. At the presidential primary election, an elector that is affiliated with a political party may vote only for a candidate of that political party.

(Emphasis added.) And they leaned on section 1-4-1203(3), which provides, in part, that the Secretary and county clerk and recorders have "the same powers and shall perform the same duties for presidential primary elections as they provide by law for other primary elections and general elections." Based on this section, they argued that, in all "other primary elections and general elections," only candidates who meet all the qualifications to hold office may access the ballot. Finally, the Electors emphasized the text of section 1-4-1204(4), which allows for "*[a]ny challenge to the listing of any candidate*" and directs the district court to assess the validity of "*all alleged improprieties.*" (Emphases added.) In the Electors' view, part 12 of the Election Code, when read as a whole, necessarily encompasses challenges under Section Three.

## C. The District Court's Final Order

¶362    In its final order, the district court rejected President Trump's argument in his motion to dismiss that the Electors failed to state a proper claim under sections 1-4-1204(4) and 1-1-113. *Anderson v. Griswold*, No. 23CV32577, ¶ 224 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023). It concluded that the Secretary lacked the authority under the Election Code to *investigate and determine* presidential primary candidate qualifications. *Id.* at ¶ 216. It then turned to whether it had the authority to adjudicate the Electors' complaint. *Id.* at ¶ 217. The court considered three cases in which this court concluded that the Election Code requires courts—not election officials—to determine candidate eligibility. *Id.* at ¶¶ 219–21; *see Hanlen v. Gessler*, 2014 CO 24, ¶ 40, 333 P.3d 41, 50 (holding that the Secretary exceeded his authority by passing a rule that permitted election officials to determine whether a candidate appearing on the state ballot was not qualified for office because "the election code requires a court, not an election official, to determine the issue of eligibility"); *Carson v. Reiner*, 2016 CO 38, ¶ 8, 370 P.3d 1137, 1139 ("[W]hen read as a whole, the statutory scheme evidences an intent that challenges to the qualifications of a candidate be resolved only by the courts . . . ."); *Kuhn v. Williams*, 2018 CO 30M, ¶ 40, 418 P.3d 478, 485 (per curiam) (a court may review the validity of a challenged candidate-nomination petition and consider extrinsic evidence in doing so). The district court found particularly instructive

8

this court's conclusion in *Kuhn* that a challenger could "present evidence demonstrating that a petition actually fails to comply with the Election Code, even if it 'appear[ed] to be sufficient' in a paper review." ¶ 39, 418 P.3d at 485; *Anderson*, ¶ 219.

¶363 The court then interpreted two provisions of the Election Code to implicitly incorporate Section Three, which it concluded grants courts broad authority to review, through section 1-1-113's expedited procedures, whether a candidate is disqualified as an insurrectionist. *Anderson*, ¶¶ 222, 224. Specifically, the court interpreted the language in section 1-4-1201 stating that the provisions of part 12 of the Election Code are intended to "conform to the requirements of federal law" as incorporating the entire U.S. Constitution, including Section Three. *Anderson*, ¶ 222. And the court noted that section 1-4-1203(2)(a) provides that only political parties that have a "qualified candidate" are entitled to participate in the presidential primary process. *Anderson*, ¶ 222. Relying on these provisions, the court held that, while the Secretary is not empowered to investigate and adjudicate a candidate's potential disability under Section Three, courts are not so constrained. *Id.* at ¶ 224.

## D. The Majority's Opinion

¶364 The majority also appears to construe part 12 very broadly. In sum, its view is that section 1-4-1201's reference to "federal law" speaks to the General

Assembly's intent, that section 1-4-1203(2)(a) limits participation in the presidential primary to "qualified" candidates, and that certification of a candidate who is not "qualified" thus constitutes a "wrongful act" within the scope of section 1-1-113. Maj. op. ¶¶ 36–37, 62–64. The majority draws on other provisions of the Election Code to inform the meaning of the term "qualified candidate." *Id.* at ¶¶ 37, 62 (citing § 1-4-1205, C.R.S. (2023) (requiring presidential primary write-in candidates to file a "notarized . . . statement of intent"); § 1-4-1101(1), C.R.S. (2023) (a write-in candidate's "affidavit of intent" must affirm that the candidate "desires the office and is qualified to assume its duties if elected"); § 1-4-1203(5) (when every party has no more than one certified candidate, whether party-nominated or write-in, the Secretary may cancel the presidential primary for all parties and declare the sole candidate the winner)). According to the majority, these provisions suggest that major party candidates—who are also required to submit a statement of intent—must also be "qualified to assume [the office's] duties if elected." *Id.* at ¶ 62; *see* § 1-4-1101(1).

¶365 Read as a whole, the majority thus interprets the Election Code to provide that a major party candidate in a presidential primary must, at a minimum, be qualified to hold the Office of President under the U.S. Constitution. Maj. op. ¶ 63. As such, it concludes that the General Assembly, through the Election Code, granted courts broad authority to determine presidential primary candidates'

10

constitutional eligibility, including eligibility under Section Three. *Id.* at ¶¶ 60–62, 65–66. In the majority's view, a reading of the Election Code that constrains courts from considering a candidate's constitutional qualifications would produce a result "contrary to the purpose of the Election Code." *Id.* at ¶ 64.

## III. The Electors Failed to State a Cognizable Claim for Relief

¶366 Sections 1-4-1204(4) and 1-1-113 frame the threshold question this court must address before turning to the merits of the parties' appeal: Did the General Assembly intend to grant Colorado courts the authority to decide Section Three challenges? Based on my reading of sections 1-4-1204(4), 1-4-1201, and 1-4-1203(2)(a), I conclude that the answer to this question is no. As a result, I conclude that the Electors have not stated a cognizable claim for relief and their complaint should have been dismissed.

### A. Section 1-4-1204(4) Allows for a Broad, but Not Unlimited, Range of Claims for Relief

¶367 As an initial matter, I acknowledge that the language in section 1-4-1204(4) is fairly broad insofar as it allows expedited challenges to the listing of any candidate on the presidential primary election ballot based on "alleged improprieties." And I agree with the majority that "section 1-1-113 'clearly comprehends challenges to a broad range of wrongful acts committed by officials charged with duties under the code,'" Maj. op. ¶ 61 (quoting *Carson*, ¶ 17, 370 P.3d at 1141), "including any act that is 'inconsistent with the Election Code,'" *id.*

11

(quoting *Frazier v. Williams*, 2017 CO 85, ¶ 16, 401 P.3d 541, 545). I also agree with the majority that a "wrongful act" is "more expansive than a 'breach' or 'neglect of duty.'" *Id.* (quoting *Frazier*, ¶ 16, 401 P.3d at 545).

¶368 But this language can only do so much. As we also held in *Frazier*, "other wrongful act" is limited to acts that are wrongful under the Election Code. ¶ 16, 401 P.3d at 545. We have also emphasized that section 1-1-113 is a *summary* proceeding designed to quickly resolve challenges brought by designated plaintiffs against state election officials prior to election day. *Id.* Indeed, past cases decided by this court reflect the generally straightforward nature of the cases filed under section 1-1-113, the lion's share of which involved disputes over state or local election residency or signature requirements. *See, e.g.*, *Griswold v. Ferrigno Warren*, 2020 CO 34, ¶ 15, 462 P.3d 1081, 1084 (deciding whether the Election Code's minimum signature requirement mandates substantial compliance and whether a U.S. Senate candidate satisfied that standard); *Kuhn*, ¶¶ 1–6, 418 P.3d at 480–81 (deciding whether a non-resident signature circulator could legally collect signatures for a candidate's petition); *Frazier*, ¶ 1, 401 P.3d at 542 (considering whether the Secretary improperly invalidated signatures included on a U.S. Senate candidate's petition to appear on the primary election ballot); *Carson*, ¶ 21, 370 P.3d at 1142 (considering whether a challenge to a candidate's qualifications

based on their residency was permitted after the Secretary certified the candidate to the ballot).

¶369 Don't get me wrong, the almost 450 entries in the district court register of actions in the two months and eleven days between September 6, 2023, the date on which the petition was filed, and November 17, 2023, the date on which the district court issued its 102-page final order, illustrate the extraordinary effort that the attorneys and the district court dedicated to this case. But that effort also proves too much. The deadlines under the statute were not met, nor could they have been. Setting aside the factual questions, an insurrection challenge is necessarily going to involve complex legal questions of the type that no district court—no matter how hard working—could resolve in a summary proceeding.

¶370 And that's to say nothing of the appellate deadline. Three days to appeal a district court's order regarding a challenge to a candidate's age? Sure. But a challenge to whether a former President engaged in insurrection by inciting a mob to breach the Capitol and prevent the peaceful transfer of power? I am not convinced this is what the General Assembly had in mind.

¶371 The various provisions of the Election Code on which the district court and the majority rely to suggest otherwise do not persuade me either.

## B. The Term "Federal Law" Does Not Support a Broad Grant of Authority to Colorado Courts to Enforce Section Three

¶372 The district court relied on the declaration of intent in part 12. *Anderson*, ¶ 222. It explains the intent of the People of the State of Colorado in the context of presidential primary elections. It provides: "In recreating and reenacting this part 12, it is the intent of the People of the State of Colorado that the provisions of this part 12 conform to the requirements of *federal law* and national political party rules governing presidential primary elections . . . ." § 1-4-1201 (emphasis added).[3] In adopting a broad view of section 1-4-1204(4)'s reach, the court assumed that the term "federal law," as used in this section, refers to the entire U.S. Constitution, including Section Three. *Anderson*, ¶¶ 222–24.

¶373 The majority also leans on this reference to "federal law" in section 1-4-1201, though more obliquely, suggesting it means the General Assembly intended for part 12 to operate "in harmony" with federal law. Maj. op. ¶ 36. I am not persuaded.

---

[3] As Professor Muller notes in his amicus brief, "A postpositive modifier like ['governing presidential primary elections'] attaches to both 'federal law' and 'national political party rules.'" Brief for Professor Derek T. Muller as Amicus Curiae Supporting Neither Party. Hence, the term "federal law" is properly understood not as a standalone term but as only relating to presidential primary elections.

14

¶374    In my view, the term "federal law" is ambiguous at best. A brief dive into the history of part 12 explains why. *See McCoy v. People*, 2019 CO 44, ¶ 38, 442 P.3d 379, 389 ("If, however, the statute is ambiguous, then we may consider other aids to statutory construction, including the consequences of a given construction, the end to be achieved by the statute, and the statute's legislative history.").

¶375    Part 12 was enacted as part of the return to a primary system in Colorado. *See* § 1-4-1102, C.R.S. (1990) (governing Colorado's presidential primary system in the 1990s). From 2002 to 2016, presidential candidates were selected through a closed party caucus system. But in 2016, after "Colorado voters experienced disenfranchisement and profound disappointment with the state's [caucus] system," voters considered Proposition 107, which promised to restore presidential primary elections in Colorado, with one significant change—unlike prior iterations of its primary system, beginning in 2020, Colorado would host open presidential primaries, allowing unaffiliated voters to participate in these primary elections. *See* Proposition 107, § 1, https:// www.sos.state.co.us/pubs/ elections/Initiatives/titleBoard/filings/2015-2016/140Final.pdf [https:// perma.cc/2GA9-ZY7U] (noting that "restor[ing] [Colorado's] presidential primary" to an open primary system would enable the "35% of Colorado voters who are independent of a party" to "participat[e] in the presidential nomination

15

process," and "encourage candidates who are responsive to the viewpoints of more Coloradans").

¶376 When Proposition 107 passed, the General Assembly amended the Election Code and adopted part 12 to formally re-introduce the presidential primary process. Nothing in this history indicates that one of the concerns animating either the proponents of Proposition 107 or the General Assembly was a need to challenge, through the courts, issues concerning candidates' constitutional disqualifications. In fact, the language in the current version of section 1-4-1201 mostly mirrors the 1990 version of part 12 (then, part 11): "It is the intent of the general assembly that the provisions of this part 11 *conform to the requirements of federal law and national political parties for presidential primary elections*." § 1-4-1104(3), C.R.S. (1990) (emphasis added).

¶377 There is some history surrounding Proposition 107 and part 12 which suggests that proponents of this new open presidential primary system were concerned about one specific constitutional issue: a potential First Amendment challenge to the new law based on political parties' private right of association. *See Independent Voters*, Denver Metro Chamber of Com., https://denverchamber.org/policy/policy-independent-voters-white-paper/ [https://perma.cc/T2TT-A2UD] (The Denver Chamber of Commerce, which launched Proposition 107, noted that a semi-open primary system, because it would permit

16

unaffiliated voters to affiliate with the Republican or Democratic parties in a presidential primary, could face legal challenges based on parties' First Amendment rights of association.); *see also* Christopher Jackson, *Colorado Election Law Update*, 46-SEP Colo. Law. 52, 53 (2017) (noting that the law was likely crafted in a manner designed to "stave off a First Amendment challenge" given the U.S. Supreme Court's 2000 decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), which struck down California's "blanket primary" law).

¶378 Curiously, the earlier version of the statute required the Secretary to provide a "written report" to the General Assembly "concerning whether the provisions of this part 11 conform to the requirements of federal law and national political party rules for presidential primary elections[,]" and provided that "the general assembly shall make such reasonable changes to this part 11 as are necessary to conform to federal law and national political parties' rules." § 1-4-1104(3), C.R.S. (1990). It is unclear if those reports were intended to speak to potential First Amendment concerns or some other issue, as any reports that may have been submitted to the General Assembly appear to have been lost to the sands of time (or, according to the State Archivist's Office, possibly a flood).

¶379 At bottom, this legislative history does little to illuminate what the 2016 General Assembly meant by this language in section 1-4-1201. What this history does show, however, is that the term "federal law" is most certainly not an

17

affirmative grant of authority to state courts to enforce Section Three in expedited proceedings under the Election Code.

## C. The Term "Qualified Candidate" Does Not Support a Broad Grant of Authority to Colorado Courts

¶380 The other principal support for the district court's broad interpretation of section 1-4-1204(4) rests on the term "qualified candidate." The majority relies heavily on this language as well. Maj. op. ¶¶ 37, 62–64.

¶381 To understand the meaning of this term, it is critical to consider it in its full context. Recall, it states:

> Except as provided for in subsection (5) of this section, each political party that has a *qualified candidate* entitled to participate in the presidential primary election *pursuant to this section* is entitled to participate in the Colorado presidential primary election. At the presidential primary election, an elector that is affiliated with a political party may vote only for a candidate of that political party.

§ 1-4-1203(2)(a) (emphases added).

¶382 The district court construed this section expansively. It looked to the term "qualified candidate" as evidence of the General Assembly's intent to grant the court authority to determine if President Trump was disqualified under Section Three. The district court, like the Electors, appears to have read section 1-4-1203(2)(a) like a syllogism, such that if (1) participation in the presidential primary is limited to *qualified candidates*, and if (2) Section Three disqualifies insurrectionists, then (3) a court may appropriately consider a

18

Section Three challenge. But that is not what the statute says. Rather, it provides: "[E]ach political party that has a *qualified candidate* entitled to participate in the presidential primary election *pursuant to this section* is entitled to participate in the Colorado presidential primary election." *Id.* (emphases added).

¶383 Section 1-4-1203(2)(a) addresses when and how presidential primary elections are conducted. It does not prescribe additional qualifications through its use of the term "qualified candidate." *See People ex rel. Rein v. Meagher*, 2020 CO 56, ¶ 22, 465 P.3d 554, 560 ("[W]e do not add words to or subtract words from a statute."). Nor can it be read, given the fact that the term is explicitly tethered to subsection 1203, as expanding the criteria outlined in section 1-4-1204(1)(b) and (c): A candidate is eligible to be certified to the ballot by (1) being a bona fide candidate for president; (2) submitting a notarized candidate's statement of intent, and (3) paying the $500 filing fee or submitting a valid write-in petition. *See* § 1-4-1204(1)(b), (c).

¶384 It is significant, as well, that this part of the statute describes when a *political party* can participate in a presidential primary election. The consequence for a party that does not have a qualified candidate—that is, a candidate who does not meet the three-part criteria laid out in section 1-4-1204(1)(b) and (c)—is that the party cannot participate in the primary. Considered in context, then, the term

"qualified candidate" does not offer support for an expansive reading of the court's authority to determine a challenge under Section Three.

¶385 The majority takes a slightly different approach. It points to section 1-4-1201's "federal law" declaration and suggests it means that the General Assembly intended part 12 to operate "in harmony" with federal law. Maj. op. ¶ 36. Then, like the district court, it gives great weight to the language in section 1-4-1203(2)(a), which it construes to mean that participation in the presidential primary is limited to "qualified candidates." *Id.* at ¶¶ 37, 62–64. It effectively reads "pursuant to this section" out of the statute by concluding that the phrase "sheds no light on the meaning of 'qualified candidate.'" *Id.* at ¶ 37 n.3 (quoting § 1-4-1203(2)(a)). The majority then asserts that, "[a]s a practical matter, the mechanism through which a presidential primary hopeful attests that he or she is a 'qualified candidate' is the 'statement of intent' (or 'affidavit of intent') filed with the Secretary." *Id.* at ¶ 37 (quoting § 1-4-1204(1)(c)).

¶386 And, it explains, the Secretary's statement of intent for a major party presidential candidate requires the candidate to affirm via checkboxes that the candidate meets the qualifications set forth in Article II of the U.S. Constitution for the Office of President, i.e., that the candidate is at least thirty-five years old, has been a resident of the United States for at least fourteen years, and is a natural-born U.S. citizen. *Id.* at ¶ 38; U.S. Const. art. II, § 1, cl. 5; *Major Party Candidate*

20

*Statement of Intent for Presidential Primary*, Colo. Sec'y of State, https://www.sos.state.co.us/pubs/elections/Candidates/files/MajorPartyCandidateStatementOfIntentForPresidentialPrimary.pdf [https://perma.cc/RY72-ASSD]. As well, the form requires the candidate to sign an affirmation that states: "I intend to run for the office stated above and *solemnly affirm that I meet all qualifications for the office prescribed by law.*" *Major Party Candidate Statement of Intent for Presidential Primary*, *supra*.

¶387 The majority stitches these various parts of the Election Code together to conclude the General Assembly intended to grant state courts the authority to decide Section Three challenges. Maj. op. ¶¶ 36–38, 62. This approach falls short for five reasons.

¶388 First, there is nothing in section 1-4-1201's "federal law" declaration that indicates the General Assembly meant to refer to Section Three. Perhaps the declaration refers to the General Assembly's concern regarding a potential First Amendment right of association challenge to the open primary system created by part 12, perhaps not. The declaration's history is muddy at best.

¶389 Second, the term "qualified candidate" cannot be fairly read to grant Colorado courts authority to adjudicate Section Three disqualification claims. The term is best understood as describing when a political party can participate in the

21

presidential primary process, not as the foundation for a wrongful act claim under section 1-4-1204(4) and section 1-1-113.

¶390 Third, even assuming the General Assembly intended to grant some authority to the courts through its reference to the candidate's statement of intent in the exceptionally roundabout manner suggested by the majority, there is no basis for concluding that authority extends beyond the fairly basic types of Article II challenges that have come before this court in the past, such as those involving a candidate's age, or other challenges like those alleging that petition circulators did not reside in Colorado.

¶391 Fourth, I am not persuaded by the majority's reliance on sections 1-4-1205 and 1-4-1101, which govern the requirements write-in candidates must satisfy before being certified to the ballot. *See* Maj. op. ¶¶ 37, 62. Like major party presidential primary candidates, write-in candidates for the presidential primary must file a "notarized . . . statement of intent" and submit to the Secretary "a nonrefundable fee of five hundred dollars . . . no later than the close of business on the sixty-seventh day before the presidential primary election." § 1-4-1205. Section 1-4-1101(1), which applies to all write-in candidates regardless of office, requires that the write-in candidate confirm "that he or she desires the office and *is qualified to assume its duties if elected.*" (Emphasis added.) According to the majority, "[t]he Election Code's explicit requirement that a write-in candidate be

22

'qualified' to assume the duties of their intended office logically implies that major party candidates under 1-4-1204(1)(b) must be 'qualified' in the same manner." Maj. op. ¶ 62.

¶392   It is true that both major party candidates and write-in candidates must fill out statement of intent forms, and that the forms are similar in some respects.  But, if anything, the General Assembly's decision to include a specific qualification provision for write-in candidates shows that when it wants to include an explicit qualifications requirement, like the one in section 1-4-1101(1), it knows how to do so.  *See People v. Diaz*, 2015 CO 28, ¶ 15, 347 P.3d 621, 625 ("But, in interpreting a statute, we must accept the General Assembly's choice of language and not add or imply words that simply are not there." (quoting *People v. Benavidez*, 222 P.3d 391, 393–94 (Colo. App. 2009))).

¶393   Fifth and finally, there is the problem that Section Three is a disqualification for office, not a qualification to serve.  As the majority acknowledges, the U.S. Supreme Court has twice declined to address whether Section Three—which is described in the text as a "disability" and is referred to as the Disqualification Clause—amounts to a qualification for office.  *Powell v. McCormack*, 395 U.S. 486, 520 n.41 (1969) (observing that an academic suggested in a law review article in 1968 that the three grounds for disqualification (impeachment, Section Three, and the Congressional incompatibility clause) and two other similar provisions were

23

each no less of a "qualification" than the Article II, Section 5 qualifications); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 787 n.2 (1995) (seeing "no need to resolve" the same question regarding Section Three in a case concerning the propriety of additional qualifications for office); Maj. op. ¶ 65.

¶394 Given the fact that the U.S. Supreme Court has not weighed in on whether Section Three is a qualification for office, it seems all the more important to look for some affirmative expression by the General Assembly of its intent to grant state courts the authority to consider Section Three challenges through Colorado's summary hearing and appeal process under the Election Code. I see no such expression.

## IV. Conclusion

¶395 The Electors' arguments below and before this court are, to my mind, unavailing. Too much of their position rests on text like "federal law" and "qualified candidate" that—on closer examination—does not appear to mean what they say it means because it is taken out of context. In short, these sections do not show an affirmative grant by the General Assembly to state courts to decide Section Three cases through Colorado's summary election challenge process.

¶396 Because it too relied on the provisions of part 12 regarding "federal law" and "qualified candidate," the district court's reasoning suffers from the same shortcomings.

¶397 And, at the end of the day, while the majority's approach charts a new course—one not entirely presented by the parties—its approach has many of the same problems. It stitches together support from the Secretary's general authority to supervise the conduct of primary and other elections, § 1-1-107(1), C.R.S. (2023); the inference that section 1-4-1201's "federal law" declaration means something pertinent to Section Three; part, but not all, of the "qualified candidate" statute, § 1-4-1203(2)(a); inferences from the write-in candidate process statute, § 1-4-1101(1); and the novel suggestion that the General Assembly granted authority to state courts to adjudicate a Section Three challenge by virtue of its reference to the Secretary's statement of intent form in section 1-4-1204(1)(c). *See* Maj. op. ¶¶ 35–37, 62–63.

¶398 I agree with the majority that, if the General Assembly wants to grant state courts the authority to adjudicate Section Three challenges through the Election Code, it can do so. *See* U.S. Const. art. II, § 1, cl. 2 (authorizing states to appoint presidential electors "in such Manner as the Legislature thereof may direct"); *see also Hassan v. Colorado*, 495 F. App'x 947, 948 (10th Cir. 2012) (recognizing that it is "a state's legitimate interest in protecting the integrity and practical functioning of the political process" that "permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office"). I just think it needs to say so.